UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

-------------------------------------------------------------------- x

SECURITIES AND EXCHANGE COMMISSION, :

                 Plaintiff,

            - against -

COHMAD SECURITIES CORPORATION,
MAURICE J. COHN, MARCIA B. COHN, and
ROBERT M. JAFFE,

                Defendants.

-------------------------------------------------------------------- x

No. 09 Civ. 5680 (LLS)

ECF Case

## DEFENDANTS COHMAD SECURITIES CORPORATION, MAURICE J. COHN AND MARCIA B. COHN'S MEMORANDUM OF LAW IN SUPPORT OF THEIR MOTION TO DISMISS

VINSON & ELKINS LLP
Clifford Thau
Steven Paradise
666 Fifth Avenue, 26th Floor
New York, New York 10103
Tel: (212) 237-0000
Fax: (212) 237-0100
cthau@velaw.com
sparadise@velaw.com

*Attorneys for Defendants*
*Cohmad Securities Corporation,*
*Maurice J. Cohn and Marcia B. Cohn*

# TABLE OF CONTENTS

**Page**

TABLE OF CONTENTS .................................................................. i

TABLE OF AUTHORITIES ........................................................ iii

PRELIMINARY STATEMENT ...................................................... 1

BACKGROUND ........................................................................ 5

ARGUMENT ............................................................................ 10

I.     THE MOTION TO DISMISS STANDARD .............................. 10

II.    THE SECTION 10(b) CLAIM SHOULD BE DISMISSED ........................................... 11

      A.     The Complaint Fails to Allege Fraud with Particularity ...................................... 13

      B.     The Complaint Fails to Support a Strong Inference of Scienter .......................... 17

            1.     The Complaint does not adequately allege "motive and opportunity" ..................................................... 17

            2.     The Complaint does not allege particularized facts demonstrating conscious misconduct or reckless disregard for the truth ........................ 18

                  a.     Allegations that Cohmad concealed its relationship with BMIS do not support a strong inference that the Cohmad Defendants knowingly or recklessly furthered a Ponzi scheme .................................................. 20

                  b.     The "red flags" listed in the Complaint do not demonstrate that the Cohmad Defendants were reckless in failing to detect Madoff's fraud ................................. 24

      C.     The 10(b) Claim Should Be Dismissed for Failure to Plead Facts Showing that the Cohmad Defendants' Actions Were "In Connection With" the Purchase or Sale of a Security .......................................... 27

            1.     Cohmad's Role as Introducing Broker Was Always at Least One Step Removed from the Actual Purchase or Sale of Securities ................ 28

            2.     Cohmad's Alleged Filings and Books and Records Violations Were Not in Connection with the Purchase or Sale of a Security ........... 29

| | D. | All Section 10(b) Claims Based on Cohmad's Alleged Failure to Disclose its Relationship with BMIS Should Be Dismissed for Failure to Adequately Plead the Existence of a Duty to Disclose | 30 |

III. THE SECTION 17(a) CLAIMS SHOULD BE DISMISSED ........................................ 32

IV. THE AIDING AND ABETTING CLAIMS IN THE THIRD, FOURTH, FIFTH, AND SEVENTH CLAIMS FOR RELIEF SHOULD BE DISMISSED ........................ 32

    A. The Aiding and Abetting Claims Under Section 10(b) of the Exchange Act and Sections 206(1) and 206(2) of the Investment Advisers Act Should Be Dismissed ........................................................................................................ 34

        1. The Complaint fails to allege actual knowledge of Madoff's fraud ......... 34

        2. The Complaint fails to allege that the Cohmad Defendants substantially assisted Madoff's fraud ....................................................... 35

    B. The Claims for Aiding and Abetting Violations of Section 15(b)(7) of the Exchange Act and Rule 206(4)-3 of the Investment Advisers Act Should Be Dismissed ........................................................................................................ 38

        1. The Rule 15b7-1 claim should be dismissed ........................................... 38

        2. The Rule 206(4)-3 claim should be dismissed ......................................... 40

    C. The SEC Lacks Authority to Impose a Monetary Penalty Under Section 209(e) of the Investment Advisers Act for Aiding and Abetting Violations ........ 41

    D. The Section 15(b)(1) Claim Against Maurice Cohn Should Be Dismissed ......... 42

CONCLUSION ........................................................................................................ 43

# TABLE OF AUTHORITIES

## Cases

*ABF Capital Mgmt. v. Askin Capital Mgmt. L.P.*,
   957 F. Supp. 1308 (S.D.N.Y. 1997) ................................................................ 18

*Abrash v. Fox*,
   805 F. Supp. 206 (S.D.N.Y. 1992) .................................................................. 28

*Antigenics Inc. v. U.S. Bancorp Piper Jaffray, Inc.*,
   No. Civ. 0971 (RCC), 2004 WL 51224 (S.D.N.Y. Jan. 5, 2004) ................... 42

*Armstrong v. McAlpin*,
   699 F.2d 79 (2d Cir. 1983) ............................................................. 32, 36, 39

*Ashcroft v. Iqbal*,
   --- U.S. ---, 129 S. Ct. 1937 (2009) ...................................................... passim

*Basic Inc. v. Levinson*,
   485 U.S. 224 (1988) ...................................................................................... 30

*Bell Atlantic Corp. v. Twombly*,
   550 U.S. 544 (2007) ................................................................................ passim

*BHC Interim Funding, L.P. v. Finantra Capital, Inc.*,
   283 F. Supp. 2d 968 (S.D.N.Y. 2003) ....................................................... 15, 29

*Bloor v. Carro, Spanbock, Londin, Rodman & Fass*,
   754 F.2d 57 (2d Cir. 1985) ........................................................................ 33, 36

*Brass v. Am. Film Techs., Inc.*,
   987 F.2d 142 (2d Cir. 1993) ........................................................................... 5

*Chem. Bank v. Arthur Andersen & Co.*,
   726 F.2d 930 (2d Cir. 1984) .......................................................................... 28

*Cromer Finance Ltd. v. Berger*,
   137 F. Supp. 2d 452 (S.D.N.Y. 2001) ........................................................... 37

*Egervary v. Young*,
   366 F.3d 238 (3d Cir. 2004) .......................................................................... 37

*Fezzani v. Bear, Stearns & Co.*,
   592 F. Supp. 2d 410 (S.D.N.Y. 2008) ........................................................... 37

*Grandon v. Merrill Lynch & Co.*,
   147 F.3d 184 (2d Cir. 1998) ..................................................................... 13, 30

*Harrison v. Rubenstein*,
   No. 02 Civ 9356 (DAB), 2007 WL 582955 (S.D.N.Y. Feb. 26, 2007) ............ 14

*Hart v. Internet Wire, Inc.*,
   145 F. Supp. 2d 360 (S.D.N.Y. 2001) ...................................................... 16, 19

*Hoffman v. UBS-AG,*
    591 F. Supp. 2d 522 (S.D.N.Y. 2008) ............................................................... 31

*IIT v. Cornfeld,*
    619 F.2d 909 (2d Cir. 1980) ............................................................... 34, 39

*In re Bayou Hedge Fund Litig.,*
    534 F. Supp. 2d 405 (S.D.N.Y. 2007),
    *aff'd, S. Cherry St., LLC v. Hennessee Group LLC,*
    573 F.3d 98 (2d Cir. 2009) ............................................................... 19, 20

*In re Bristol-Myers Squibb Sec. Litig.,*
    312 F. Supp. 2d 549 (S.D.N.Y. 2004) ............................................................... 21, 27

*In re Elevator Antitrust Litig.,*
    502 F.3d 47 (2d Cir. 2007) ............................................................... 11

*In re Global Crossing, Ltd. Sec. Litig.,*
    322 F. Supp. 2d 319 (S.D.N.Y. 2004) ............................................................... 12

*In re Morgan Stanley & Van Kampen Mut. Fund Sec. Litig.,*
    No. 03 Civ. 8208 (RO), 2006 WL 1008138 (S.D.N.Y. Apr. 18, 2006) ............................................................... 18

*Kalnit v. Eichler,*
    264 F.3d 131 (2d Cir. 2001) ............................................................... 12, 17, 19, 20

*Kramer v. Time Warner Inc.,*
    937 F.2d 767 (2d Cir.1991) ............................................................... 8

*Levitt v. Bear Stearns & Co.,*
    340 F.3d 94 (2d Cir. 2003) ............................................................... 22

*Leykin v. AT&T Corp.,*
    423 F. Supp. 2d 229 (S.D.N.Y. 2006),
    *aff'd,* 216 F. App'x 14 (2d Cir. 2007) ............................................................... 28

*Morse v. Weingarten,*
    777 F. Supp. 312 (S.D.N.Y. 1991) ............................................................... 28

*Pension Comm. of Univ. of Montreal Pension Plan v. Banc of Am. Sec., LLC,*
    446 F. Supp. 2d 163 (S.D.N.Y. 2006) ............................................................... 29

*Press v. Chem. Inv. Servs. Corp.,*
    166 F.3d 529 (2d Cir. 1999) ............................................................... 30

*Ranco Mgmt. Corp. v. DG Inv. Bank Ltd.,*
    17 F.3d 883 (6th Cir. 1994) ............................................................... 30

*Rich v. Maidstone Fin., Inc.,*
    No. 98 Civ. 2569 (DAB), 2002 WL 31867724 (S.D.N.Y. Dec. 20, 2002) ............................................................... 14

*Rombach v. Chang,*
    355 F.3d 164 (2d Cir. 2004) ............................................................... 12, 23, 42

*Ross v. Bolton,*
    904 F.2d 819 (2d Cir. 1990) ............................................................... 14

*Russello v. United States,*
    464 U.S. 16 (1983) ................................................................41

*Ryan v. Hunton & Williams,*
    No. 99-CV-5938 (JG), 2000 WL 1375265 (E.D.N.Y. Sept. 20, 2000)...........................38

*S. Cherry St., LLC v. Hennessee Group LLC,*
    573 F.3d 98 (2d Cir. 2009)...........................................................19, 20

*Scone Invs., L.P. v. Am. Third Mkt. Corp.,*
    No. 97 CIV. 3802 (SAS), 1998 WL 205338 (S.D.N.Y. Apr. 28, 1998)...........................15

*SEC v. Bolla,*
    550 F. Supp. 2d 54 (D.D.C. 2008)..................................................41

*SEC v. Cedric Kushner Promotions,*
    417 F. Supp. 2d 326 (S.D.N.Y. 2007) ...............................................33

*SEC v. Collins & Aikman Corp.,*
    524 F. Supp. 2d 477 (S.D.N.Y. 2007) ............................................11, 18

*SEC v. Dorozhko,*
    08-0201-cv, 2009 WL 2169201 (2d Cir. July 22, 2009) ...........................12, 30

*SEC v. Espuelas,*
    579 F. Supp. 2d 461 (S.D.N.Y. 2008) .................................20, 33, 34, 35

*SEC v. KPMG LLP,*
    412 F. Supp. 2d 349 (S.D.N.Y. 2006) ...............................................33

*SEC v. Lucent Techs. Inc.,*
    No. Civ. 04-2315 (WHW), 2005 WL 1206841 (D.N.J. May 20, 2005)...........................35

*SEC v. Lyon,*
    529 F. Supp. 2d 444 (S.D.N.Y. 2008) ...............................................11

*SEC v. Monarch Funding Corp.,*
    192 F.3d 295 (2d Cir. 1999)...........................................................12, 13

*SEC v. Pentagon Capital Mgmt. PLC,*
    612 F. Supp. 2d 241 (S.D.N.Y. 2009) ...........................................13, 17, 32

*SEC v. Sandifur,*
    No. C05-1631C, 2006 WL 538210 (W.D. Wash. Mar. 2, 2006)...........................35

*SEC v. Treadway,*
    430 F. Supp. 2d 293 (S.D.N.Y. 2006) ...............................................33

*SEC v. Zandford,*
    535 U.S. 813 (2002) ................................................................28, 29

*Shields v. Citytrust Bancorp, Inc.,*
    25 F.3d 1124 (2d Cir. 1994)...........................................................18

*Sofi Classic S.A. de C.V. v. Hurowitz,*
    444 F. Supp. 2d 231 (S.D.N.Y. 2006) ...............................................16

*Staehr v. Hartford Fin. Servs. Group, Inc.*,
    547 F.3d 406 (2d Cir. 2008).................................................................................7

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*,
    551 U.S. 308 (2007) ...................................................................................17

*Thomas H. Lee Equity Fund V, L.P. v. Mayer Brown, Rowe & Maw LLP*,
    612 F. Supp. 2d 267 (S.D.N.Y. 2009) .............................................14, 15

*UBS Asset Mgmt. (N.Y.), Inc. v. Wood Gundy Corp.*,
    914 F. Supp. 66 (S.D.N.Y. 1996) .........................................12, 15, 19

*United States v. Alvarado*,
    No. 01 CR. 156 (RPP), 2001 WL 1631396 (S.D.N.Y. 2001)............................31

*United States v. Finnerty*,
    533 F.3d 143 (2d Cir. 2008)..........................................................12

*United States v. Skelly*,
    442 F.3d 94 (2d Cir. 2006)..........................................................4, 31

**Rules and Statutes**

15 U.S.C.
    § 80b-9(e)(1) ...................................................................................41

17 C.F.R.
    § 240.10b-5 ...................................................................................28

    § 240.15b3-1 ...................................................................................42

    § 240.15b7-1 ...................................................................................38

    § 275.206(4)-3(a)(2)(iii) ...................................................................................40

Federal Rules of Civil Procedure,
    Rule 8(a)...................................................................................10

    Rule 9(b) ...................................................................................passim

    Rule 10(c)...................................................................................5

    Rule 12(b)(6) ...................................................................................10

**Other Authorities**

Daphna Abrams, Note, *A Second Look at Clearing Firm Liability*,
    67 BROOK. L. REV. 479 (2001)............................................................22

## PRELIMINARY STATEMENT

This case is a misdirected and flawed attempt to use the federal securities laws to sanction Cohmad Securities Corporation ("Cohmad"), Maurice Cohn and his daughter Marcia Cohn (collectively with Cohmad, the "Cohmad Defendants") for their failure to discover that Bernard Madoff, a man with whom they had enjoyed a long personal and professional relationship and who was widely revered on Wall Street, including having served as Chairman of NASDAQ, was secretly perpetrating one of the largest securities frauds in history. But, as has become clear, the defendants were not the only ones who Madoff fooled. Madoff's principal regulators, the United States Securities and Exchange Commission ("SEC") and the Financial Industry Regulatory Authority ("FINRA"), as well as countless numbers of sophisticated financial institutions, individuals, and other market participants, also were unable to discover the fraud Madoff perpetrated for more than twenty years. And for good reason. As recent events revealed, Madoff and his lieutenant went to extreme lengths to ensure that his fraud could not be discovered, and they succeeded in deceiving the SEC, FINRA and thousands of others.

The SEC's Complaint is devoid of facts indicating that the Cohmad Defendants were better informed than the SEC itself or the legions of others who Madoff fooled. Stripped of its conclusory allegations, the Complaint pleads no facts whatsoever indicating that Madoff revealed the fraud to the Cohmad Defendants, or that the Cohmad Defendants knowingly furthered the fraud. It thus fails to satisfy even the basic Rule 8 requirement that a claim be plausible on its face. *See Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007), and *Ashcroft v. Iqbal*, --- U.S. ---, 129 S. Ct. 1937 (2009). Viewed in light of Rule 9(b)'s requirement that fraud claims be pleaded with particularity, the Complaint's dearth of specific factual allegations -- and its resulting failure to state a claim -- is even more striking. The rigorous pleading requirements for securities fraud claims are designed to protect defendants against unsupported allegations of

fraud and the reputational damage such allegations cause. These standards require dismissal of the SEC's vague and factually deficient Complaint.

The Complaint's purported claims are derived from scattered and disjointed allegations concerning the Cohmad Defendants' alleged "stealth marketing" of Bernard L. Madoff Investment Securities Corporation ("BMIS"), purported concealment of Madoff's investment advisory business from regulators, and failure to detect supposed "red flags," which the SEC missed but nonetheless still claims should have alerted the Cohmad Defendants that Madoff's operation was fraudulent. For all its bluster, however, the SEC fails utterly to plead specific facts sufficient to transform its conclusory allegations and legal assertions from mere speculation into a cognizable federal securities claim.

The Complaint's most glaring weakness is its failure even to attempt to identify a particular act, statement or omission by a particular Cohmad Defendant that defrauded any investor. The crux of the Complaint is the claim that the Cohmad Defendants were "engaged in a well-organized marketing operation" whereby they "deceived investors by creating the false impression that investors would be admitted into the Madoff investment only as a special favor." (Compl. ¶ 3). But the SEC admits that Cohmad did not seek out investors for Madoff at all -- rather, investors "angled for ways to get in [to BMIS]," (*id.* ¶ 24), and investors "asked if [Cohmad's] representatives could make an introduction to Madoff so they could invest with BMIS." (*Id.* ¶ 26.) The Cohmad Defendants would oblige these investors' requests by introducing them to a representative from BMIS. If these investors then made their own decision to open an account with BMIS, Cohmad would receive a fee for that introduction, which is a common practice on Wall Street and certainly not something inherently suspicious. Stripped of speculation and innuendo, the Complaint fails to identify a single false statement or fraudulent

act by a Cohmad Defendant to a BMIS investor. This striking lack of particularity flies in the face of Rule 9(b) and requires dismissal of the vast majority of the Complaint.

In addition, the SEC does not even attempt to plead that the Cohmad Defendants had actual knowledge of Madoff's fraud. Instead, the Complaint alleges that the Cohmad Defendants were reckless in not knowing about Madoff's fraud based on a number of purported "red flags." But the purported "red flags" the Complaint identifies, such as Madoff's interest in securing new investors or that Cohmad's fees were based on the amount of an initial investment in BMIS (Compl. ¶¶ 53, 55), are completely consistent with business practices in the securities industry, where hedge funds routinely pay fees for introductions to investors. Moreover, the allegations that Cohmad sought to conceal the existence of BMIS's investment advisory business are internally contradictory: the SEC admits that Cohmad routinely disclosed in its regulatory filings its business relationship with BMIS and the full amount of all fees received from it, but alleges concealment based on Cohmad's description of these fees in its filings as "brokerage service fees" or "fees for account supervision, investment advisory and administrative services." (*Id.* ¶¶ 42, 43.) The SEC fails to plead a single fact to show that the Cohmad Defendants intended to deceive anyone by using the descriptions "account service fees" and "fees for account supervision" in Cohmad's filings.

The Complaint also fails to demonstrate that any of the activity it attributes to the Cohmad Defendants took place "in connection with" the purchase or sale of a security. BMIS's purchases and sales of securities -- which turned out to be entirely fraudulent -- took place well after the alleged "introductions" to Madoff requested of Cohmad by investors. The Complaint does not even allege that after investors achieved their objective of meeting who the SEC itself

describes as "the great Madoff" (*id.* ¶ 2), Cohmad played any role in any investment decisions or in any actual securities transaction between BMIS and investors.

Further, to the extent the Complaint predicates liability on the Cohmad Defendants' purported failure to disclose their relationship with, or fees received from, BMIS, such claim should be dismissed because the Complaint does not -- and cannot -- plead that the Cohmad Defendants had any legal obligation to disclose this information. At most, the role the Cohmad Defendants played was akin to that of a middleman, and the Second Circuit has held that a middleman is under no obligation to disclose incentive compensation he receives. *United States v. Skelly*, 442 F.3d 94 (2d Cir. 2006).

For all these reasons, and as discussed further below, the SEC has failed to plead a direct securities fraud claim against the Cohmad Defendants under section 10(b) of the Exchange Act or section 17(a) of the Securities Act. For similar reasons, the Complaint also fails to state a claim for aiding and abetting liability. The Complaint does not even attempt to plead facts showing that the Cohmad Defendants had "actual knowledge" of Madoff's primary violations, and the aiding and abetting claims should be dismissed for that reason alone. The Complaint also lacks specific facts showing that the Cohmad Defendants "substantially assisted" Madoff's violations. The SEC appears to claim that the Cohmad Defendants assisted Madoff's fraud by concealing his investment advisory business from meaningful inspection or examination. But the SEC makes this claim despite articles appearing as early as 2001 in *Barron's* and *MAR/Hedge*, widely reporting that Madoff was managing approximately $6 billion of investors' money. Moreover, the SEC's own audit examinations of BMIS failed to reveal Madoff's fraud, or even that he was acting as an unregistered investment adviser until 2006, when an SEC action resulted in BMIS registering as an investment adviser. Even after registering as an investment

4

adviser, however, Madoff succeeded in perpetrating his fraud for over two more years before he turned himself in. Not only does Madoff's remarkable success at concealing his fraud render more specious the suggestion that Cohmad's regulatory filings prevented the SEC from uncovering this fraud, it casts crippling doubt on the lynchpin of the SEC's claims in this lawsuit -- the spurious notion that the Cohmad Defendants somehow should have known about Madoff's Ponzi scheme when nobody else did.

*       *       *

Madoff's criminal fraud has engendered great emotion and cries for vengeance. Because of the Cohmad Defendants' relationship with Madoff, the SEC has engaged in a "rush to judgment," and filed a legally deficient Complaint. The Complaint improperly seeks to hold the Cohmad Defendants responsible for Madoff's crimes based on a "guilt by association" theory. But as demonstrated below, a dispassionate application of both the law governing the pleading of securities fraud claims and common sense confirms that the SEC's Complaint should be dismissed for failure to state a claim and for failure to plead fraud with particularity.

## BACKGROUND[1]

### The Parties

Maurice Cohn has more than a fifty-year unblemished record in the securities industry.[2] From approximately 1962 through 1985, Mr. Cohn was a named partner in the New York Stock

---

[1] This section is derived from the allegations of the Complaint, which the Cohmad Defendants accept as true for the purpose of this motion only, as well as documents incorporated in the Complaint by reference. Where a complaint relies upon documents central to its claim, those documents are considered part of the pleadings. FED. R. CIV. P. 10(c); *see also Brass v. Am. Film Techs., Inc.*, 987 F.2d 142, 150 (2d Cir. 1993).

[2] Mr. Cohn has one reported incident on his industry registration form, dating back to 1964. Mr. Cohn was sanctioned by the NYSE because his firm hired a relative of another NYSE member firm's employee, without the other firm's prior consent. (*See* Ex. A attached to Declaration of Steven Paradise in Support of Motion to Dismiss ("Paradise Decl.").

Exchange ("NYSE") member firm and American Stock Exchange specialist firm that became Cohn, Delaire & Kaufman ("CDK"). (Compl. ¶ 15.) In or about 1983, Mr. Cohn sold his interest in CDK to a British investment banking firm, and approximately two years later, Mr. Cohn left that firm to form Cohmad Securities Corporation, a broker dealer registered with the SEC and the National Association of Securities Dealers ("NASD"). (*Id.* ¶ 14.) [3] Prior to the instant matter, in its nearly twenty-five year history, Cohmad has never been the subject of any regulatory proceeding.

Marcia Cohn, who is Maurice Cohn's daughter, joined Cohmad in 1988 and is a minority shareholder. (Compl. ¶¶ 14, 16.) Marcia Cohn is a registered representative and principal of Cohmad. (*Id.* ¶ 16.) Prior to joining Cohmad, Marcia Cohn was a registered representative with Cowen & Co., where she first became registered in 1982. (*Id.*) Like her father, Ms. Cohn has an unblemished record in the securities industry. (*See* Paradise Decl. Ex. C.)

Bernard Madoff, who was a neighbor and longtime friend of Maurice Cohn, was the founder and sole shareholder of BMIS, a FINRA member firm that Madoff started in or about 1960. Since 1985, Cohmad's regulatory filings with FINRA and the SEC have fully disclosed that Madoff was a minority shareholder and control person of Cohmad. (Compl. ¶¶ 14, 15; *see, e.g.,* Paradise Decl. Ex. D.) During the time that Maurice and Marcia Cohn knew Madoff and up until December 11, 2008, Madoff was a prominent figure in the securities industry, having served as Chairman of the Board of Directors of the NASDAQ stock market (Compl. ¶ 18) and, among other things, sat on SEC Advisory Committees and led Securities Industry Association panels (*see* Paradise Decl. Ex. E). Madoff was often quoted in periodicals and other industry publications, such as *The Wall Street Journal* and *The New York Times*, as an expert on trading,

---

[3] Cohmad is currently registered with, and a member of, FINRA. (Compl. ¶ 14.) (*See* Paradise Decl. Ex. B.) FINRA is the successor in interest to the NASD. All references herein to FINRA include the NASD.

securities and compliance issues. (*See id.* Exs. F - H.) [4] Madoff also was highly respected among his peers in the securities industry. (*See id.* Ex. I.) Due to his leadership and great reputation in the securities industry, and their long relationship with him, Maurice Cohn and Marcia Cohn trusted Madoff and sought out his advice on "legal compliance questions concerning Cohmad's retail brokerage business." (Compl. ¶ 32.)

Since 1985, Cohmad subleased, on a fully disclosed basis, space and facilities from BMIS. This arrangement began while the firms were located at 110 Wall Street and continued after they moved to 885 Third Avenue. In addition, both Maurice Cohn and Marcia Cohn maintained accounts with BMIS, which, like thousands of other investors, were totally lost on December 11, 2008 as a result of Madoff's fraud. (*See* Paradise Decl. Ex. J.)

### Cohmad's Business

In addition to Cohmad's retail stock brokerage business, which involves purchasing and selling securities for its own customers' accounts (Compl. ¶ 14), Cohmad received a finder's fees from BMIS for referring to BMIS individuals who asked to invest with BMIS (*id.* ¶ 34), and was also paid for "lay-off trades that BMIS's market making operations made through Cohmad" (*id.*). Cohmad consistently reported these revenues in the annual audit reports it filed with the SEC pursuant to Section 17 of the Exchange Act and Rule 17a-5. (*See, e.g.,* Paradise Decl. Ex. D.) Cohmad included these revenues in its Statement of Income under the description "Brokerage Service Fees," and further disclosed to the SEC, in a footnote to its financial statements, the gross amount BMIS paid to Cohmad in fees for "brokerage and other related services" (*id.*). The SEC's Complaint acknowledges that the Cohmad Defendants did not solicit investors for BMIS;

---

[4] The Court may take judicial notice of the information in press articles without converting the motion into a motion for summary judgment. *See, e.g., Staehr v. Hartford Fin. Servs. Group, Inc.,* 547 F.3d 406, 425 (2d Cir. 2008) (judicial notice is appropriate "of the fact that press coverage, prior lawsuits, or regulatory filings contained certain information, without regard to the truth of their contents.")

rather, the SEC alleges that investors approached Cohmad: "prospective investors asked if the representatives could make an introduction to Madoff so they could invest with BMIS." (Compl. ¶ 26.) The SEC also alleges that investors "angled for ways to get in" to BMIS. (*Id.* ¶ 24.) Once importuned, Cohmad and its registered representatives told prospective investors that they would "see if they could get the investors in" to invest with BMIS. (*Id.* ¶ 26.) The Complaint does not allege a single fact concerning what was said between any investor and the Cohmad Defendants or when or where any such interaction took place between any investor and the Cohmad Defendants. Nor is there any allegation in the Complaint that any inaccurate or misleading information of any kind was communicated by anyone at Cohmad to any individual seeking to invest with Madoff.

### **The Madoff Fraud**

Maurice Cohn and Marcia Cohn learned for the first time on December 11, 2008 that Madoff had been operating a giant Ponzi scheme. (Compl. ¶ 18.) Madoff has consistently maintained that he acted alone. (*United States v. Bernard L. Madoff*, S.D.N.Y. 09 Cr. 213 (DC).) Only two other parties, BMIS's auditor David Friehling and BMIS Chief Financial Officer Frank DiPascali, have been accused criminally. Whereas Friehling was not charged with having knowledge of the fraud (*see* Paradise Decl. Ex. K[5]), DiPascali has admitted to an elaborate and extensive concealment of the Ponzi scheme from everyone (*see id.* Ex. L). Indeed, as the United States Attorney's Office asserts in its Criminal Information against DiPascali (*see id.* Ex. M), and as the SEC itself pleads in its complaint against DiPascali (*see id.* Ex. N), Madoff and

---

[5] "[C]ourts routinely take judicial notice of documents filed in other courts . . . to establish the fact of such litigation and related filings." *Kramer v. Time Warner Inc.*, 937 F.2d 767, 774 (2d Cir.1991).

DiPascali succeeded in concealing the Ponzi scheme from everyone, including regulators and investors alike, for almost two decades.[6]

The regulators, including the SEC and FINRA, have acknowledged that they never discovered the Ponzi scheme and did not have knowledge of the existence of Madoff's investment advisory business prior to 2006, when BMIS first registered with the SEC as an investment adviser. The SEC conducted as many as five audits of BMIS during the relevant time period, not one of which uncovered Madoff's fraud. (*See* Paradise Decl. Ex. O.) The SEC does not allege that the Cohmad Defendants played any role or interfered in any of these audits or examinations of BMIS. Instead, the SEC challenges the accuracy of Cohmad's descriptions of the fees it earned from Madoff on Cohmad's audited financial statements and FOCUS reports, but ignores that Cohmad fully and accurately disclosed: (i) that Madoff was a control person of Cohmad, (ii) that Cohmad had a significant business relationship with BMIS, (iii) the correct amount of the fees Cohmad was paid by BMIS and that such fees were the large majority of its overall revenue, and (iv) that it subleased space from BMIS for which it paid rent. (Compl. ¶¶ 41, 42, 43.)

**<u>Reports on Madoff</u>**

Although the SEC portrays Cohmad as a stealth sales force (*id.* ¶ 28) for BMIS's "phantom advisory business" (*id.* ¶ 49), Madoff was featured in the press in the early 2000's in both *Barron's* and *MAR/Hedge*, which published feature articles about Madoff, including his investment advisory business. The *MAR/Hedge* article revealed that BMIS had between $6 billion and $7 billion of total assets under management, consisting of investments from wealthy

---

[6] (See Paradise Decl. Ex. M at p. 3) ("From at least the early 1980s through on or about December 11, 2008 . . . FRANK DIPASCALI, JR. . . . perpetrated a scheme to defraud the IA Clients by . . . disseminating false and fraudulent documents to IA Clients purporting to show that their funds have been invested, and lying to the SEC and an accounting firm to conceal the fraudulent scheme.").

individuals, family offices, endowments and feeder funds. (*See* Paradise Decl. Ex. I.) In the article, Madoff answered questions regarding his investment strategy. Separately, *Barron's* reported that Madoff's hedge fund peers named Madoff as their "favorite and most-respected hedge-fund manager." (*See id.* Ex. P.) *Barron's* also reported that Madoff managed "more than $6 billion for wealthy individuals." (*Id.*)

Thus, although the SEC tries to portray BMIS's investment advisory business as a secret about which very few people knew, it is readily apparent that as of at least 2001, the existence of BMIS's investment advisory business: (i) was reported in at least two important financial publications, (ii) was known to the thousands of investors who invested with Madoff (*see id.* Ex. J), and (iii) was known to the hedge fund industry (*see id.* Exs. I, P). By any measure, BMIS's investment advisory business was not a well kept secret during the time Cohmad, Maurice Cohn and Marcia Cohn were receiving fees from BMIS.

**ARGUMENT**

## I.     THE MOTION TO DISMISS STANDARD

To survive a motion to dismiss under Rule 12(b)(6), the SEC's Complaint must contain sufficient factual detail to "state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007) (interpreting FED. R. CIV. P. 8(a)). "A claim has facial plausibility when the pleaded factual content allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 129 S. Ct. 1937, 1940 (2009). Allegations phrased as legal conclusions need not be accepted as true, *Twombly*, 550 U.S. at 555, and claims that are merely possible or conceivable are subject to dismissal under Rule 12(b)(6). *Iqbal*, 129 S. Ct. at 1950. To avoid dismissal, the SEC must plead facts sufficient to "nudge [its] claims across the line from conceivable to plausible." *In re Elevator Antitrust*

*Litig.*, 502 F.3d 47, 50 (2d Cir. 2007) (quoting *Twombly*, 550 U.S. at 570).[7] A complaint alleging facts that are "merely consistent with a defendant's liability . . . stops short of the line between possibility and plausibility of entitlement to relief." *Iqbal*, 129 S. Ct. at 1949. "[D]etermining whether a complaint states a plausible claim is context-specific, requiring the reviewing court to draw on its experience and common sense." *Id.* at 1940. Allegations consistent with "routine market conduct" or an "obvious alternative explanation" do not give rise to a plausible inference of misconduct. *See Twombly*, 550 U.S. at 566-67.

The Complaint does not support a rational inference that Cohmad is liable for the misconduct alleged, even were its allegations arguably not subject to the heightened Rule 9(b) pleading standard applicable to fraud claims. *See Iqbal*, 129 S. Ct. at 1940, 1950-51.[8] The Complaint fails utterly to make a plausible, common-sense case that Cohmad knowingly or recklessly participated in Madoff's Ponzi scheme. The SEC tries to gloss over this deficiency using conclusory labels and bare legal conclusions, but at bottom the Complaint is doomed by the inability of the pleaded facts to raise the SEC's claims beyond the speculative to the truly plausible. *See Twombly*, 550 U.S. at 555.

## II.     THE SECTION 10(b) CLAIM SHOULD BE DISMISSED

To state a violation of Section 10(b) or Rule 10b-5, the SEC must allege that a defendant "(1) made a material misrepresentation or a material omission as to which he had a duty to speak,

---

[7] The pleading standard required by the Supreme Court in *Twombly* is applicable to civil actions brought by the SEC. *See, e.g., SEC v. Collins & Aikman Corp.*, 524 F. Supp. 2d 477, 484 (S.D.N.Y. 2007). Accordingly, the SEC must plead facts, with the particularity required by Rule 9(b), that state a plausible claim for relief. *See, e.g., SEC v. Lyon*, 529 F. Supp. 2d 444, 453 (S.D.N.Y. 2008).

or used a fraudulent device; (2) with scienter; (3) in connection with the purchase or sale of securities." *SEC v. Monarch Funding Corp.*, 192 F.3d 295, 308 (2d Cir. 1999). To the extent the Complaint alleges deceptive or fraudulent conduct in violation of Rule 10b-5(a) or (c), the "scienter" and "in connection with" requirements still apply, but instead of a material misrepresentation or omission, the complaint must allege that the defendant committed a manipulative or deceptive act in furtherance of the scheme to defraud. *See In re Global Crossing, Ltd. Sec. Litig.*, 322 F. Supp. 2d 319, 336 (S.D.N.Y. 2004). Such manipulative or deceptive conduct "irreducibly entails some act that gives the victim a false impression." *SEC v. Dorozhko*, 08-0201-cv, 2009 WL 2169201, at *6 (2d Cir. July 22, 2009) (quoting *United States v. Finnerty*, 533 F.3d 143, 148 (2d Cir. 2008)).

These elements must be pled in accordance with the plausibility requirement announced in *Twombly* and *Iqbal.* Additionally, "[a] complaint asserting securities fraud must also satisfy the heightened pleading requirement of [Rule] 9(b), which requires fraud to be alleged with particularity." *Kalnit v. Eichler*, 264 F.3d 131, 138 (2d Cir. 2001). For four reasons, the SEC's Third Claim for Relief, whether proceeding under Rule 10b-5(a), (b), or (c), fails to satisfy these requirements and should be dismissed.[9]

---

[8] The Rule 9(b) particularity standard applies to all claims premised on fraud, regardless of how the claims are denominated in the Complaint. *See Rombach v. Chang*, 355 F.3d 164, 171 (2d Cir. 2004); Fed. R. Civ. P. 9(b). Here, the Complaint contains several allegations of guilty knowledge and fraudulent behavior by Cohmad, and the SEC realleges paragraphs 1-63 as a prelude to each cause of action. The entire Complaint therefore sounds in fraud and is subject to Rule 9(b). *See id.* ("claims that do rely upon averments of fraud are subject to the test of Rule 9(b)"); *see also UBS Asset Mgmt. (N.Y.), Inc. v. Wood Gundy Corp.*, 914 F. Supp. 66, 71 (S.D.N.Y. 1996) (Stanton, J.) ("Where claims of fraud are asserted, claims alleged to arise out of the same conduct are considered to sound in fraud and are subject to the same pleading requirements under Rule 9(b).").

[9] Although they address the deficiencies in the SEC's Third Claim for Relief first, the Cohmad Defendants are also moving to dismiss the SEC's First and Second Claims for Relief (which allege violations of section 17(a) of the Securities Act) for the same reasons. *See* Part III, *infra*.

First, the Complaint's vague fraud allegations fail to specify any <u>particular</u> misstatements, omissions, or deceptive conduct as required by Rule 9(b). There are no facts pleaded of a single interaction -- let alone a false statement -- between any Cohmad Defendant and a single BMIS investor.

Second, the Complaint's allegations do not give rise to the "strong inference" of scienter required by the Second Circuit. *See, e.g., SEC v. Pentagon Capital Mgmt. PLC*, 612 F. Supp. 2d 241, 263 (S.D.N.Y. 2009). The Complaint does not allege motive and opportunity, or conscious misbehavior or recklessness, in a manner that strongly suggests that the Cohmad Defendants intended to defraud BMIS's investors.

Third, the SEC has not adequately alleged that any conduct, statements, or omissions alleged in the Complaint took place "in connection with" the purchase or sale of a security. *See, e.g., Monarch*, 192 F.3d at 308. To the contrary, the allegations confirm that the Cohmad Defendants' alleged role in Madoff's fraud was limited to that of a middleman that was steps removed from any hypothetical purchase or sale of a security by a BMIS investor (no such actual purchases or sales are pleaded in the Complaint).

Finally, to the extent the SEC's Rule 10b-5 claims are predicated upon the Cohmad Defendants' failure to disclose to BMIS investors the nature of their relationship with BMIS, the Complaint does not -- and cannot -- even allege that the Cohmad Defendants owed a duty to disclose this information. Absent a duty to disclose, any alleged omissions are inactionable. *See, e.g., Grandon v. Merrill Lynch & Co.*, 147 F.3d 184, 189 (2d Cir. 1998).

### A.    The Complaint Fails to Allege Fraud with Particularity

Rule 9(b) requires that the circumstances constituting any alleged fraud be stated with particularity, thereby serving as an important safeguard against improvident charges of wrongdoing that can cause irreparable harm to a defendant's reputation and goodwill. *See Ross*

*v. Bolton*, 904 F.2d 819, 823 (2d Cir. 1990). Accordingly, "[t]he particularity requirement contained in Rule 9(b) is substantial." *Rich v. Maidstone Fin., Inc.*, No. 98 Civ. 2569 (DAB), 2002 WL 31867724, at *10 (S.D.N.Y. Dec. 20, 2002). To comply with this requirement with respect to alleged misstatements or omissions (Rule 10b-5(b)), the SEC must (i) specify the statements it contends were fraudulent, (ii) identify the speaker, (iii) state where and when the statements were made, and (iv) explain why the statements were fraudulent. *Thomas H. Lee Equity Fund V, L.P. v. Mayer Brown, Rowe & Maw LLP*, 612 F. Supp. 2d 267, 274 (S.D.N.Y. 2009). Where the Complaint alleges fraud based on deceptive conduct or a fraudulent scheme (Rules 10b-5(c) and (e)), it "must specify [i] what deceptive or manipulative acts were performed, [ii] which defendants performed them, [iii] when the acts were performed, and [iv] the effect the scheme had on investors in the securities at issue." *Id.* The SEC's allegations fail to satisfy these "substantial" pleading requirements. *Rich*, 2002 WL 31867724, at *10.

Notably, nowhere does the SEC allege that a particular Cohmad representative made a particular false and fraudulent statement or committed a particular deceptive act that caused a particular investor to invest with Madoff. Instead, many of the Complaint's fraud allegations are made generically against "Cohmad representatives," which is patently insufficient to state a claim against any particular Cohmad Defendant. (*See, e.g.*, Compl. ¶¶ 26, 27.) Rule 9(b) requires the SEC to "set [ ] forth separately the acts complained of by each defendant." *Harrison v. Rubenstein*, No. 02 Civ. 9356 (DAB), 2007 WL 582955, at *12 (S.D.N.Y. Feb. 26, 2007). As this court has stated:

> Courts are especially vigilant in applying Rule 9(b) where a complaint is made against multiple defendants. Each defendant is entitled to be apprised of the circumstances surrounding the fraudulent conduct with which it individually stands charged . . . To this end, a complaint may not rely upon blanket references to the acts of all of the defendants without identifying the nature of each defendant's participation in the fraud.

14

*Scone Invs., L.P. v. Am. Third Mkt. Corp.*, No. 97 CIV. 3802 (SAS), 1998 WL 205338, at *4 (S.D.N.Y. Apr. 28, 1998).

Moreover, despite Rule 9(b)'s requirements, the Complaint is replete with "broad generalities" that fail to identify adequately any specific misstatements, omissions or fraudulent conduct by a particular defendant that caused any particular individual to invest with Madoff. *See BHC Interim Funding, L.P. v. Finantra Capital, Inc.*, 283 F. Supp. 2d 968, 978-79 (S.D.N.Y. 2003) (holding that complaint failed to adequately allege fraud where its allegations relied on "meaningless terms such as 'various public and/or private statements and communications.'"). Central to its fraud claim, the SEC vaguely alleges that "Cohmad's representatives strategically circulated among wealthy individuals in various exclusive milieus" and "offhandedly mentioned they were affiliated with Madoff." (Compl. ¶ 26.) But there is no specific factual allegation whatsoever of the "who, what, when, where, or how" of a single fraudulent statement, omission, or act. *See Thomas H. Lee Equity Fund*, 612 F. Supp. 2d at 274; *UBS Asset Mgmt.*, 914 F. Supp. at 70-71 (Stanton, J.) ("Fraud allegations ought to specify the time, place, speaker, and content of the alleged misrepresentations."). Further, the Complaint's nebulous assertion that the Cohmad Defendants "offhandedly" disclosed their affiliation with Madoff to potential investors contradicts the SEC's claim that the Cohmad Defendants fraudulently concealed their relationship with BMIS. (*Compare id.* ¶ 26 with ¶ 28.) Furthermore, the Complaint does not identify particular speakers, does not allege that any particular person(s) were targeted, and does not specify that any alleged misstatements were made, and if so, where or when any alleged deceptive conduct took place. It thus fails to plead the "who, what, when, where, or how" of the fraud pursuant to Rule 9(b), as required.

15

Significantly, the Complaint does not plead facts showing that the Cohmad Defendants solicited investors. To the contrary, the SEC admits that investors approached Cohmad: "prospective investors asked if the representatives could make an introduction to Madoff so they could invest with BMIS," (Compl. ¶ 26), and investors "angled for ways to get in" to BMIS. (*Id.* ¶ 24.) When asked, Cohmad and its registered representatives told prospective investors that they would "see if they could get the investors in" to invest with BMIS. (*Id.* ¶ 26.) The SEC also alleges that no records of "conversations, account openings, suitability analysis or anything else concerning marketing BMIS's advisory business . . . were maintained." (*Id.* ¶ 44.) The absence of any records of client solicitation is particularly telling, and the only rational inference to be drawn from the Complaint's allegations is that the Cohmad Defendants introduced certain investors, at the investors' request, to a widely-renowned investment manager who paid them a finder's fee if such investors subsequently elected to open an account. *See Hart v. Internet Wire, Inc.*, 145 F. Supp. 2d 360, 368 (S.D.N.Y. 2001).

The Complaint is also rife with internal inconsistencies and, as a result, fails to identify with particularity the deceptive misstatements, omissions, or acts that constitute the alleged fraud, and the securities fraud claims should be dismissed for this reason alone. *See Sofi Classic S.A. de C.V. v. Hurowitz*, 444 F. Supp. 2d 231, 249 (S.D.N.Y. 2006) (dismissing fraud claim under Rule 9(b) where the complaint alleged "certain inconsistent factual allegations"). For example, it is alleged that the Cohmad Defendants lured investors into BMIS's fraudulent advisory scheme (Compl. ¶ 22), yet it is also conceded that "many investors angled for ways to get in." (*Id.* ¶ 24.) Similarly, although the Complaint alleges that Cohmad willfully concealed its relationship with BMIS (*id.* ¶ 42), it also admits that Cohmad disclosed year after year to the SEC in its regulatory filings that Madoff was a control person of Cohmad (*id.* ¶ 41) and that

16

Cohmad disclosed month after month and year after year in its monthly FOCUS reports and yearly audited financial statements the amount of the fees it received from Madoff. (*Id.* ¶ 43.) Finally, there is no dispute that Cohmad disclosed in its annual audited financial statements that the fees BMIS paid it constituted the large majority of its overall revenues. These disclosures severely undermine, and render implausible, any inference that Cohmad was trying to conceal its relationship with BMIS from the SEC or anyone else with access to its regulatory filings.

## B.    The Complaint Fails to Support a Strong Inference of Scienter

To state a claim under Rule 10b-5(a), (b) or (c), the SEC must allege with particularity that the Cohmad Defendants acted with scienter, which is "a mental state embracing intent to deceive, manipulate, or defraud." *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 319 (2007). In the Second Circuit, "scienter allegations must give rise to a strong inference of fraudulent intent." *See, e.g., Kalnit*, 264 F.3d at 138-39. The "strong inference" requirement applies to enforcement actions brought by the SEC. *Pentagon Capital*, 612 F. Supp. 2d at 263. A strong inference of fraudulent intent is established by alleging, with particularity, facts that (1) show the defendant had "both motive and opportunity to commit fraud," or (2) "constitute strong circumstantial evidence of conscious misbehavior or recklessness." *Kalnit*, 264 F.3d at 138. The SEC's allegations do not support a strong inference that the Cohmad Defendants consciously or recklessly participated in a Ponzi scheme under either of these, or any other, theories.

### *1.    The Complaint does not adequately allege "motive and opportunity"*

The Complaint alleges that Cohmad's compensation structure with BMIS provided the Cohmad Defendants with a motive to commit fraud. (*See, e.g.*, Compl. ¶¶ 27, 34.) But this allegation is insufficient as a matter of law. The assertion that a defendant stands to gain economically from fraud does not establish motive under the heightened pleading requirements of Rule 9(b). *See, e.g., In re Morgan Stanley & Van Kampen Mut. Fund Sec. Litig.*, No. 03 Civ.

8208 (RO), 2006 WL 1008138, at *10 (S.D.N.Y. Apr. 18, 2006) (allegation that defendant concealed its activities "because doing so ensured that more customers would invest in [funds], thereby increasing . . . Defendants' commissions" did not satisfy Rule 9(b)); *ABF Capital Mgmt. v. Askin Capital Mgmt. L.P.*, 957 F. Supp. 1308, 1326-27 (S.D.N.Y. 1997) (allegation that defendant "was paid fees based on a percentage of the dollar amount invested" did not allege a motive for fraud).

Here, the SEC alleges that Madoff paid the Cohmad Defendants between .25% and 1% of any original capital contribution made by investors the Cohmad Defendants referred to BMIS. (Compl. ¶ 27.) But this kind of basic economic incentive is not sufficient "motive" to establish a strong inference of fraudulent intent. As the Second Circuit has held:

> Incentive compensation can hardly be the basis on which an allegation of fraud is predicated. On a practical level, were the opposite true, the executives of virtually every corporation in the United States could be subject to fraud allegations. . . .

*Shields v. Citytrust Bancorp, Inc.*, 25 F.3d 1124, 1130 (2d Cir. 1994) (internal quotations and citations omitted). Accordingly, the Complaint's allegation that Cohmad was paid fees for introducing investors to BMIS who already wanted to invest with BMIS is insufficient to plead scienter based on a motive and opportunity theory.

### 2. The Complaint does not allege particularized facts demonstrating conscious misconduct or reckless disregard for the truth

"Where motive is not apparent, it is still possible to plead scienter by identifying circumstances indicating conscious behavior by the defendant, though the strength of the circumstantial allegations must be correspondingly greater." *Collins & Aikman*, 524 F. Supp. 2d at 487. "Conclusory allegations that a defendant knew or was reckless in not knowing the true facts will not satisfy a plaintiff's pleading requirements." *In re Bayou Hedge Fund Litig.*, 534 F. Supp. 2d 405, 415 (S.D.N.Y. 2007), *aff'd, S. Cherry St., LLC v. Hennessee Group LLC*, 573 F.3d

98 (2d Cir. 2009). To avoid dismissal, the Complaint must allege, with particularity, facts showing conduct that "at the least . . . is highly unreasonable and which represents an extreme departure from the standards of ordinary care to the extent that the danger was either known to the defendant or so obvious that the defendant must have been aware of it." *Kalnit*, 264 F.3d at 142; *accord UBS Asset Mgmt.*, 914 F. Supp. at 71 (dismissing Rule 10b-5 claims where the plaintiffs failed to adequately particularize "a factual basis for their conclusory allegations regarding [defendant's] knowledge.").

The standard is more than basic recklessness. Rather, it is "conscious recklessness – *i.e.*, a state of mind *approximating actual intent*, and *not merely a heightened form of negligence*." *S. Cherry St., LLC v. Hennessee Group LLC*, 573 F.3d 98 (2d Cir. 2009). A plaintiff must "show that the defendants acted with fraudulent intent (*i.e.*, the intention of deceiving the plaintiff) . . . even when [the] plaintiff relies on the recklessness prong of scienter." *Bayou*, 543 F. Supp. 2d at 417. A complaint based on recklessness that lacks "specific facts supporting an inference of knowledgeable participation in the alleged fraud will not survive a motion to dismiss." *Id.* (citing *Hart*, 145 F. Supp. 2d at 368).

Moreover, to the extent the SEC's claim is predicated on the Cohmad Defendants' alleged failure to investigate the business operations of BMIS and Madoff, such failure to investigate, even if true, does not amount to recklessness. For example, in *South Cherry*, which the Second Circuit decided last month, the plaintiff alleged that the defendant investment advisor should have discovered that the Bayou Hedge Fund, in which the defendant invested the plaintiff's money, was a Ponzi scheme. 573 F.3d at 98. The Second Circuit rejected the assertion that the defendant acted recklessly by failing to "take obvious investigative steps" and ignoring "clear red flags" because the complaint had not adequately alleged any fact *known* to

the defendant that would have made the fraudulence of Bayou's operation "obvious." *Id.* "Even an egregious failure to gather information will not establish 10b-5 liability as long as the defendants did not deliberately shut their eyes to the facts." *Bayou*, 534 F. Supp. 2d at 415. Furthermore, "allegations consistent with innocent conduct are never sufficient for a strong inference" of fraudulent intent. *SEC v. Espuelas*, 579 F. Supp. 2d 461, 474 (S.D.N.Y. 2008).

The SEC attempts to satisfy this stringent standard by alleging that Cohmad (1) deliberately concealed its relationship with BMIS in various regulatory filings, and (2) "knew or recklessly disregarded" facts indicating that Madoff was conducting a fraud. (Compl. ¶¶ 37, 50.) Neither allegation is sufficient.

> *a.   Allegations that Cohmad concealed its relationship with BMIS do not support a strong inference that the Cohmad Defendants knowingly or recklessly furthered a Ponzi scheme*

The Complaint alleges that "[t]hrough false filings and inadequate books and records, Madoff and the Defendants[10] had succeeded in concealing BMIS's advisory business and its relationship with Cohmad from the various regulators," (*id.* ¶ 46), and thereby "further enabled Madoff's fraud." (*Id.* ¶ 49.) The fatal flaw in this conclusion, however, lies in the Complaint's failure to plead facts showing that Madoff's Ponzi scheme was either *known* to the Cohmad Defendants or *so obvious* that the Cohmad Defendants must have been aware of it. *See Kalnit*, 264 F.3d at 142.

For example, the Complaint alleges that Cohmad mischaracterized fees received from BMIS as "brokerage service fees" (in its 2007 Annual Audit Report) or "fees for account supervision, investment advisory and administrative services" (in its quarterly FOCUS reports). (Compl. ¶¶ 42-43.) The SEC contends that these actions were intended to further Madoff's fraud

---

[10] As shown above, the reference to Defendants as a group by itself fails to satisfy Rule 9(b). *See* Section II.A., *supra.*

by concealing BMIS's advisory business from regulators (*id.* ¶ 46); but the SEC fails to plead facts that show this to be plausible. Notably, the Complaint has not alleged any facts showing that the Cohmad Defendants were even aware that Madoff was not a registered investment advisor, leaving wholly unsupported its conclusion that "the Cohns were aware that Madoff avoided registration as an investment advisor for decades" (*id.* ¶ 53), and begging the question, how could the Cohmad Defendants have intended to conceal something of which they were not aware? *See In re Bristol-Myers Squibb Sec. Litig.*, 312 F. Supp. 2d 549, 562 (S.D.N.Y. 2004) (holding that complaint failed to allege conscious misbehavior where it did not "specifically allege defendants' knowledge of the facts or access to information contradicting their public statements.").

Moreover, the allegations in the Complaint actually undercut any inference that Cohmad intended to conceal its relationship with BMIS, as regardless of how the fees paid by BMIS were characterized, the amount and source of these payments from BMIS were fully disclosed by Cohmad annually (Compl. ¶¶ 42, 43), and Cohmad's books and records (which as the Complaint notes were "subject to regulatory review") show that these payments were based on the amount of money investors introduced by Cohmad invested with BMIS. (*Id.* ¶¶ 43, 56.) Specifically, Cohmad reported its revenues from BMIS in its annual Rule 17a-5 audit reports, included them in its Statement of Income under the description "brokerage and other related services," and further disclosed in its financial statements the gross amount BMIS paid to Cohmad each year as finder's fees. This behavior does not support an inference that the Cohmad Defendants

knowingly concealed their relationship with BMIS to hide Madoff's fraud. Indeed, it actually suggests otherwise.[11]

In addition, the Complaint improperly relies on purported "false responses" in Cohmad's Forms BD and amendments thereto in attempting to allege that Cohmad sought to conceal its relationship with BMIS. (*Id.* ¶ 39.) The SEC alleges that Cohmad's Forms BD contained "false responses" with respect to three categories of disclosures. First, the SEC faults Cohmad for failing to disclose that it referred investors to BMIS in its response to Question 7 on Form BD, which asks: "Does applicant refer or introduce customers to any broker or dealer?" (*Id.* ¶ 39.) Cohmad responded by disclosing that it introduced its retail brokerage customers to Bear Stearns, its clearing broker. This answer is consistent with the use of the word "introduce" in the brokerage industry. As the Second Circuit explained,

> Clearing firms provide the necessary services and capital typically needed by small brokerage houses to complete a securities transaction, most importantly, the clearing function. . . . Small brokerage firms, commonly referred to as '*introducing firms*,' typically lack sufficient capital, back office technology and personnel to 'self clear.' As a result, they enter into 'carrying agreements' with clearing firms to out source clearing and other services.

*Levitt v. Bear Stearns & Co.*, 340 F.3d 94, 97-98 (2d Cir. 2003) (quoting Daphna Abrams, Note, *A Second Look at Clearing Firm Liability*, 67 BROOK. L. REV. 479, 484-85 (2001)) (emphasis added). Cohmad's answer to Question 7 fully disclosed its relationship with its clearing broker, Bear Stearns. The SEC points to no law, regulation, or rule requiring that Cohmad disclose its referral of prospective investors to BMIS where Cohmad did not introduce its customers to BMIS for the purpose of clearing securities transactions.

---

[11] With respect to Cohmad's monthly FOCUS reports filed with FINRA described in the Complaint, those reports contain a limited number of pre-populated labels, including "fees for account supervision, investment advisory and

Second, the SEC takes issue with Cohmad's purported failure to disclose, in response to Question 10.A. on Form BD, that Cohmad was "under the control of BMIS and both Cohmad and BMIS were under Madoff's common control." (Compl. ¶ 39.)[12] This position exalts form over substance. The SEC admits that in another section of the Form BD Cohmad "did disclose the [sic] Madoff was a control person of Cohmad . . . ." (*Id.*) Given that Cohmad admittedly disclosed Madoff's status as a control person of Cohmad, the allegation regarding Question 10.A. is nothing more than "splitting hairs" and does not raise a plausible inference of scienter. Moreover, this allegation is circular, as the purported failure to disclose that Cohmad was "under the control" of BMIS and Madoff is based on nothing but the SEC's legally insufficient allegation that BMIS and Madoff controlled Cohmad.

Third, the SEC alleges that in response to Question 12 on Form BD -- which asks the applicant to identify the "Types of Business" in which the applicant engaged -- Cohmad did not disclose its business of referring investors to BMIS, but checked the box "Other" and provided the description "Development of Hedging and Investment Strategies." (*Id.*) Like the descriptions of fees received from BMIS in the 2007 Annual Audit Reports and in Focus reports, the SEC fails to plead facts showing that the Cohmad Defendants used this description to deceive the SEC or anyone else.

In sum, the Complaint implausibly assumes a connection between Cohmad's alleged false filings and recordkeeping and knowledge of Madoff's Ponzi scheme. *See Rombach*, 355 F.3d at 176 ("As this Court has observed, a pleading technique that couples a factual statement

administrative services," from which Cohmad could choose to characterize the fees it received from Madoff. Any allegation that Cohmad should have specified the source of fees more precisely is thus wholly unfounded.

[12] Question 10.A. asks whether an "applicant [is] controlled by any . . . organization that is engaged in the securities or investment advisory business." (Compl. ¶ 39.) Cohmad responded "No" to this question. (Compl. ¶ 39.)

with a conclusory allegation of fraudulent intent is insufficient to support the inference that the defendants acted recklessly or with fraudulent intent."). The SEC asks the Court to ignore its failure to plead facts showing that the Cohmad Defendants were aware that Madoff was not a registered investment advisor, and to ignore the fact that Cohmad repeatedly disclosed the fact that it received fees from BMIS and the size of those fees, and to instead make the implausible inference that the Cohmad Defendants intended to further Madoff's fraud through the alleged mischaracterization of the referral fees Cohmad received. But in the absence of any particularized facts indicating that the Cohmad Defendants knew about Madoff's fraud, it is implausible to suggest that their alleged concealment of Cohmad's relationship with BMIS creates the requisite strong inference that the Cohmad Defendants knowingly or recklessly furthered the Ponzi scheme.

> b.  *The "red flags" listed in the Complaint do not demonstrate that the Cohmad Defendants were reckless in failing to detect Madoff's fraud*

Paragraphs 53-56 contain several purported "facts" that the Cohmad Defendants allegedly knew or recklessly disregarded that supposedly indicated Madoff was engaged in fraud. (Compl. ¶¶ 53-56.) Many of these allegations are consistent with "routine" business practices or have "obvious alternative explanations," and none of them supports a strong, or even plausible, inference that the Cohmad Defendants were aware of Madoff's fraud. *See Twombly*, 550 U.S. at 566-67.

The SEC makes much of the "inherently suspicious" compensation structure described in Paragraphs 55 and 56, where it is alleged that Cohmad was compensated "based on the cumulative amount of funds that Cohmad . . . had brought into BMIS" rather than the "assets under management for those accounts." (Compl. ¶ 55.) Far from "inherently suspicious," however, this compensation method is entirely consistent with the nature of Cohmad's alleged

role. The Complaint alleges that Cohmad's primary role was the introduction of new investors to Madoff, investors who were "angling for a way to get into" BMIS. (*Id.* ¶ 24.) It makes perfect business sense that Madoff would have compensated Cohmad based on the amount of funds new investors brought to BMIS through Cohmad rather than on any subsequent appreciation in the accounts attributable to BMIS's trading prowess. Indeed, the supposedly less "suspicious" compensation method advanced by the SEC would have tied Cohmad's compensation to the success of BMIS's investment strategies and resulting appreciation in investors' accounts, which would be an unusual way to structure what is essentially alleged to have been a finder's fee.

The Complaint further alleges that Maurice Cohn's compensation changed in 2002 to "a flat fee of $2 million per year." (*Id.* ¶ 57.) Presumably, a flat fee does not raise any "red flags," as Mr. Cohn's compensation was no longer tied to the amount of money an investor maintained in his or her BMIS account. Thus, whatever knowledge Mr. Cohn is supposed to have gleaned about Madoff's fraud by virtue of the "suspicious" compensation structure must have been acquired prior to the alleged change in compensation structure. As with the rest of the SEC's scienter allegations, one is left to guess at exactly how and when it should have become obvious to the Cohmad Defendants (when it was not even suspected by many others, including the SEC) that Madoff was running a Ponzi scheme.

Equally deficient is the allegation that "Madoff was eager to secure new investors and to pay handsomely for them, while projecting an aura of exclusivity and indifference to new money." (*Id.* ¶ 53.) As anyone who watches TV commercials or reads magazine ads can attest, the projection of an "aura of exclusivity" is a common marketing tactic even for products that, unlike BMIS, are not targeted exclusively to the wealthy. And it would be the rare investment advisor who was not "eager to secure new investors." Moreover, the alleged "facts" about

Madoff's carefully projected image were readily apparent to any observer, including the SEC, but his fraud did not become obvious until it was publicly revealed by Madoff on December 11, 2008. This is true in spite of the publication of two articles in which Madoff's investment advisory business was openly discussed and questioned, thereby removing any notion of an "exclusive aura." (Paradise Decl. Exs. I, P.)

The allegation that Madoff directed the Cohmad Defendants to turn away investors who worked in the financial industry also fails to support a strong inference of scienter. (Compl. ¶ 53.) That a highly sought-after money manager who can pick and choose his clients might prefer clients who are less likely to second-guess his investment decisions is not a fact that makes it obvious to everyone associated with the advisor that he is running a Ponzi scheme.

Likewise, the allegation that Madoff directed the Cohmad Defendants to avoid "written marketing materials, cold calls, and e-mails" does nothing to satisfy the SEC's substantial pleading burden. (*Id.*) The only rational inference the Cohmad Defendants could have drawn from Madoff's recommendations was that Madoff was very cautious about disseminating written material about his proprietary trading strategies, and there are many non-fraudulent reasons for such caution. For example, the use of e-mail in the brokerage industry is sometimes discouraged because brokerage firm compliance officers are required by rule to review all incoming and outgoing correspondence to and from their brokers, and electronic mail is difficult to monitor. And, conducting business in person or over the phone almost always carries less risk of losing proprietary information and creating liability. Again, it must have been known by anyone who cared to know that Cohmad and Madoff rarely used e-mail, disseminated written marketing materials, or conducted cold calls. But this "red flag" caused no one, including the SEC, even to suspect Madoff's fraud. Moreover, this allegation, like several others discussed above, conflicts

with others in the Complaint, which simultaneously alleges that Cohmad was both a "sales force" for BMIS's investment advisory business (*id.* ¶ 28), and unable to engage in any marketing. (*Id.* ¶¶ 6, 53.)

In sum, the Complaint's scienter allegations boil down to scattered assertions regarding Madoff's marketing and compensation methods and, as discussed above, Cohmad's alleged camouflaging of its relationship with BMIS. The implication is apparently that the confluence of these "red flags" should have made Madoff's fraud obvious to the Cohmad Defendants despite the fact that it was not even suspected by regulators, investors or the media. Tellingly, however, the Complaint pleads no facts whatsoever identifying a single conversation, document, or event that put the Cohmad Defendants on notice of Madoff's criminal wrongdoing. *In re Bristol-Myers*, 312 F. Supp. 2d at 562; *supra* at II.A. With the benefit of hindsight, it may appear easy to say today, after Madoff's fraud has been revealed, that someone in the Cohmad Defendants' position should have known what was going on. But the SEC's burden is to plead particularized facts supporting a strong inference that, at a time when Bernie Madoff was among the most respected investment strategists in the country and when no regulatory authority or other observer suspected him of fraud, his Ponzi scheme should have been obvious to the Cohmad Defendants. The Complaint fails utterly to meet this burden. The Section 10(b) claim should therefore be dismissed.

### C. The 10(b) Claim Should Be Dismissed for Failure to Plead Facts Showing that the Cohmad Defendants' Actions Were "In Connection With" the Purchase or Sale of a Security

The Complaint also fails to plead specific facts to make a plausible case that the Cohmad Defendants' conduct, statements and alleged omissions took place "in connection with" the purchase or sale of a security. The "in connection with" requirement applies to all actions brought under Rule 10b-5, regardless of what subdivision of the rule the defendant is alleged to

27

have violated. 17 C.F.R. § 240.10b-5; *see also Leykin v. AT&T Corp.*, 423 F. Supp. 2d 229, 238

(S.D.N.Y. 2006) (Stanton, J.), *aff'd*, 216 F. App'x 14 (2d Cir. 2007).

### 1.    *Cohmad's Role as Introducing Broker Was Always at Least One Step Removed from the Actual Purchase or Sale of Securities*

The phrase "in connection with" requires a "transactional nexus between a defendant's

conduct and a plaintiff's purchase or sale of securities." *Morse v. Weingarten*, 777 F. Supp. 312,

316-17 (S.D.N.Y. 1991). In other words, the plaintiff must allege fraudulent conduct that

coincides with the purchase or sale of securities. *SEC v. Zandford*, 535 U.S. 813, 822 (2002).

Allegations demonstrating only "but-for" causation between a defendant's conduct and the

purchase or sale of a security will not satisfy the "in connection with" requirement. *Abrash v.*

*Fox*, 805 F. Supp. 206, 208 (S.D.N.Y. 1992); *see also Chem. Bank v. Arthur Andersen & Co.*,

726 F.2d 930, 943 (2d Cir. 1984).

Here, the Complaint fails to allege that any action by the Cohmad Defendants coincided

with the purchase or sale of a security, and even were the standard "but-for" causation, the

allegations still fall short. (Compl. ¶ 26.) Although "Cohmad representatives" allegedly

"introduced" potential investors to BMIS, these investors were, in the SEC's words, already

"angling to get in" to BMIS. (*Id.* ¶¶ 24, 26.) Thus, according to the Complaint itself, the

Cohmad Defendants played no role in anyone's decision to invest with Madoff. Indeed, the SEC

apparently concedes that investors' minds were already made up before they made contact with a

Cohmad Defendant. Moreover, the Complaint does not allege whether days, weeks, or more

time passed between an investor's conversation with Cohmad and his or her opening an account

with BMIS. The Complaint does not identify a single investor who bought securities from BMIS

based on anything a Cohmad Defendant said. Nor does the Complaint allege that any investor

opened an account prior to meeting or speaking with a BMIS representative. It was only after

opening an account when any actual securities fraud occurred. In short, the Complaint alleges no specific facts demonstrating that any Cohmad Defendant said or did anything that coincided with a purchase or sale of securities that led to losses by investors. It should therefore be dismissed.

Perhaps recognizing that the "introductory" role it has pled does not allege a violation of Rule 10b-5, the SEC attempts to establish that Cohmad's relationship with BMIS investors was "more than merely introductory." (Compl. ¶ 35.) The Complaint alleges that Cohmad maintained "customer service" relationships with certain investors it had referred to BMIS and that Cohmad answered questions about BMIS accounts or statements. (*Id.*) Once again, the SEC fails to identify who provided the vague "customer service" or when and to which investor it was provided. More significantly and by its very wording, however, this allegation admits that Cohmad's conduct occurred *subsequent to*, and not *in connection with*, the purchase or sale of a security. *BHC Interim Funding*, 283 F. Supp. 2d at 978 ("alleged misrepresentations, made after [closing during which shares of stock were pledged], were not made 'in connection with' the purchase or sale of any security"); *see also Pension Comm. of Univ. of Montreal Pension Plan v. Banc of Am. Sec., LLC*, 446 F. Supp. 2d 163, 189-90 (S.D.N.Y. 2006) (dismissing 10(b) claims that related to the retention, and not the purchase or sale of, securities). The Complaint thus fails to allege the required "transactional nexus" between the Cohmad Defendants' alleged conduct and the purchase or sale of a security, and it should be dismissed.

### 2. Cohmad's Alleged Filings and Books and Records Violations Were Not in Connection with the Purchase or Sale of a Security

Finally, the Complaint alleges that Cohmad made false filings or kept inadequate books and records, thereby enabling Madoff's fraud by concealing the true nature of BMIS's advisory business and its relationship with Cohmad. (Compl. ¶¶ 46-49.) Even if true, such concealment does not "coincide" with the purchase or sale of a security. *Zandford*, 535 U.S. at 824. To the

extent the SEC relies on such conduct as violative of Rule 10b-5, its claim should be dismissed for failure to allege fraudulent conduct that occurred in connection with the purchase or sale of a security.

### D. All Section 10(b) Claims Based on Cohmad's Alleged Failure to Disclose its Relationship with BMIS Should Be Dismissed for Failure to Adequately Plead the Existence of a Duty to Disclose

To the extent the Complaint relies on Cohmad's alleged failure to disclose its relationship with BMIS as the predicate for its Section 10(b) claims, those claims fail not only because the Cohmad Defendants did disclose that relationship, *see supra* at part II.B.2.a, but also because the Cohmad Defendants did not owe BMIS's investors any duty to disclose this information. An omission is only actionable in certain limited circumstances. *Basic Inc. v. Levinson*, 485 U.S. 224, 239 n.17 (1988). Specifically, there must be a duty to disclose, and the omitted facts must be material. *Grandon*, 147 F.3d at 189; *see also Dorozhko*, 2009 WL 2169201, at *6 (reaffirming that "silence is fraudulent only if there is a duty to disclose"). Here, the SEC has failed even to allege that the Cohmad Defendants owed BMIS's investors any duty to disclose its relationship with, and fees received from, BMIS. In any event, such a duty does not exist as a matter of law.

A broker owes no fiduciary duty to the purchaser of a security. *Press v. Chem. Inv. Servs. Corp.*, 166 F.3d 529, 536 (2d Cir. 1999). Any fiduciary obligation that arises is limited only to "the narrow task of consummating the transaction requested." *Id.* Furthermore, a "finder," who brings two parties together owes fiduciary duties to neither of the parties who ultimately consummate a transaction. *Ranco Mgmt. Corp. v. DG Inv. Bank Ltd.*, 17 F.3d 883, 889 (6th Cir. 1994) (applying New York law). Here, the Cohmad Defendants were not "consummating" any transaction as a broker -- the SEC pleads that their role was, at most, an introductory one. (Compl. ¶ 26.) Nor are the Cohmad Defendants alleged to have been anything

more than "finders," who brought investors to Madoff but did not participate in any transactions. As such, the SEC does not -- and cannot -- plead that any fiduciary obligation arose between the Cohmad Defendants and the investors introduced to BMIS.

The Cohmad Defendants also were under no obligation to disclose any compensation or referral fees they received from BMIS. The Second Circuit has explicitly held that a middleman is under no obligation to disclose any incentive compensation he receives:

> [I]t is a fundamental tenet of Anglo-American commercial law that neither a seller nor a middleman has an obligation to disclose his financial incentives for selling a particular commodity.

*United States v. Skelly*, 442 F.3d 94, 97 (2d Cir. 2006). Accordingly, even if BMIS's investors were customers of Cohmad (which the Complaint concedes they were not), "it is settled Second Circuit law that 'no SEC rule requires the registered representatives who deal with [customers] to disclose their own compensation . . .'" *Hoffman v. UBS-AG*, 591 F. Supp. 2d 522, 533 (S.D.N.Y. 2008) (quoting *Skelly*, 442 F.3d at 97) (brokers selling mutual fund shares had no obligation to disclose their revenue-sharing arrangement or an internal incentive scheme offered by the brokerage house).

Finally, Cohmad's incentive compensation arrangement with BMIS was not a material fact that would require disclosure even if a duty existed. A registered representative's compensation is not material when it is not charged to the customer's transaction. *United States v. Alvarado*, No. 01 CR. 156 (RPP), 2001 WL 1631396, at *8 (S.D.N.Y. 2001). Here, the SEC has not alleged that any compensation received by Cohmad was charged to a customer's transaction with BMIS.

Accordingly, to the extent the Section 10(b) claims are predicated upon Cohmad's alleged failure to disclose its relationship with BMIS, these claims should be dismissed for failure to establish that Cohmad was under any duty to disclose this information.

## III.   THE SECTION 17(a) CLAIMS SHOULD BE DISMISSED

The Complaint alleges that the Cohmad Defendants violated sections 17(a)(1) and 17(a)(2)-(3) of the Securities Act. (Compl. ¶¶ 67, 71.) The elements and pleading standards applicable to these claims are essentially the same as for Section 10(b) claims, although no showing of scienter is required for the SEC to obtain an injunction under subsections (a)(2) or (a)(3). *Pentagon Capital Mgmt.*, 612 F. Supp. 2d at 258. Accordingly, as demonstrated in Part II, *supra*, the SEC's First and Second Claims for Relief should be dismissed for: (i) failure to plausibly and particularly plead fraudulent statements or conduct; (ii) failure to establish a "strong inference" of scienter (where applicable); (iii) failure to establish conduct "in connection with" the purchase or sale of a security; and (iv) failure to establish a duty to disclose.

## IV.   THE AIDING AND ABETTING CLAIMS IN THE THIRD, FOURTH, FIFTH, AND SEVENTH CLAIMS FOR RELIEF SHOULD BE DISMISSED

The SEC alleges that the Cohmad Defendants aided and abetted Madoff's violations of (i) Section 10(b) of the Exchange Act and Rule 10b-5, (Compl. ¶ 76); (ii) Sections 206(1) and 206(2) of the Investment Advisers Act (Compl. ¶ 81); (iii) Section 206(4) of the Investment Advisers Act (Compl. ¶ 90); (iv) Section 15(b)(7) of the Exchange Act (Compl. ¶ 104); and (v) Section 15(b)(1) of the Exchange Act (Compl. ¶ 91).[13]

For each of the aiding and abetting claims alleged in the Complaint, the required elements are the same. The SEC must allege facts supporting a plausible inference (1) of the existence of a securities law violation by the primary wrongdoer; (2) of knowledge of the

violation by the aider and abettor; and (3) that the aider and abettor substantially assisted in the primary violation. *Armstrong v. McAlpin*, 699 F.2d 79, 91 (2d Cir. 1983); *Twombly*, 550 U.S. at 569. To satisfy the second element, the SEC must plead that the alleged aider and abettor had "*actual knowledge*" of the primary violation. *Espuelas*, 579 F. Supp. 2d at 471; *SEC v. Cedric Kushner Promotions*, 417 F. Supp. 2d 326, 334-35 (S.D.N.Y. 2007); *SEC v. KPMG LLP*, 412 F. Supp. 2d 349, 382-83 (S.D.N.Y. 2006).[14] The third element requires the SEC to plead plausibly that "acts of the aider and abettor proximately caused the harm . . . on which the primary liability is predicated. . . . Allegations of a 'but for' causal relationship are insufficient." *Bloor v. Carro, Spanbock, Londin, Rodman & Fass*, 754 F.2d 57, 62-63 (2d Cir. 1985).

Here, the SEC has failed to plead specific facts showing either "actual knowledge," "substantial assistance," or both with regard to each aiding and abetting claim subject to this motion to dismiss. The Complaint does not plausibly allege facts showing that the Cohmad Defendants knew of Madoff's primary violations or that their actions proximately caused the harm that resulted from the violations. *See Iqbal*, 129 S. Ct. at 1949. Accordingly, the aiding and abetting claims in the Third, Fourth, Fifth, and Seventh Claims for Relief should be dismissed.

---

[13] The Cohmad Defendants are not moving to dismiss the aiding and abetting claims alleged in the Eighth Claim for Relief, and are moving to dismiss the Sixth Claim for Relief only as to Maurice Cohn.

[14] Some courts in this district have held that the knowledge element of aiding and abetting liability can be satisfied through a showing of recklessness. *See, e.g., SEC v. Treadway*, 430 F. Supp. 2d 293, 339 (S.D.N.Y. 2006). These courts rely on cases decided before the passage of the PSLRA to find that where defendants owe a fiduciary duty to those defrauded, the SEC may state an aiding and abetting claim upon a pleading of recklessness. *Id.* Where no fiduciary duty is owed, actual knowledge is required. *Id.* In *KPMG*, Judge Cote reasoned that given that the PSLRA authorized the SEC to pursue aiding and abetting claims, and that the PSLRA defines knowledge as "actual knowledge," the SEC must allege actual knowledge of the primary violation to plead an aiding and abetting claim. 412 F. Supp. 2d at 382-83. For these reasons, the actual knowledge standard should apply to the SEC's aiding and abetting claims. Even if the Court determines that a pleading of recklessness is sufficient to state an aiding and abetting violation where a fiduciary duty exists, the actual knowledge standard still applies here because the Complaint does not allege that the Cohmad Defendants owed fiduciary duties to persons defrauded by Madoff and BMIS. *See supra*, Part II.C.

**A.** **The Aiding and Abetting Claims Under Section 10(b) of the Exchange Act and Sections 206(1) and 206(2) of the Investment Advisers Act Should Be Dismissed**

The SEC alleges in its Third and Fourth Claims for Relief that the Cohmad Defendants aided and abetted Madoff's violations of Section 10(b) of the Exchange Act and Sections 206(1) and 206(2) of the Investment Advisers Act. These claims sound in fraud and are therefore subject to Rule 9(b). *IIT v. Cornfeld*, 619 F.2d 909, 923 (2d Cir. 1980) (applying Rule 9(b) to aiding and abetting claims); *Espuelas*, 579 F. Supp. 2d at 469 (same). Although the SEC does not specify the primary violations upon which it relies in alleging aiding and abetting liability, the only theory of primary liability supported by the allegations in the Complaint is that Madoff violated Section 10(b) and Sections 206(1) and 206(2) by operating a Ponzi scheme. (Compl. ¶ 18.) Accordingly, to state an aiding and abetting claim, the SEC must plead facts showing that the Cohmad Defendants had actual knowledge of the Ponzi scheme and that the Cohmad Defendants substantially assisted Madoff in operating it. The Complaint fails to allege plausibly either of these elements with the particularity required by Rule 9(b) and stops far "short of the line between possibility and plausibility of entitlement to relief." *Iqbal*, 129 S. Ct. at 1949.

### 1. *The Complaint fails to allege actual knowledge of Madoff's fraud*

The Complaint is devoid of any factual allegations indicating that the Cohmad Defendants had *actual knowledge* of Madoff's fraud. The SEC attempts to mask this deficiency with the conclusory assertion that the Cohmad Defendants "knew, or recklessly disregarded, facts indicating that Madoff was conducting a securities fraud." (Compl. ¶ 53). But even if the supposed "red flags" listed in the Complaint supported a finding of recklessness, and they do not, *see* Part II.B.2, *supra*, there are no pleaded facts indicating *actual* knowledge. For this reason alone, the Complaint fails to state a claim for aiding and abetting violations of Section 10(b) and Sections 206(1) and 206(2).

*SEC v. Espuelas* is instructive. 579 F. Supp. 2d 461. There, the plaintiff alleged that the defendant, a corporate vice president, aided and abetted the corporation's improper revenue recognition in violation of Rule 10b-5. *Id* at 484. The SEC attempted to plead actual knowledge by alleging that the defendant was aware of red flags that should have put him on notice of the corporation's primary violations. *Id.* The Court rejected this theory, holding that although the red flags may "raise a strong inference that [the defendant] was reckless[,] . . . [t]he fact that actual knowledge is the standard for aiding and abetting, however, compels the Court to dismiss the claims against [the defendant] . . . ." *Id.* Dismissal was warranted because the complaint "contain[ed] no allegations that someone with accounting knowledge communicated to [the defendant] that the transactions were being accounted for incorrectly. . . ." *Id.*

Here, as in *Espuelas*, the SEC has, not pleaded the facts showing reckless disregard of red flags (Compl. ¶ 56), let alone any specific facts indicating that the Cohmad Defendants actually knew that Madoff was engaged in the Ponzi scheme. The purported red flags do not even raise a strong inference of recklessness, *see* Part II.A.2, *supra*, let alone of actual knowledge, and are thus insufficient to support an aiding and abetting claim.[15]

### 2. The Complaint fails to allege that the Cohmad Defendants substantially assisted Madoff's fraud

To plead successfully the substantial assistance element of its aiding and abetting claims, the SEC must allege that the Cohmad Defendants' actions were the proximate cause of losses

---

[15] *See also SEC v. Lucent Techs. Inc.*, No. Civ. 04-2315 (WHW), 2005 WL 1206841, at *7 (D.N.J. May 20, 2005) (dismissing claim against defendant for aiding and abetting a corporation's improper revenue recognition because allegation that defendant executed improperly accounted for transactions was not sufficient to establish actual knowledge of improper accounting); *SEC v. Sandifur*, No. C05-1631C, 2006 WL 538210, at *12 (W.D. Wash. Mar. 2, 2006) (dismissing aiding and abetting claims with regard to a "highly atypical" transaction where there was a "total lack of any alleged connection between [the] defendants' involvement in structuring the transaction and their knowledge that it was being done for allegedly illegal purposes.").

suffered by BMIS investors. *Bloor*, 754 F.2d at 62; *Armstrong*, 699 F.2d at 92. Allegations of "but for" causation are insufficient. *Bloor*, 754 F.2d at 63.

The SEC's primary substantial assistance theory appears to be that the Cohmad Defendants furthered Madoff's Ponzi scheme by making, or allowing Madoff to make, false regulatory filings that did not disclose Cohmad's marketing function (Compl. ¶ 41), thus concealing "the workings of BMIS's phantom advisory business from any meaningful inspection or examination." (Compl. ¶ 49.) But even accepting, for the sake of argument, the allegation that Cohmad concealed its marketing function from regulators, the Complaint fails to allege that this concealment was the proximate cause of the harm suffered by BMIS investors. To plead proximate cause, the SEC must allege that losses incurred by BMIS investors were a "direct or reasonably foreseeable result" of the Cohmad Defendants' conduct. *Bloor*, 754 F.2d at 62-63. The Complaint, however, does not and cannot connect the losses suffered by BMIS's investors to Cohmad's allegedly false filings. Even if, as alleged, Cohmad's failure to disclose its relationship with Madoff somehow contributed to BMIS not receiving a "meaningful inspection or examination" (and no facts alleged support that assertion) (Compl. ¶ 49), the SEC does not allege facts showing that such an inspection would have uncovered the fraud or that the lack of such an inspection was the proximate cause of harm suffered by BMIS investors. Indeed, during the relevant time period, the SEC conducted as many as five audits of BMIS, not one of which uncovered Madoff's fraud. (*See* Paradise Decl. Ex. O.) Even after the SEC forced BMIS to register as an investment advisor in 2006, thereby eliminating even any notion of secrecy, Madoff was able to continue his criminal misconduct for more than two more years. (*See id.* Ex. B.)

Nor can the SEC support its aiding and abetting claims by alleging that the Cohmad Defendants substantially assisted the Ponzi scheme by referring investors to BMIS. Plainly, the investors' relationship with BMIS, not with the Cohmad Defendants, proximately caused investors' losses. Given the SEC's allegation that investors who had already decided to invest with Madoff sought out the Cohmad Defendants for an introduction, there is not even a "but-for" causal link between the actions the Complaint attributes to the Cohmad Defendants and the investors' losses in the Ponzi scheme. *See supra* at part II.B.1. And even assuming for the sake of argument that the Cohmad Defendants committed a wrongful act, "an intervening act of a third party, which actively operates to produce harm after the first person's wrongful act has been committed, is a superseding cause which prevents the first person from being liable for the harm which his antecedent wrongful act was a substantial factor in bringing about." *Egervary v. Young*, 366 F.3d 238, 246 (3d Cir. 2004).

In *Cromer Finance Ltd. v. Berger*, 137 F. Supp. 2d 452 (S.D.N.Y. 2001), investors in a fund that engaged in a Ponzi scheme alleged that the fund's clearing broker, Bear Stearns, provided substantial assistance to the Ponzi scheme by extending credit to the fund in violation of margin rules and in violation of the limits described in the fund's offering memorandum.[16] 137 F. Supp. 2d at 471. The court dismissed the aiding and abetting claim against Bear Stearns, reasoning that "[w]hile the Ponzi scheme may only have been possible because of Bear Stearns' actions, or inaction, Bear Stearns' conduct was not a proximate cause of the Ponzi scheme." *Id.* at 472.

---

[16] In *Cromer Finance*, plaintiff brought a claim for aiding and abetting fraud under New York common law. 137 F. Supp. 2d at 466, 67. The elements of aiding and abetting fraud under New York law are the same as the elements of aiding and abetting under the federal securities laws. *Fezzani v. Bear, Stearns & Co.*, 592 F. Supp. 2d 410, 423 (S.D.N.Y. 2008) (listing elements of aiding and abetting fraud under New York law as (i) existence of fraud, (ii) knowledge of fraud by aider and abettor, and (iii) substantial assistance).

The same is true here. At most, the SEC has alleged that Cohmad unknowingly facilitated the Ponzi scheme through its referral efforts (and, as demonstrated above, this is not the case), but this is a far cry from adequately alleging that the Cohmad Defendants proximately caused the Ponzi scheme. *See also Ryan v. Hunton & Williams*, No. 99-CV-5938 (JG), 2000 WL 1375265, at *5 (E.D.N.Y. Sept. 20, 2000) (bank that misrepresented to an investor the financial condition of an entity that turned out to be running a Ponzi scheme did not proximately causes the investor's losses in the Ponzi scheme).

In sum, because the Complaint fails to allege plausibly, with the particularity required by Rule 9(b), that the Cohmad Defendants actually knew of <u>and</u> substantially assisted Madoff's fraud, the aiding and abetting claims in the Third and Fourth Claims for Relief should be dismissed.

**B.    The Claims for Aiding and Abetting Violations of Section 15(b)(7) of the Exchange Act and Rule 206(4)-3 of the Investment Advisers Act Should Be Dismissed**

In the Fifth and Seventh Claims for Relief, the SEC accuses the Cohmad Defendants of aiding and abetting BMIS's and Madoff's failures to disclose certain information to the SEC. These claims, which are also governed by Rule 9(b) because they are grounded in allegations of fraud, should be dismissed because, as with the claims for aiding and abetting violations of Section 10(b) and the Investment Advisers Act, the Complaint fails to allege adequately that the Cohmad Defendants had actual knowledge of, or substantially assisted, the violations.

### *1.    The Rule 15b7-1 claim should be dismissed*

Rule 15b7-1 requires that any person associated with a brokerage firm be registered with the national securities association of which the brokerage firm is a member before such person can effect a securities transaction for a customer. 17 C.F.R. § 240.15b7-1. The Complaint alleges that Maurice and Marcia Cohn were associated persons of BMIS (Compl. ¶ 102), and that

BMIS violated Rule 15b7-1 by failing to register the Cohns with the NASD, and later with FINRA. (*Id.* ¶ 100-01.) The Complaint further alleges that the Cohmad Defendants aided and abetted the violation.

This claim should be dismissed because the Complaint fails to allege plausibly that the Cohmad Defendants substantially assisted BMIS's Rule 15b7-1 violations. To be clear, the SEC's claim is not that the Cohns are liable because they are not registered as associated persons of BMIS. Rather, the SEC is seeking to hold the Cohmad Defendants liable for BMIS's purported registration violations. This theory of secondary liability is completely undermined, however, by the SEC's allegations that "Cohmad was controlled by . . . BMIS" (*Id.* ¶ 36), that "Madoff was considered the 'Boss' by Cohmad representatives" (*Id.* ¶ 32), and that "Madoff exercised actual control over Cohmad's operations" (*Id.* ¶ 32). Given these allegations of Madoff's and BMIS's domination and control of Cohmad, the notion that the Cohmad Defendants proximately caused BMIS's purported failure to register Cohmad representatives is not only implausible -- it is far-fetched.

Furthermore, the SEC does not allege any specific action taken by the Cohmad Defendants to substantially assist BMIS's Rule 15b7-1 violations. There is only the allegation that the Cohmad Defendants were "each aware that BMIS did not register them," and "thus knowingly provided substantial assistance to the violations." (*Id.* ¶¶ 102-03.) But the Second Circuit has held that allegations of knowledge combined with inaction do not support a claim for aiding and abetting liability. *See Armstrong*, 699 F.2d at 92 ("Awareness and approval, standing alone, do not constitute substantial assistance."). Rather, "inaction can create aider and abettor liability only when there is a conscious or reckless violation of an independent duty to act." *IIT*, 619 F.2d at 927 (accountant did not substantially assist false statements in a prospectus because

it had no independent duty to correct portions of the prospectus other than the financial statement it prepared).  Here, the SEC has not alleged that the Cohmad Defendants had any duty to correct BMIS's regulatory filings or to ensure that BMIS complied with Rule 15b7-1.  Accordingly, the Rule 15b7-1 claims should be dismissed.

### 2.    *The Rule 206(4)-3 claim should be dismissed*

Rule 206(4)-3 requires in certain circumstances that a solicitor working on behalf of an investment adviser provide a copy of the investment adviser's brochure and a separate written disclosure document that explains specific details concerning the relationship between the client, the solicitor, and the investment adviser.  17 C.F.R. § 275.206(4)-3(a)(2)(iii).  The SEC alleges that the Cohmad Defendants did not provide BMIS investors with the required written disclosure, (Compl. ¶ 88), but does not charge the Cohmad Defendants with a primary violation.  Rather, the Complaint alleges only that the Cohmad Defendants substantially assisted BMIS's violation of Rule 206(4)-3.

This claim should be dismissed for the same reasons as the Rule 15b7-1 claim.  The SEC fails to allege that the Cohmad Defendants had any duty to ensure that BMIS made the required disclosures to investors, and the Complaint's allegations of BMIS's and Madoff's domination and control of the Cohmad Defendants undermine the charge that the Cohmad Defendants proximately caused BMIS's disclosure violations.  Moreover, to the extent this claim is predicated on BMIS's failure to distribute the required information to its customers, there are no facts indicating that the Cohmad Defendants had actual knowledge of this failure.  This claim should therefore be dismissed for this independent reason as well.

**C.    The SEC Lacks Authority to Impose a Monetary Penalty Under Section 209(e) of the Investment Advisers Act for Aiding and Abetting Violations**

Because civil monetary penalties are available under section 209(e) of the Investment Advisers Act only against primary violators of the Act, the SEC's request for civil penalties as a remedy for aiding and abetting claims exceeds its statutory authority and should be dismissed.

Section 209(e) of the Investment Advisors Act provides that "[w]henever it shall appear to the [SEC] that any person has violated any provision of [the Investment Advisers Act] . . . the [SEC] may bring an action in a United States district court to seek, and the court shall have jurisdiction to impose, upon a proper showing, a civil penalty to be paid by the person who committed such violation. 15 U.S.C. § 80b-9(e)(1). But, "[s]ection 209(e) of the [Investment] Advisers Act does not authorize the SEC to seek, or grant this Court jurisdiction to impose, monetary penalties upon [a Defendant] for his aiding and abetting violations of that Act." *SEC v. Bolla*, 550 F. Supp. 2d 54, 63 (D.D.C. 2008). In *Bolla*, the court compared the text of section 209(e) to a comparable provision in the same Congressional act, which explicitly provided for monetary penalties for aiding and abetting liability. Relying on the well-settled rule that "where Congress includes particular language in one section of a statute but omits it in another section of the same Act, it is generally presumed that Congress acts intentionally and purposely in the disparate inclusion or exclusion," *Russello v. United States*, 464 U.S. 16, 23 (1983), the court reasoned that the omission of an explicit authorization to impose monetary penalties on aiders and abettors under section 209(e) prevents the imposition of such penalties. *Id.* at 59. The well-reasoned decision in *Bolla* supports dismissal of the SEC's request for civil penalties in connection with its Investment Advisors Act claims.

### D. The Section 15(b)(1) Claim Against Maurice Cohn Should Be Dismissed

The SEC alleges in its Sixth Claim for Relief that Maurice Cohn aided and abetted Cohmad's purported violation of section 15(b)(1) of the Exchange Act and Rule 15b3-1. (Compl. ¶ 97.) Rule 15b3-1 requires a broker-dealer to file an amendment to Form BD if the information on the Form BD or amendment thereto becomes inaccurate. 17 C.F.R. § 240.15b3-1. According to the Complaint, Maurice Cohn filed Forms BD and amendments that failed to disclose that Cohmad was referring customers to BMIS and that BMIS was under common control with Cohmad. (Compl. ¶ 95.) As with other claims in the Complaint, the particularity requirements of Rule 9(b) apply to this claim for relief. *Rombach*, 355 F.3d at 171 (claims predicated upon averments of fraud are subject to Rule 9(b), regardless of whether fraud is an element of the claim). The allegations concerning Maurice Cohn with regard to his primary and aiding and abetting liability fall far short of the exacting particularity standard of Rule 9(b) because the SEC has failed to allege the "what, where, when, and how" of the fraud. *Antigenics Inc. v. U.S. Bancorp Piper Jaffray, Inc.*, No. Civ. 0971 (RCC), 2004 WL 51224, at *3 (S.D.N.Y. Jan. 5, 2004).

First, the Complaint fails to make the specific allegations required to plead that Maurice Cohn is primarily liable for violations of Rule 15b3-1. The Complaint does not allege *when* Maurice Cohn allegedly filed Forms BD, nor does it identify *what* specific Form BD Maurice Cohn filed. The SEC only asserts in a conclusory fashion that "Maurice Cohn . . . filed misleading forms with the SEC on behalf of Cohmad." (Compl. ¶ 96.) Such an allegation fails to satisfy Rule 9(b), and the claim should therefore be dismissed for this reason alone.

Second, the SEC fails to plead adequately aiding and abetting liability against Maurice Cohn. The SEC alleges that "Maurice Cohn . . . knowingly provided substantial assistance to the violations of . . . Rule 15b3-1." This is an exemplar of the type of bare legal conclusion that

*Twombly* holds need not be accepted as true, *Twombly*, 550 U.S. at 555, and is unsupported by any factual detail that would explain *how* Maurice Cohn allegedly "knowingly provided substantial assistance" to the commission of the violations charged. Accordingly, the claim against Maurice Cohn for aiding and abetting a violation of section 15(b)(1) and Rule 15b3-1 should be dismissed.

## CONCLUSION

For the foregoing reasons, the SEC's First, Second, Third, Fourth, Fifth, and Seventh Claims for Relief should be dismissed, and the Sixth Claim for relief should be dismissed as to Maurice Cohn.

Respectfully Submitted,

VINSON & ELKINS LLP


By: s/ Steven Paradise
    Clifford Thau
    Steven Paradise
666 Fifth Avenue, 26th Floor
New York, New York 10103
Tel: (212) 237-0000
Fax: (212) 237-0100

*Attorneys for Defendants*
*Cohmad Securities Corporation,*
*Maurice J. Cohn and Marcia B.*
*Cohn*