**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
----------------------------------------------------------------------------------x

SECURITIES AND EXCHANGE COMMISSION,                    :
                                                                         :
                        Plaintiff,                              :
                                                                         :        **09 Civ. 5680 (LLS)**
            - against -                                       :        **ECF Case**
                                                                         :
COHMAD SECURITIES CORPORATION,              :
MAURICE J. COHN, MARCIA B. COHN, and      :
ROBERT M. JAFFE,                                          :
                        Defendants.                          :
                                                                         :
----------------------------------------------------------------------------------x


**PLAINTIFF'S MEMORANDUM OF LAW IN OPPOSITION TO
DEFENDANTS COHMAD SECURITIES CORPORATION,
MAURICE J. COHN, AND MARCIA B. COHN'S MOTION TO DISMISS**

Vincent P. Sherman
Alexander M. Vasilescu
Israel Friedman
Preethi Krishnamurthy
Securities and Exchange Commission
New York Regional Office
3 World Financial Center
New York, NY 10281
(212) 336-1100
Attorneys for Securities
    and Exchange Commission

October 2, 2009

# TABLE OF CONTENTS

PRELIMINARY STATEMENT ................................................................1

SUMMARY OF THE COMPLAINT................................................................2

ARGUMENT ................................................................6

I.    STANDARDS ON THE MOTION TO DISMISS ................................................6

II.   THE COMPLAINT ADEQUATELY PLEADS SECURITIES FRAUD. ..........................8

    A.    The Complaint Adequately Pleads Fraudulent Misrepresentations, Omissions and Deceptive Conduct by the Cohmad Defendants. ...........................9

    B.    The Complaint Adequately Pleads Scienter. ........................................14

        1.    Motive and Opportunity...........................................................14

        2.    Conscious Misbehavior or Recklessness ....................................16

    C.    The Complaint Adequately Pleads Conduct That is "In Connection With" the Purchase or Sale of Securities.....................................19

III.  THE COMPLAINT ADEQUATELY PLEADS THAT THE COHMAD DEFENDANTS AIDED AND ABETTED MADOFF'S VIOLATIONS OF VARIOUS EXCHANGE ACT AND ADVISERS ACT PROVISIONS. .........................21

    A.    The Complaint Adequately Alleges That the Cohmad Defendants Aided and Abetted Madoff's Violations of Exchange Act Section 10(b) and Rule 10b-5 and Advisers Act Sections 206(1) and 206(2). ..........................22

        1.    The Complaint Adequately Alleges that Cohmad and the Cohns Had Knowledge of Madoff's Fraud. ..................................22

        2.    The Complaint Adequately Alleges that Cohmad and the Cohns Substantially Assisted Madoff's Fraud. ............................25

    B.    The Complaint Adequately Alleges That the Cohmad Defendants Aided and Abetted Madoff's Violations of Exchange Act Section 15(b)(7) and Rule 15b7-1, and Advisers Act Section 206(4) and Rule 206(4)-3. ..............28

        1.    Exchange Act Section 15(b)(7) and Rule 15b7-1 ......................28

        2.    Advisers Act Section 206(4) and Rule 206(4)-3........................30

i

IV.    THE COMPLAINT ADEQUATELY ALLEGES THAT MAURICE COHN VIOLATED EXCHANGE ACT SECTION 15(B)(1) AND AIDED AND ABETTED MADOFF'S VIOLATIONS OF EXCHANGE ACT SECTION 15(B)(1). ......................32

V.    THIS COURT HAS AUTHORITY TO IMPOSE CIVIL PENALTIES UNDER SECTION 209(E) OF THE ADVISERS ACT FOR AIDING AND ABETTING. ..........34

CONCLUSION.................................................................................................................38

# TABLE OF AUTHORITIES

**Cases**          **Page(s)**

*Aaron v. SEC*, 446 U.S. 680 (1980) ................................................................. 9

*ABF Capital Management v. Askin Capital Management, L.P.*,
     957 F. Supp. 1308 (S.D.N.Y. 1997) ...................................................... 16

*Accousti v. Wolas*, No. 95-CV-5267 (JG), 1996 WL 1088218 (E.D.N.Y. Oct. 10, 1996) .......... 27

*Acito v. IMCERA Group*, 47 F.3d 47, 52 (2d Cir. 1995) ........................................ 14, 38

*Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128 (1972) ......................... 20

*Armstrong v. McAlpin*, 699 F.2d 79 (2d Cir. 1983) .............................................. 26

*Ashcroft v. Iqbal*, 129 S. Ct. 1937 (2009) ..................................................... 7

*Barnhart v. Peabody Coal Co.*, 537 U.S. 149 (2003) .......................................... 36-37

*Basic Inc. v. Levinson*, 485 U.S. 224 (1988) ................................................... 11

*Baxter v. A.R. Baron & Co.*, No. 94 Civ. 3913(JGK),
     1996 WL 586338 (S.D.N.Y. Oct. 11, 1996) .............................................. 15

*In re Bayou Hedge Fund Litigation,* 534 F. Supp. 2d 405 (S.D.N.Y. 2007), *aff'd*,
     *South Cherry Street, LLC v. Hennesse Group LLC,* 573 F.3d  98 (2d Cir. 2009) ............ 19

*Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007) ........................................... 7

*Berko v. SEC*, 316 F.2d 137 (2d Cir. 1963) .................................................... 26

*BHC Interim Funding, L.P. v. Finantra Capital, Inc.*,
     283 F. Supp. 2d 968 (S.D.N.Y. 2003) .................................................. 13, 21

*Bloor v. Carro, Spanbock, Londin, Rodman & Fass*, 754 F.2d 57 (2d Cir. 1985) ................. 26

*In re Centerline Holdings Co. Sec. Litig.,* No. 08 Civ. 505(SAS),
     2009 WL 2391768 (S.D.N.Y. Aug. 4, 2009) ............................................... 11

*Central Bank of Denver, N.A. v. First Interstate Bank of Denver*, 511 U.S. 164 (1994) ....... 25, 36

*Chill v. General Electric Co.*, 101 F.3d 263 (2d Cir. 1996) ................................... 17

*City of New York v. Beretta U.S.A. Corp.*, 524 F.3d 385 (2d Cir. 2008) ...................................... 35

*Clay v. United States*, 537 U.S. 522 (2003) ................................................................................ 36

*Core-Mark International Corp. v. Commonwealth Insurance Co.*,
    No. 05 Civ. 0183(WHP), 2006 WL 2501884 (S.D.N.Y. Aug. 30, 2006)....................... 7-8

*Cortec Industries, Inc. v. Sum Holding L.P.*, 949 F.2d 42 (2d Cir. 1991) .................................... 38

*Cromer Finance Ltd. v. Berger*, 137 F. Supp. 2d 452 (S.D.N.Y. 2001)........................................ 27

*EEOC v. Commercial Office Products Co.*, 486 U.S. 107 (1988)................................................. 35

*Egervary v. Young*, 366 F.3d 238 (3rd Cir. 2004) ....................................................................... 27

*Emergent Capital Inv. Mgmt., LLC v. Stonepath Group, Inc.*, 343 F.3d 189 (2d Cir. 2003) ......... 6

*Harrison v. Rubenstein*, No. 02 Civ. 9356(DAB),
    2007 WL 582955 (S.D.N.Y. Feb. 26, 2007)....................................................................... 10

*Hart v. Internet Wire, Inc.*, 145 F. Supp. 2d 360 (S.D.N.Y. 2001)................................................ 12

*JP Morgan Chase Bank v. Winnick*, 406 F.Supp.2d 247 (S.D.N.Y. 2005) ................ 25-27, 29, 33

*Levitt v. Bear, Stearns & Co.*, 340 F.3d 94 (2d Cir. 2003) ............................................................ 7

*Morgan Guaranty Trust Co. of New York v. Tisdale*, No. 95 Civ. 8023 (BSJ),
    1996 WL 544240 (S.D.N.Y. Sept. 25, 1996)...................................................................... 35

*In re Morgan Stanley and Van Kampen Mutual Funds Securities Litigation*,
    No. 03 Civ. 8208(RO), 2006 WL 1008138 (S.D.N.Y. Apr. 18, 2006)............................... 16

*Nigerian National Petroleum Corp. v. Citibank, N.A.*, No. 98 Civ. 4960(MBM),
    1999 WL 558141 (S.D.N.Y. July 30, 1999) ........................................................................ 25

*In re Novagold Resources, Inc. Securities Litigation*, No. 08 Civ. 7041 (DLC),
    2009 WL 1575220 (S.D.N.Y. June 5, 2009) ........................................................................ 7

*Novak v. Kasaks*, 216 F.3d 300 (2d Cir. 2000) ................................................. 7, 10, 14, 17, 19, 33

*In re Philip Services Corp. Securities Litigation*, 383 F. Supp. 2d 463 (S.D.N.Y. 2004) ........... 18

*Press v. Chemical Inv. Servs. Corp.*, 166 F.3d 529 (2d Cir. 1999)............................................... 20

*Ross v. Bolton*, 904 F.2d 819 (2d Cir.1990)................................................................................... 7

*Ruotol v. City of New York*, 514 F.3d 184, 188 (2d Cir. 2008).................................................... 6

*Schlifke v. Seafirst Corp.*, 866 F.2d 935 (7th Cir. 1989)............................................................ 11

*In re Scholastic Corp. Sec. Litig.*, 252 F.3d 63 (2d Cir. 2001) ...................................................... 8

*Scone Investments, L.P. v. American Third Market Corp.*, No. 97 CIV. 3802 (SAS),
    1998 WL 205338 (S.D.N.Y. Apr. 28, 1998)................................................................... 10

*SEC v. Banner Fund International*, 211 F.3d 602 (D.C. Cir. 2000)................................................ 9

*SEC v. Bolla*, 550 F. Supp. 2d 54 (D.D.C. 2008) ..............................................................34, 36-37

*SEC v. Capital Gains Research Bureau, Inc.*, 375 U.S. 180 (1963)............................................. 26

*SEC v. Cedric Kushner Promotions, Inc.*, 417 F. Supp. 2d 326, 334 (S.D.N.Y. 2006) .............. 22

*SEC v. Collins & Aikman Corp.*, 524 F. Supp. 2d 477 (S.D.N.Y. 2007)....................................... 9

*SEC v. Credit Bancorp, Ltd.*, 386 F.3d 438 (2d Cir. 2004) ....................................................... 26

*SEC v. DiBella*, No. Civ. 304CV1342EBB, 2005 WL 3215899 (D. Conn. Nov. 29, 2005)........ 22

*SEC v. DiBella*, Nos. 08-1673-cv(L) & 08-3797-cv(CON) (2d Cir. argued May 14, 2009)........ 34

*SEC v. Dorozhko*, 574 F.3d 42 (2d Cir. 2009).......................................................................... 11

*SEC v. Dunn*, 587 F. Supp. 2d 486 (S.D.N.Y. 2008)................................................................. 14

*SEC v. Espuelas*, 579 F. Supp. 2d 461 (S.D.N.Y. 2008) ........................................................24-25

*SEC v. Fehn*, 97 F.3d 1276 (9th Cir. 1996) .............................................................................. 36

*SEC v. First Jersey Securities, Inc.*, 101 F.3d 1450 (2d Cir. 1996)......................................... 9, 20

*SEC v. George*, 426 F.3d 786 (6th Cir. 2005).......................................................................... 18

*SEC v. Kenton Capital, Ltd.*, 69 F. Supp. 2d 1 (D.D.C. 1998) .................................................... 9

*SEC v. KPMG LLP*, 412 F. Supp. 2d 349 (S.D.N.Y. 2006) ...................................................9, 22

*SEC v. Lucent Technologies Inc.*, No. CIV. 04-2315 (WHW),
    2005 WL 1206841 (D.N.J. May 20, 2005)................................................................24-25

*SEC v. Lybrand*, 200 F. Supp. 2d 384 (S.D.N.Y. 2002) ............................................................ 36

*SEC v. Monarch Funding Corp.*, 192 F.3d 295 (2d Cir. 1999) ...................................................... 9

*SEC v. Moran*, 922 F. Supp. 867 (S.D.N.Y. 1996)........................................................ 32

*SEC v. Parnes*, No. 01 CIV 0763 LLS THK,
2001 WL 1658275 (S.D.N.Y. Dec. 26, 2001) ........................................................ 6, 14, 20

*SEC v. Pentagon Capital Management PLC*, 612 F. Supp. 2d 241 (S.D.N.Y. 2009) ...... 14, 21, 25

*SEC v. Power,* 525 F. Supp. 2d 415 (S.D.N.Y. 2007) .................................................... 9

*SEC v. Sandifur*, NO. C05-1631C, 2006 WL 538210 (W.D. Wash. Mar. 2, 2006) ..................... 25

*SEC v. Stanard*, No. 06 Civ. 7736 (GEL), 2009 WL 196023 (S.D.N.Y. Jan. 27, 2009)......... 21-22

*SEC v. Terezakis*, No. 95 CV 2533(NG), 1997 WL 720760 (E.D.N.Y. Sept. 30, 1997) ............. 10

*SEC v. Treadway*, 430 F. Supp. 2d 293 (S.D.N.Y. 2006)............................................... 25

*SEC v. U.S. Environmetal, Inc.*, 155 F.3d 107 (2d Cir. 1998)........................................ 14

*SEC v. U.S. Environmetal, Inc.*, 82 F. Supp. 2d 237 (S.D.N.Y. 2000)................................ 10

*SEC v. Universal Express, Inc.*, 475 F. Supp. 2d 412 (S.D.N.Y. 2007) ............................... 9

*SEC v. Washington Investment Network*, 475 F.3d 392 (D.C. Cir. 2007) .................................. 22

*SEC v. Zandford*, 535 U.S. 813 (2002) ................................................................. 20

*SEC v. Zwick*, No 03 Civ. 2742 (JGK), 2007 WL 831812 (S.D.N.Y. Mar. 16, 2007)................ 25

*Semple v. Eyeblaster, Inc.*, No. 08 Civ. 9004 (HB),
2009 WL 1457163 (S.D.N.Y. May 26, 2009) ........................................................ 6, 18

*Shields v. Cititrust Bank Corp.*, 25 F.3d 1124 (2d Cir.1994) ....................................... 16

*Sofi Classic S.A. de C.V. v. Hurowitz*, 444 F.Supp.2d 231 (S.D.N.Y. 2006)......................... 12-13

*Stoneridge Investment Partners, LLC v. Scientific-Atlanta, Inc.*, 552 US 148,
128 S. Ct. 761 (2008)............................................................................. 36

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308 (2007) ............................... 14

*Thomas H. Lee Equity Fund V, L.P. v. Mayer Brown, Rowe & Maw LLP,*
612 F. Supp. 2d 267 (S.D.N.Y. 2009)............................................................... 10-11, 13

*In re Time Warner Securities Litigation*, 9 F.3d 259, 268 (2d Cir. 1993) .................................... 11

*UBS Asset Management (New York) Inc. v. Wood Gundy Corp.*,
    914 F. Supp. 66 (S.D.N.Y. 1996).................................................................................... 13

*United States v. Bryser*, 954 F.2d 79 (2d Cir. 1992) ...................................................... 37

*United States v. Councilman*, 418 F.3d 67 (1st Cir. 2005) ............................................ 37

*United States v. Dauray*, 215 F.3d 257 (2d Cir. 2000) .................................................. 35

*United States v. Finnerty*, 533 F.3d 143, 148 (2d Cir. 2008).......................................... 11

*United States v. Naftalin*, 441 U.S. 768 (1979) ....................................................... 19-20

*Vladimir v. Bioenvision Inc.*, 606 F. Supp. 2d 473 (S.D.N.Y. 2009)........................... 7, 18

*In re Ward*, SEC Release No. 226, 2003 WL 21026952 (May 8, 2003) ...................... 29

*Wyndham Assocs. v. Bintliff*, 398 F.2d 614 (2d Cir. 1968)........................................... 35

## Statutes and Rules                                               Page(s)

Securities Act of 1933 §17(a), 15 U.S.C. § 77q(a) ......................................................... 9

Securities Exchange Act of 1934 ("Exchange Act") §10(b), 15 U.S.C. § 78j(b)................. passim

Exchange Act § 15(b), 15 U.S.C. § 78o(b)............................................................28-29, 32-33

Exchange Act § 21(d), 15 U.S.C. § 78u(d)...............................................................35-36

Exchange Act § 21D(b), 15 U.S.C. § 78u-4(b)............................................................. 14

Investment Advisers Act of 1940 ("Advisers Act") § 203, 15 U.S.C. § 80b-3 ......................35-36

Advisers Act § 206, 15 U.S.C. § 80b-6 ......................................................22, 26, 28, 30-32

Advisers Act § 209(d), 15 U.S.C. § 80b-9(d) ...........................................................34-36

Advisers Act § 209(e), 15 U.S.C. § 80b-9(e)............................................................34-37

Advisers Act § 214, 15 U.S.C. § 80b-14 ..................................................................34-35

Exchange Act Rule 10b-5, 17 C.F.R. § 240.10b-5 ............................................................ passim

Exchange Act Rule 15b3-1, 17 C.F.R. § 240.15b3-1 .............................................................. 32-33

Exchange Act Rule 15b7-1, 17 C.F.R. § 240.15b7-1 ............................................................ 28

Advisers Act Rule 206(4)-3, 17 C.F.R. § 275.206(4)-3 ................................................... 28, 30-32

**Rules of Procedure**                                                                          **Page(s)**

Federal Rule of Civil Procedure 8(a) ............................................................................ 7

Federal Rule of Civil Procedure 9(b) ...................................................................... passim

Federal Rule of Civil Procedure 15(a) ....................................................................... 37

Plaintiff Securities and Exchange Commission (the "Commission") respectfully submits this memorandum of law in opposition to the motion to dismiss filed by Defendants Cohmad Securities Corporation ("Cohmad"), Maurice J. Cohn and Marcia B. Cohn (collectively, "the Cohmad Defendants").[1]  For the reasons set forth below, the Cohmad Defendants' motion to dismiss should be denied.

## PRELIMINARY STATEMENT

A constant stream of new money is the lifeblood of any Ponzi scheme, and certainly for one as large and far-reaching as the fraud at Bernard L. Madoff Investment Securities LLC ("BMIS").  For more than two decades, the Cohmad Defendants were essential to the frauds and violations committed by Bernard L. Madoff ("Madoff") and BMIS, channeling billions of dollars in investor funds into the fraud.  In exchange, Madoff and BMIS paid the Cohmad Defendants a kickback of over $100 million for the referrals and the Cohmad Defendants continued bringing in new money and keeping their arrangement with Madoff secret.  What these defendants knew was that Madoff's investment "program" required a constant infusion of fresh cash, and that he paid them enormous sums of money to keep the cash flowing to him.

Rather than disclose to investors that Madoff was eager for new money, the Cohmad Defendants helped mislead investors into believing that Madoff was too successful to need new investment and that he would only begrudgingly allow a privileged few (and well-connected) investors to give him money to manage.  The Cohmad Defendants hid the fact that they were essentially BMIS's in-house marketing arm, charged with scouring country clubs and other haunts of the wealthy for new sources of funds.  For many years the Cohmad Defendants hid

---

[1]     The Cohmad Defendants have not moved to dismiss the aiding and abetting claims alleged in the Eighth Claim for Relief, and have only moved to dismiss the Sixth Claim for Relief as to Maurice Cohn.

from investors, from regulatory filings and from the public that their primary function (and over 90% of their revenues in some years) was to solicit new investments into BMIS. Indeed, the Complaint alleges that they lied in regulatory filings with the Commission to conceal the vast number of accounts they referred to Madoff.

Despite this ongoing, pervasive and systematic conduct, the Cohmad Defendants, who for decades were housed within BMIS's office space and worked just a few steps from Madoff's office, assert in their motion that these allegations are somehow deficient. They assert, among other things, that more particularity is called for and that the allegations in the Commission's complaint do not support an inference of fraud by the Cohmad Defendants or of their aiding and abetting Madoff's fraud. Their motion is without merit. The allegations in the Complaint are adequately detailed and particular and clearly and directly state actionable claims. The Cohmad Defendants fully understand the charges against them and the factual allegations underlying those charges. Therefore, this Court should deny their Motion to Dismiss.

## SUMMARY OF THE COMPLAINT

Over the course of two decades, the Cohmad Defendants brought billions of dollars and hundreds of accounts into Madoff's Ponzi scheme. (¶¶ 1-2; 6; 21; 29.)[2] Cohmad and those associated with Cohmad (including the individual defendants) solicited and referred investors who opened more than 800 accounts; Maurice Cohn brought hundreds of investors into BMIS, and Marcia Cohn brought in at least 40 accounts. (¶¶ 29, 51-52.) Defendant Robert Jaffe raised more than $1 billion from more than 150 investors. (¶¶ 5, 58-59.) As in any Ponzi scheme, new investors and new investments were essential to perpetuating Madoff's scheme, and Madoff paid

---

[2]     References to "¶ __" are to Plaintiff's Complaint, filed June 22, 2009.

the Cohmad Defendants and Jaffe many millions of dollars for the victims they referred.  (¶¶ 1-2.)  Cohmad received more than $100 million in referral fees from Madoff.  (¶ 21.)

Unlike the victims they referred, Maurice and Marcia Cohn were experienced and sophisticated securities industry professionals.[3]  Maurice "Sonny" Cohn is Chairman, Chief Executive Officer and a principal of Cohmad.  (¶ 15.)  He has substantial experience in the securities industry:  before he founded Cohmad in 1985, he was a principal at the brokerage firm Cohn, Delaire & Kaufman.  (*Id*.)  He is also a former member of the New York Stock Exchange and specialist at the American Stock Exchange.  (*Id*.)  Marcia Cohn, his daughter, is Cohmad's President, Chief Operating Officer, Chief Compliance Officer and a principal.  (¶ 16.)  Before joining Cohmad in 1988, she worked at another registered broker-dealer; and while at Cohmad she was at times registered as associated with three other broker-dealers.  (*Id*.)  She has taken and passed numerous licensing examinations required for securities professionals, including Series 4, 7, 24, 55, and 63.  (*Id*.)

Their firm, Cohmad, was created and registered as a broker-dealer by Madoff and Maurice Cohn in 1985.  (¶ 14.)  Cohmad held itself out as an introducing retail broker that cleared through Bear Stearns (¶ 37), but in truth Cohmad was nothing more than a part of BMIS.  (¶ 2.)  Although Madoff and his brother, Peter, owned only 24 percent of Cohmad, they effectively controlled all of it. (¶¶ 31-32.)  Cohmad's offices were embedded within BMIS's offices on the 18th and 19th floors of the Lipstick Building; some Cohmad representatives even sat on the BMIS trading desk.  (¶ 33.)  Cohmad and BMIS shared everything from reception to photocopiers to bathrooms and, before approximately 2002, Cohmad's payroll and health benefits plans were integrated with BMIS and Cohmad shared email servers with BMIS.  (*Id*.)

---

[3]    Jaffe, too, was an experienced and sophisticated securities industry professional.  (¶ 17)

Both Maurice and Marcia Cohn are "representatives" of Cohmad, as is Jaffe. (¶ 15-17.) The Cohns held themselves out as registered and associated with Cohmad, but they were also associated with BMIS. (¶ 45.)

Cohmad never disclosed the true nature of the work it did for Madoff, nor did it disclose the commissions it received from Madoff. (¶¶ 21, 28, 38.) From its inception, Madoff controlled Cohmad and used it as his stealth, in-house marketing arm. (¶¶ 20, 22, 28.) Madoff's marketing strategy was to cultivate an aura of exclusivity—that his investments were open only to the privileged few—and the corresponding appearance that he did not need any marketing or any solicitation to obtain new investments. (¶¶ 3, 23.) This was false; the truth was that Madoff was eager for new investors and new money to fund his Ponzi scheme. (¶¶ 6, 53.) To bring this new money in, the Cohmad Defendants targeted affluent investors who were unlikely to notice unusual aspects of their Madoff investment, meeting with them in exclusive milieus such as New Jersey golf clubs and the Palm Beach County Club. (¶¶ 3, 26.) As part of this marketing effort, Cohmad representatives projected themselves as individuals who had become wealthy through investing with Madoff and BMIS. (¶ 26.) This, too, was false. The Cohmad Defendants did not provide prospective investors with required disclosures describing, among other things, the nature of their relationship with BMIS and the terms of their compensation arrangement, nor did they disclose the fact that Cohmad was controlled by BMIS to those prospective investors at the time of the solicitation or referral. (¶¶ 84-86.)

Although they told no one, the Cohmad Defendants generated the vast majority of their revenue by referring investors to Madoff's Ponzi scheme. (¶¶ 3, 22, 34.) Cohmad's compensation arrangement with Madoff was as unusual as it was lucrative: Madoff paid Cohmad in monthly installments, based on a percentage of the investor capital that Cohmad had

referred and that remained at BMIS. (¶¶ 27, 55.)  Because this was a more complicated

calculation than merely paying a commission based on a percentage of the referral at the time of

the referral, Cohmad maintained a database that tracked the capital in Madoff's scheme on a per-

investor basis.  (¶ 53.)  Beginning in 2002, Madoff changed this arrangement for the accounts

brought in by Maurice Cohn and began paying him a flat fee of $2 million per year, wholly

unrelated to the capital he brought in.  (¶¶ 34, 57.)  The unusual way that Madoff compensated

the Cohmad Defendants did or should have indicated that any profits generated by Madoff were

fictitious.  (¶¶ 54-56.)  And none of this was ever disclosed.

　　　In finding and referring investors, the Cohmad Defendants understood that Madoff

generally did not want sophisticated investors who might ask "too many questions," such as

finance or banking professionals. (¶¶ 6, 48.)  This was a clear red flag, and there were others,

such as:

- Madoff directed Cohmad and the Cohns to maintain a cloud of secrecy about how
  BMIS was marketed, banning all written marketing materials, cold calls, and
  emails with potential clients;

- Madoff was eager to secure new investors and to pay handsomely for them, while
  projecting an image of exclusivity and indifference to new money; and

- Madoff had insisted for decades on keeping the existence of his multi-billion
  dollar advisory business concealed from regulators and others.  (¶ 53.)

　　　Consistent with its misrepresentations to investors, the Cohmad Defendants made false

filings on Cohmad's behalf that concealed Cohmad's extensive dealings with BMIS and the fact

that Cohmad's representatives were engaging in activity associated with BMIS and acting on

BMIS's behalf.  (¶ 4.)  In the Forms BD it filed with the Commission, it concealed the enormous

number of accounts that it had referred to BMIS and minimized the extent of its referral

business. (¶¶ 39-41.)  Cohmad likewise lied and misled in the financial statements it filed with

the Commission and in its internal books and records, and it maintained no books and records

regarding its referrals, concealing the revenues it derived from Madoff investors.  (¶¶ 42-44.)
These lies put their securities licenses at risk, but the Cohns were willing to do so to continue
working for Madoff.  (¶ 53.)

The Cohmad Defendants brought in investors while knowing, or recklessly disregarding,
facts indicating BMIS and Madoff were engaged in securities fraud.  (¶ 50.)  They spoke with
prospective investors, agreed to try to put in a good word, and assisted and arranged the opening
of investors' accounts with BMIS.  (¶ 26.)  Even after Cohmad brought customers into BMIS,
Cohmad and its representatives maintained relationships with investors.  (¶ 35.)  Customers
brought into BMIS by Cohmad called Cohmad for all sorts of questions relating to their BMIS
accounts, such as what the returns were, whether their investments were "in the market" at a
particular time, how to read the complex BMIS statements, or how to convert direct accounts to
trust accounts.  (*Id.*)  The Cohns provided investors with answers to their inquiries, even
checking with Madoff or employees on BMIS's 17th floor to find out the answers.  (*Id.*)

## ARGUMENT

### I.    STANDARDS ON THE MOTION TO DISMISS

On a motion to dismiss under Rule 12(b)(6), "[d]ismissal is warranted only where it
appears beyond doubt that the plaintiff can prove no set of facts which would entitle him to
relief."  *SEC v. Parnes*, No. 01 CIV 0763 LLS THK, 2001 WL 1658275, at * 3 (S.D.N.Y. Dec.
26, 2001) (quotation and citation omitted).  A court must "accept the facts alleged in the
complaint as true, even if doubtful, and draw all reasonable inferences in favor of the nonmoving
party."  *Semple v. Eyeblaster, Inc.*, No. 08 Civ. 9004 (HB), 2009 WL 1457163, at *3 (S.D.N.Y.
May 26, 2009) (citing *Ruotol v. City of New York*, 514 F.3d 184, 188 (2d Cir. 2008)).  *See also
Emergent Capital Inv. Mgmt., LLC v. Stonepath Group, Inc.*, 343 F.3d 189, 194 (2d Cir. 2003)

(dismissal is appropriate only "if, accepting all the allegations in the Complaint as true and drawing all reasonable inferences in plaintiff's favor, the Complaint fails to allege any set of facts that would entitle plaintiff to relief").

To survive a motion to dismiss, the complaint must contain sufficient factual matter to "state a claim to relief that is plausible on its face." *In re Novagold Res., Inc. Sec. Litig.*, No. 08 Civ. 7041 (DLC), 2009 WL 1575220, at *8 (S.D.N.Y. June 5, 2009) (quoting *Ashcroft v. Iqbal*, 129 S. Ct. 1937, 1949 (2009)); *see also Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007). In determining whether the factual allegations are enough to "raise a right to relief above the speculative level," *id.*, 550 U.S. at 555, the Court's "sole focus is on the sufficiency of the pleadings and not on the weight of the evidence that might be presented at trial." *Vladimir v. Bioenvision Inc.*, 606 F. Supp. 2d 473, 483 (S.D.N.Y. 2009) (citations omitted). *See also Levitt v. Bear, Stearns & Co.*, 340 F.3d 94, 101 (2d Cir. 2003) (the court's task is to "assess the legal feasibility of the complaint, not to assay the weight of the evidence which might be offered in support thereof").

With respect to claims that do not sound in fraud, the Complaint need only contain "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a). Securities fraud claims, however, are subject to the pleading requirements imposed by Federal Rule of Civil Procedure 9(b). Therefore, the Complaint must "state with particularity the circumstances constituting fraud." Fed. R. Civ. P. 9(b). "[I]ntent, knowledge, and other conditions of a person's mind may be alleged generally." *Id.* The primary purpose of Rule 9(b) is "to afford [a] defendant fair notice of the plaintiff's claim and the factual ground upon which it is based." *Novak v. Kasaks*, 216 F.3d 300, 314 (2d Cir. 2000) (quoting *Ross v. Bolton*, 904 F.2d 819, 823 (2d Cir.1990)). *See also Core-Mark Intern. Corp. v. Commonwealth Ins. Co.*, No. 05

Civ. 0183(WHP), 2006 WL 2501884, at *8 (S.D.N.Y. Aug. 30, 2006).  The "pleading of detailed

evidentiary matter in securities litigation" is not required under Rule 9(b).  *In re Scholastic Corp.*

*Sec. Litig.*, 252 F.3d 63, 72 (2d Cir. 2001).

## II.    THE COMPLAINT ADEQUATELY PLEADS SECURITIES FRAUD.

Overlooking and distorting the Complaint's factual allegations, the Cohmad Defendants

argue that the claims pursuant to Section 10(b) of the Securities Exchange Act of 1934

("Exchange Act") and Rule 10b-5 thereunder and Section 17(a) of the Securities Act of 1933

should be dismissed for (i) failure to plead fraudulent statements, omissions or deceptive conduct

with particularity (and the lack of a duty to disclose as a matter of law); (ii) failure to plead facts

giving rise to a strong inference of scienter; and (iii) failure to plead conduct "in connection

with" the purchase or sale of a security.  Because none of these arguments has any merit, none of

the Commission's fraud claims should be dismissed.

Section 10(b) makes it "unlawful for any person, directly or indirectly, … [t]o use or

employ, in connection with the purchase or sale of any security …, any manipulative or

deceptive device or contrivance in contravention of such rules and regulations as the

Commission may prescribe…."  15 U.S.C. § 78j(b).  Pursuant to Rule 10b-5, promulgated

thereunder, it is unlawful:

> (a) To employ any device, scheme, or artifice to defraud,
>
> (b) To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or
>
> (c) To engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person, in connection with the purchase or sale of any security.

17 C.F.R. § 240.10b-5.

To state a claim for liability under Section 10(b) and Rule 10b-5, the Commission must allege that a defendant (i) made a material misrepresentation or a material omission as to which he had a duty to speak, or used a fraudulent device, (ii) with scienter, (iii) in connection with the purchase or sale of securities. *SEC v. Monarch Funding Corp.*, 192 F.3d 295, 308 (2d Cir. 1999); *SEC v. First Jersey Sec., Inc.*, 101 F.3d 1450, 1467 (2d Cir. 1996); *SEC v. Collins & Aikman Corp.*, 524 F. Supp. 2d 477, 485 (S.D.N.Y. 2007); *SEC v. Power,* 525 F. Supp. 2d 415, 419 (S.D.N.Y. 2007). The Commission, unlike a private plaintiff, need not allege or prove reliance, causation or damages. *SEC v. KPMG LLP*, 412 F. Supp. 2d 349, 375 (S.D.N.Y. 2006).

The elements for a claim under Securities Act Section 17(a)(1) mirror the elements of a claim under Exchange Act Section 10(b) and Rule 10b-5, except that the act or omission must be in the "offer or sale" of securities. *First Jersey Sec.*, 101 F.3d at 1467; *SEC v. Banner Fund Int'l*, 211 F.3d 602, 609-10 (D.C. Cir. 2000). Consequently, the sections "establish very similar requirements for proof of securities fraud." *SEC v. Kenton Capital, Ltd.*, 69 F. Supp. 2d 1, 12 (D.D.C. 1998). Claims brought under Sections 17(a)(2) and 17(a)(3) do not require a showing of scienter. *Aaron v. SEC*, 446 U.S. 680, 701-02 (1980). On page 32 of their memorandum of law, movants imply that this holding by *Aaron* is limited to instances where the SEC seeks "to obtain an injunction," but their implication has no basis in law. *See id.* ("§ 17(a)(2) and § 17(a)(3) … may be violated even in the absence of scienter"); *SEC v. Universal Express, Inc.*, 475 F. Supp. 2d 412, 423 (S.D.N.Y. 2007) ("Scienter need not be proven … to establish a violation of Sections 17(a)(2) and (3)….").

### A.    The Complaint Adequately Pleads Fraudulent Misrepresentations, Omissions and Deceptive Conduct by the Cohmad Defendants.

The Cohmad Defendants assert that the Complaint lacks allegations of misstatements, omissions and fraudulent conduct sufficient to satisfy Rule 9(b). However, the Complaint

contains more than enough of the 'who, what, when, where and how' to afford them fair notice of plaintiff's claims and the factual grounds upon which they are based. *See Novak*, 216 F.3d at 314; *see also SEC v. Terezakis*, No. 95 CV 2533(NG), 1997 WL 720760, at *2 (E.D.N.Y. Sept. 30, 1997) (a Commission complaint alleging a Ponzi scheme met the requirements of Rule 9(b) where it "alleged … the source of the alleged misrepresentations, … that the misrepresentations were made between 1988 and 1992 and that they were made in the course of social gatherings in [defendants'] homes and in one-on-one meetings" even though it did not "specify the exact date and place of each alleged misrepresentation"). Indeed, movants are sufficiently apprised of plaintiff's claims to draft a 43-page memorandum of law.[4]

"[W]here the fraud is based on alleged misrepresentations, the complaint must 'specify the statements it claims were false or misleading, give particulars as to the respect in which plaintiff contends the statements were fraudulent, state when and where the statements were made, and identify those responsible for the statements." *Thomas H. Lee Equity Fund V, L.P. v. Mayer Brown, Rowe & Maw LLP*, 612 F. Supp. 2d 267, 274 (S.D.N.Y. 2009) (citation and internal quotation omitted). "A plaintiff pleading fraud based on deceptive conduct must specify what deceptive or manipulative acts were performed, which defendants performed them, when

---

[4]    Despite the lengthy treatment they give the Complaint, movants claim that many of the fraud allegations are directed at "Cohmad representatives" and that those allegations cannot or do not suffice as against any one defendant. The Complaint, however, need only "adequately distinguish[] the roles of each participant in the alleged scheme, such that [each defendant] can readily ascertain what part he is alleged to have played in the" scheme. SEC v. *U.S. Envtl.*, 82 F. Supp. 2d 237, 241 (S.D.N.Y. 2000). As the cases cited by movants acknowledge, there is no bright-line rule against group pleading. *See Harrison v. Rubenstein*, No. 02 Civ. 9356(DAB), 2007 WL 582955, at * 12 (S.D.N.Y. Feb. 26, 2007) (Rule 9(b) prohibits vague allegations that clump together multiple defendants); *Scone Investments, L.P. v. American Third Market Corp.*, No. 97 CIV. 3802 (SAS), 1998 WL 205338, at *4 (S.D.N.Y. Apr. 28, 1998) (Rule 9(b) prohibits "blanket references … without identifying the nature of each defendant's participation in the fraud"). Even in its use of the term "Cohmad representatives," the Complaint puts Cohmad and the Cohns on notice of each of their alleged deceptive conduct and therefore satisfies Rule 9(b).

the acts were performed, and the effect the scheme had on investors in the securities at issue."
*Id.* (citation and internal quotation omitted).  "'Deceptive' covers a wide spectrum of conduct
involving cheating or trading in falsehoods," including "misrepresenting one's identity."  *SEC v.
Dorozhko*, 574 F.3d 42, 50 (2d Cir. 2009).  Section 10(b) and Rule 10b-5 prohibit an "act that
gives the victim a false impression."  *Id.* (quoting *United States v. Finnerty*, 533 F.3d 143, 148
(2d Cir. 2008)).

Unlike fraudulent misrepresentations and deceptive conduct, omissions are actionable
only if the defendant had a duty to disclose.  *Basic Inc. v. Levinson*, 485 U.S. 224, 239 n.17
(1988).  A duty to disclose exists when "secret information renders prior public statements
materially misleading."  *See, e.g., In re Centerline Holdings Co. Sec. Litig.,* No. 08 Civ.
505(SAS), 2009 WL 2391768, at *3 (S.D.N.Y. Aug. 4, 2009) (citing *In re Time Warner Sec.
Litig.*, 9 F.3d 259, 268 (2d Cir. 1993)); *see also Schlifke v. Seafirst Corp.*, 866 F.2d 935, 944 (7th
Cir. 1989) (even absent fiduciary duty, "incomplete disclosures, or 'half-truths,' implicate a duty
to disclose whatever additional information is necessary to rectify the misleading statements").
The Cohmad Defendants possessed such "secret" information and had a duty to disclose it.

The Complaint adequately pleads misrepresentations, omissions and deceptive conduct
by Cohmad, Maurice Cohn and Marcia Cohn.  For example, each of these defendants—Cohmad
through its representatives, including the Cohns and Jaffe—falsely marketed the Madoff
investment strategy as an exclusive investment opportunity when they knew it was neither
exclusive nor an investment opportunity.  (¶ 2.)  They solicited investors for Madoff even though
they knew he was engaged in securities fraud.  (¶¶ 50-53, 58-59.)  Indeed, the Cohmad
Defendants knew that Madoff had a voracious need for huge amounts of money, and that he paid
them enormous sums to provide it.  (¶¶ 53-57)  This information alone was enough to put them

on notice of the fraud.  Moreover, on a motion to dismiss, this is precisely the inference that must be drawn.

In addition to fostering a false aura of exclusivity and concealing the fraud from investors, the Cohns and Jaffe projected themselves as individuals who had become wealthy through investing with Madoff and BMIS.  (¶¶ 26, 59.)   Cohmad and the Cohns concealed the fact that most of the wealth they derived from Madoff or BMIS came from commissions for referrals, and likewise concealed the unique structure of their compensation scheme, which paid them over time a percentage of the capital invested by each investor they had referred, less any withdrawals from their account.  (¶¶ 28, 38, 54-57.)  And in order to help to conceal the fraud from view, Cohmad, through the Cohns, lied and misled in the Forms BD and financial statements Cohmad filed with the Commission and in its internal books and records.  (¶¶ 39-43.)

Movants cite a number of cases that do not support dismissal here.  For example, in *Hart v. Internet Wire, Inc.*, 145 F. Supp. 2d 360 (S.D.N.Y. 2001), the court dismissed allegations against Bloomberg, L.P., that arose out of a fake press release that Bloomberg had picked up from another news wire service and re-issued.  On facts far removed from those in the instant case, the court concluded that plaintiffs—a class of shareholders—had failed to allege scienter because the Complaint did not sufficiently allege that Bloomberg knew or should have known that the press release was a fake.  *Id.* at 366-67.[5]  The Cohmad Defendants also argue that the Complaint contains internal inconsistencies, and rely on *Sofi Classic S.A. de C.V. v. Hurowitz*,

---

[5]        In addition to being inapposite to this case, *Hart* has nothing to do with the proposition(s) that it is offered in support of on page 16 of movants' memorandum, *i.e.*, that "[t]he absence of any records of client solicitation is particularly telling" or that "the only rational inference … is that the Cohmad Defendants introduced certain investors, at the investors' request, to a widely-renowned investment manager who paid them a finder's fee if such investors subsequently elected to open an account."

444 F.Supp.2d 231 (S.D.N.Y. 2006). In *Sofi Classic*, the complaint alleged conduct constituting

fraudulent inducement of contract that occurred *after* the agreement in question had been

reached—a true inconsistency that made a fraudulent inducement claim impossible. *Id.* at 249.

But the purported inconsistencies identified by movants (Mem. at 16)[6] are not in fact

inconsistent: prospective investors can be both lured and angle to invest, and the disclosures

noted in the Complaint do not reveal the true nature of the relationship between the Cohmad

Defendants and BMIS.

 *BHC Interim Funding, L.P. v. Finantra Capital, Inc.*, 283 F. Supp. 2d 968 (S.D.N.Y.

2003) is similarly far removed from the facts here. There, the court dismissed an Amended

Complaint that "relie[d] on broad generalities when discussing the allegedly misleading

statements" and used "meaningless terms" such as "various public and/or private statements and

communications." *Id.* at 979. In contrast, the Complaint in this action pleads specific facts in

support of its allegations.

 Finally, movants rely on a number of cases for various assertions of the law without

regard to the applicability of their facts. *See Thomas H. Lee Equity Fund*, 612 F.Supp.2d 267

(dismissing securities fraud claims against a law firm that had allegedly made misrepresentations

in connection with a leveraged buyout); *UBS Asset Management (New York) Inc. v. Wood Gundy

Corp.*, 914 F. Supp. 66 (S.D.N.Y. 1996) (dismissing securities fraud claims against a broker-

dealer who had sold unrated debt securities to two sophisticated plaintiffs).

 The Complaint therefore pleads fraudulent misrepresentations, omissions and deceptive

conduct by Cohmad, Maurice Cohn and Marcia Cohn with the specificity required by Rule 9(b).

---

[6] References to "Mem at __" are to Movants' Memorandum of Law in Support of Their
Motion to Dismiss, filed August 21, 2009.

**B.    The Complaint Adequately Pleads Scienter.**

To adequately plead scienter under Rule 9(b), the Complaint need allege at most "facts that give rise to a strong inference of fraudulent intent." *Novak*, 216 F.3d at 307 (2d Cir. 2000) (quoting *Acito v. IMCERA Group*, 47 F.3d 47, 52 (2d Cir. 1995)).[7]   The Commission can adequately plead such an inference by alleging "facts to show that defendants had both motive and opportunity to commit fraud, or by alleging facts that constitute strong circumstantial evidence of conscious misbehavior or recklessness." *Id*. (quoting *Acito*, 47 F.3d at 52).   The Complaint more than adequately does both.

1.    Motive and Opportunity

The Complaint alleges that Cohmad, Maurice Cohn and Marcia Cohn all had the motive and opportunity to commit securities fraud.  The Cohmad Defendants do not dispute opportunity,

---

[7]    Although this Court has held that the "strong inference" standard applies to Commission enforcement actions and not only to private securities litigation, the Second Circuit has not yet so held.  *See Parnes*, 2001 WL 1658275, at *5; *SEC v. U.S. Envtl., Inc.*, 155 F.3d 107, 111 (2d Cir. 1998) (concluding that Commission complaint satisfied Rule 9(b) because generalized allegations of intentional or reckless wrongdoing were sufficient and that the particularized motive of the defendant was "irrelevant"); *Novak*, 216 F.3d at 306 (calling the "strong inference" standard a "requirement for a private action under Rule 10b-5").  The Commission certainly need not satisfy the further heightened pleading standard for scienter established by the Private Securities Litigation Reform Act ("PSLRA"), which applies only to private litigations.  *See* 15 U.S.C. § 78u-4(b).  In *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308 (2007), the Supreme Court held that, in order to plead scienter "under the PSLRA's heightened pleading instructions," a complaint must allege facts such that "a reasonable person would deem the inference of scienter cogent and at least as compelling as any opposing inference one could draw from the facts alleged." *Id.* at 321, 324.  The Supreme Court relied on the PSLRA's requirement that private plaintiffs plead with particularity facts that give rise to a strong inference of scienter, a requirement absent from Rule 9(b), and on the PSLRA's purpose of "curb[ing] frivolous, lawyer-driven litigation, while preserving investors' ability to recover on meritorious claims," a policy rationale inapplicable to Commission enforcement actions.  *Id.* at 322-23.  Correctly reasoning that the PSLRA does not apply outside the context of private securities litigation, several courts in this District have declined to apply the *Tellabs* heightened pleading standard to Commission enforcement actions such as this one.  *See SEC v. Pentagon Capital Mgmt. PLC*, 612 F. Supp. 2d 241, 263-64 (S.D.N.Y. 2009); *SEC v. Dunn*, 587 F. Supp. 2d 486, 500-02 (S.D.N.Y. 2008).

only motive.  As alleged in the Complaint, the Defendants' motive is straightforward and simple: greed and their long time relationship and friendship with Madoff.

Cohmad, Maurice Cohn and Marcia Cohn had a long-term relationship and friendship with Madoff as Maurice Cohn was Madoff's former neighbor, Madoff was a minority owner of Cohmad, and Cohmad was housed and operated within BMIS.  (¶¶ 14, 15, 32-36.)  Through payments by Madoff to Cohmad, the Defendants made $100 million for their fraudulent activity and defendant Maurice Cohn made millions more in direct payments from BMIS.  (¶ 2.)  The Complaint alleges that Cohmad had a "rich compensation" arrangement with Madoff  in which BMIS compensated Cohmad for the principal that investors left in BMIS each year.  (¶ 27.)  By 2008, the Defendants accounted for billions of dollars of principal invested by investors who had over 800 accounts at BMIS.  (¶ 29.)  Maurice Cohn and Marcia Cohn owned 73% of Cohmad (¶ 14) so they each enjoyed substantial wealth by perpetrating the charade that Cohmad was an independent broker-dealer when in fact it was Madoff's in-house marketing force which screened investors, brought them into BMIS and failed to disclose red flags to those investors. Further evidencing that Cohmad was nothing more than a sham entity designed to bring in investors to BMIS is the fact that BMIS payments to the Defendants accounted for the vast majority of Cohmad's revenues:  as high as 92.82% and no less than 79.98% in the relevant years.  (¶ 34.)

This constitutes the kind of direct pecuniary motive that courts have found sufficient for the purposes of Rule 9(b).  *See*, *e.g.*, *Baxter v. A.R. Baron & Co.*, No. 94 Civ. 3913(JGK), 1996 WL 586338, at * 3 (S.D.N.Y. Oct. 11, 1996) (the realization of "sales commissions from the allegedly fraudulent sales of securities to the plaintiffs" was "a direct pecuniary motive tied to the plaintiffs' purchases of securities and provides a sufficient motive for fraud").  If the Cohmad

Defendants really believed Madoff was what he purported to be, why would he have been paying them so much money to solicit investors?

The Cohmad Defendants' sole argument as to motive is that it is not enough for plaintiff to allege that they stood to gain economically from the fraud. (Mem. at 17-18.)   The cases on which they rely, however, do not support such a broad rule and did not involve the extraordinary compensation arrangement and long-term relationship that was the motive for Cohmad and the Cohns to commit securities fraud.  In *In re Morgan Stanley and Van Kampen Mutual Funds Securities Litigation*, No. 03 Civ. 8208(RO), 2006 WL 1008138 (S.D.N.Y. Apr. 18, 2006), no fraudulent motive was found with respect to undisclosed compensation schemes because plaintiffs had only pointed to economic gain that was publicly disclosed.  *Id.*, at *10.   In *ABF Capital Management v. Askin Capital Management, L.P.*, 957 F. Supp. 1308 (S.D.N.Y. 1997), where the Court did not dismiss the Complaint, the court did not rely solely on defendants' pay structure to establish their motive for committing securities fraud.  *Id.* at 1326-27.  And in *Shields v. Cititrust Bank Corp.*, 25 F.3d 1124 (2d Cir.1994), the court rejected arguments that the alleged desire of executives to keep their jobs (and the attendant compensation and prestige) sufficed to establish motive to inflate the stock price of their company.  *Id.* at 1130.  These cases stand for nothing more than the unremarkable proposition that merely alleging that defendants acted in their economic self-interest will not suffice.  The defendants in this case were paid in perpetuity a percentage of every dollar invested and withdrawn.  In other words, their motive was tied directly to the dollars that had been committed to Madoff's scheme.

2.    Conscious Misbehavior or Recklessness

The Complaint also alleges conscious misbehavior with respect Cohmad, Maurice Cohn and Marcia Cohn.  They knew of the fraud, even if they didn't know all of the details.  Among

other allegations, the Complaint alleges that Cohmad and the Cohns falsely marketed the Madoff investment strategy as an exclusive investment opportunity when they knew it was neither. (¶¶ 25-28.) It alleges that the Cohns and Jaffe held themselves out as having become wealthy through investing with Madoff and BMIS when they knew that was not true. (¶¶ 26 28.) It alleges that the Defendants concealed Cohmad's relationship with BMIS. (¶¶ 37-49.) It alleges that they knowingly filed false documents with the SEC, putting their securities licenses at risk, to deflect regulatory scrutiny that could have uncovered the existence of Madoff's securities fraud, if not his Ponzi scheme. (¶¶ 38-42, 53.) And it alleges that the database they used to calculate what Madoff owed them for referrals tracked only capital contributions and withdrawals without regard to purported returns, which suggested that Madoff's purported profits were fictitious. (¶ 56.)

The Complaint also alleges that the Cohmad Defendants either were aware of the implications of or "ignored obvious signs of fraud," identifying some of those red flags. *Novak*, 216 F.3d at 308 (quoting *Chill v. General Elec. Co.*, 101 F.3d 263, 267 (2d Cir. 1996)). Indeed, Cohmad and the Cohns knew of Madoff's voracious need for a constant influx of huge amounts of new money and that Madoff paid them extremely well to raise that new money. (¶¶ 53-57) In other words, they had actual knowledge of all of the hallmarks of the huge Ponzi scheme. Other red flags included the carefully created false impression of exclusivity, the express aversion to sophisticated or inquisitive investors, the cloud of secrecy surrounding the purported investment and its marketing, the unusual structure of Cohmad's compensation, and Madoff's insistence on keeping the advisory business hidden for as long as possible. (¶¶ 3, 6, 23, 27-28, 38, 48, 53-57.) Moreover, the Cohmad Defendants even made false filings with the Commission to conceal their relationship with Madoff. (¶¶ 4, 39-44) And as the Complaint alleges, Cohmad and the Cohns

essentially lived with these red flags day in, day out, for decades.  (¶¶ 2, 14, 15, 16, 19, 20, 50-57)  Whether understood or ignored, the Cohmad Defendants' alleged awareness of these red flags suffices to establish conscious misbehavior or recklessness for purposes of Rule 12(b)(6). *See In re Philip Servs. Corp. Sec. Litig.*, 383 F. Supp. 2d 463, 475 (S.D.N.Y. 2004) ("multiple allegations of 'red flags,' considered in the aggregate, support an inference of fraudulent intent adequate to survive a motion to dismiss"); *SEC v. George*, 426 F.3d 786, 797 (6th Cir. 2005).

Movants say that "[m]any of these allegations are consistent with 'routine' business practices or have 'obviously alternative explanations….'"  (Mem. at 24.)  However, they provide no support for what might be "routine" and forget that, on this Rule 12(b)(6) motion, the Court must draw all reasonable inferences in favor of the Commission and ignore the weight of the evidence that might be presented at trial.  *Semple*, 2009 WL 1457163, at *3; *Vladimir*, 606 F. Supp. 2d  at 483.

The Movants' arguments concerning their concealment of their relationship with BMIS is likewise misplaced on this motion.  The Complaint alleges that the Cohmad Defendants made false filings on Cohmad's behalf that concealed Cohmad's extensive dealings with BMIS, including lying and misleading in the Forms BD it filed to hide the enormous number of accounts that it had referred to BMIS and to minimize the extent of its referral business. (¶¶ 4, 39-41.)  The Complaint also alleges that Cohmad lied and misled in the financial statements it filed with the Commission and in its internal books and records, and that it maintained no books and records regarding its referrals.  (¶¶ 42-44.)  All of this was done, as the Complaint alleges with sufficient particularity, to hide Madoff's advisory business and to conceal the existence of Madoff's fraud.  (¶¶ 4, 42-44.)

Movants try to counter the Complaint by saying the answer to one question (Question 7 on Form BD) may have been half right; the answer to another question (Question 10A on Form BD) may have been answered elsewhere, though not on the Form BD; and the answer to a third question (Question 12 on Form BD) may have been wrong, but there was no intent to deceive. (Mem. at 22-23.)  These arguments raise factual disputes that are not properly raised or considered on a motion to dismiss for failure to state a claim, and here serve only to underscore the particularity with which the Complaint is pleaded and the "fair notice" provided in accordance with the principal purpose of Rule 9(b).  *See Novak*, 216 F.3d at 314.

Finally, contrary to Defendants' assertion, dismissal of the complaint in this case is not supported by *In re Bayou Hedge Fund Litigation*, 534 F. Supp. 2d 405, 415 (S.D.N.Y. 2007), *aff'd, South Cherry Street, LLC v. Hennessee Group LLC,* 573 F.3d  98 (2d Cir. 2009).  In *Bayou*, the Court dismissed a fraud complaint brought by plaintiff investor in the Bayou Hedge Fund fraud against the advisor that had recommended investing in Bayou.  In that case, the complaint did not allege that the defendant advisor had any "red flags" that Bayou was a fraud, nor that the defendant advisor had engaged in deceptive acts.  The court dismissed the complaint in the *Bayou* case as it only alleged that the defendant advisor had failed to fulfill its promise to conduct due diligence on the *Bayou* investment. Here, the Complaint alleges that the Defendants engaged in a campaign of active deception of the investors regarding Cohmad's relationship with BMIS and created false documents to hide that relationship.

## C.    The Complaint Adequately Pleads Conduct That is "In Connection With" the Purchase or Sale of Securities.

Rule 10b-5 and Section 17(a) respectively prohibit fraud "in connection with the purchase or sale of any security" or "in the offer or sale of any securities."  Courts have generally treated these standards as identical.  *See, e.g., United States v. Naftalin*, 441 U.S. 768, 773 n.4

(1979) ("[W]e are not necessarily persuaded that 'in' is narrower than 'in connection with.' Both Congress … and this Court … have on occasion used the terms interchangeably.") (internal citations omitted); *First Jersey Sec.*, 101 F.3d 1450, 1467 (2d Cir. 1996).

The Supreme Court, the Second Circuit, and this Court have all recognized that the federal securities laws should be "construed 'not technically and restrictively, but flexibly to effectuate [their] remedial purposes'" and that the "in connection with" requirement must therefore be broadly construed. *SEC v. Zandford*, 535 U.S. 813, 820 (2002) (quoting *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128, 161 (1972)); *Parnes*, 2001 WL 1658275, at *8 (citing *Press v. Chemical Inv. Servs. Corp.*, 166 F.3d 529, 537 (2d Cir. 1999)). In *Zandford*, the Supreme Court, granting deference to the Commission's broad reading of the "in connection with" requirement, held that "it is enough that the scheme to defraud and the sale of securities coincide." 535 U.S. at 820, 822.

The *Zandford* Court agreed that "a broker who accepts payment for securities that he never intends to deliver … violates Section 10(b) and Rule 10b-5." *Id.* at 819-20. This is exactly how Madoff's Ponzi scheme functioned, and the Complaint alleges that the Cohmad Defendants' fraudulent misrepresentations and deceptive conduct more than just "coincided" with the sale of securities, *Zandford*, 535 U.S. at 822, but were an integral and inextricable part of the Ponzi scheme because they deceptively solicited investors for the sole purpose of having them invest in Madoff's purported securities investment; Madoff then accepted payment from these investors with no intention of purchasing securities; and Madoff then paid Cohmad and the Cohns a commission based on the investor's capital contribution that remained with Madoff. (¶¶ 3, 6-7, 18, 26, 54-57.) Thereafter, the Cohmad Defendants fielded questions from investors regarding their purported (but fake) investments, describing account statements and activity.

(¶ 35.)  Contrary to movants' argument, their alleged conduct is both causally and temporally connected to Madoff's purported securities transactions.

Defendants incorrectly assert that the Complaint alleges that the Defendants' conduct occurred *subsequent to* the purchase of a securities, and thus not *in connection* to the purchase or sale of a securities.  The Complaint makes clear that the Defendants' scheme to defraud occurred throughout the solicitation of investors' funds into BMIS.  As such, the deceptive conduct occurred in connection with the purchase or sale of securities as the scheme represented that BMIS would trade securities for clients after they deposited funds into BMIS.  The Defendants rely on cases that are inapposite.  For example, *BHC Interim Funding* concerned allegations of securities fraud by the plaintiff corporation that obtained securities as part of a loan to fund the defendant's acquisition of another company.  238 F. Supp. 2d at 978.  The citation referred to by the Cohmad Defendants concerns the court's dismissal of alleged misrepresentations that occurred <u>after</u> the loan transaction was completed.

**III.    THE COMPLAINT ADEQUATELY PLEADS THAT THE COHMAD DEFENDANTS AIDED AND ABETTED MADOFF'S VIOLATIONS OF VARIOUS EXCHANGE ACT AND ADVISERS ACT PROVISIONS.**

Where the Complaint alleges that the Cohmad Defendants aided and abetted primary violations of Sections 10(b) and 15(b)(7) of the Exchange Act and Rules 10b-5 and 15b7-1 thereunder, and Sections 206(1), (2) and (4) of the Investment Advisers Act of 1940 ("Advisers Act") and Rule 206(4)-3 thereunder, it must allege (i) an underlying violation of each provision of the securities laws; (ii) knowledge of that violation, and (iii) substantial assistance in the achievement of the primary violation.  *SEC v. Stanard*, No. 06 Civ. 7736 (GEL), 2009 WL 196023, at *31 (S.D.N.Y. Jan. 27, 2009); *Pentagon Capital,* 612  F. Supp. 2d at 266.  The

Cohmad Defendants contend that the Complaint has failed to plead the "knowledge" and "substantial assistance" elements with particularity.

> **A.      The Complaint Adequately Alleges That the Cohmad Defendants Aided and Abetted Madoff's Violations of Exchange Act Section 10(b) and Rule 10b-5 and Advisers Act Sections 206(1) and 206(2).**

The Complaint adequately pleads that the Cohmad Defendants aided and abetted Madoff's securities fraud.  In particular, the Complaint adequately alleges both that they knew of the fraud and that they substantially assisted it.

> 1.      The Complaint Adequately Alleges that Cohmad and the Cohns Had Knowledge of Madoff's Fraud.

The Complaint sufficiently alleges that Cohmad and the Cohns knew of Madoff's fraud.[8] For pleading purposes, knowledge may be alleged circumstantially.  For instance, in *KPMG*, the court denied a defendant's motion for summary judgment on the Commission's aiding and abetting claim where a jury "could … interpret[]" or "could infer" from some facts that the defendant had actual knowledge of the fraudulent misstatements, even where other facts tended to show that the defendant did not act in bad faith.  412 F. Supp. 2d at 384-85.

---

[8]      The Second Circuit has yet to decide the requisite level of scienter for aiding and abetting claims under the Exchange Act or the Advisers Act.  Nevertheless, several courts in this District have required a showing of the defendant's "actual knowledge of the violation" for aiding and abetting Exchange Act violations.  *Stanard*, 2009 WL 196023, at *31 (quoting *SEC v. Cedric Kushner Promotions, Inc.*, 417 F. Supp. 2d 326, 334 (S.D.N.Y. 2006)); *KPMG*, 412 F. Supp. 2d at 382-83.  The scienter standard for claims of aiding and abetting violations of the Advisers Act is even less clear.  The Court of Appeals for the District of Columbia Circuit has required only "knowledge of wrongdoing" or "a general awareness [on the part of the alleged aider and abettor] that his role was part of an overall activity that was improper."  *SEC v. Washington Inv. Network*, 475 F.3d 392, 397 (D.C. Cir. 2007); *but see SEC v. DiBella*, No. Civ. 304CV1342EBB, 2005 WL 3215899, at *8-9 (D. Conn. Nov. 29, 2005) (setting forth same knowledge standard for aiding and abetting claims under both the Exchange Act and the Advisers Act in absence of fiduciary duty).  The Court need not resolve these issues at this time, as the Complaint adequately pleads Cohmad and the Cohn's actual knowledge of Madoff's securities fraud.

As the Complaint adequately alleges, Cohmad and the Cohns knew about Madoff's securities fraud and the lies surrounding or underpinning it.  They knew, for example, that the Madoff investment was not an exclusive opportunity limited to the privilege few.  (¶ 2.)  They knew that Madoff wanted to target less sophisticated investors who would not ask too many questions, and they did just that.  (¶¶ 6, 48-49, 53.)  They knew that, contrary to how they held themselves out, they had not become wealthy from personally investing with Madoff.  (¶¶ 26, 59.)  They knew that they were compensated based not on how much capital they referred, but by how much of the capital they referred remained with Madoff.  (¶¶ 54-57.)  And they lied in filings with the Commission, intentionally concealing Cohmad's extensive dealings with BMIS, including the enormous number of accounts that Cohmad had referred to BMIS, in an attempt to deflect regulatory scrutiny from the scheme.  (¶¶ 37-49.)  In other words, the Cohns clearly knew that their statements to Madoff investors were false.  This alone constitutes aiding and abetting fraud on the investors, whether or not they knew of the Ponzi scheme.

Moreover, as discussed above, the overwhelming circumstantial evidence alleged in the Complaint is more than enough for pleading purposes to evidence knowledge of Madoff's securities fraud.  What these defendants knew most of all was that Madoff's business had an insatiable need for constant infusions of enormous amounts of fresh cash.  And Madoff paid the Cohmad Defendants enormous compensation to raise these needed billions of dollars in secret.  They also knew of or ignored numerous other red flags—which included the carefully created false impression of exclusivity, the express aversion to sophisticated or inquisitive investors, the cloud of secrecy surrounding the purported  investment and its marketing, the unusual structure of Cohmad's compensation, and Madoff's insistence on keeping the advisory business hidden for as long as possible (¶¶ 3, 6, 23, 27-28, 38, 48, 53-57)—that did or should have alerted the

Cohmad Defendants to Madoff's securities fraud.  After all, the Cohns were experienced

securities industry professionals.  (¶¶ 15-16.)

Movants reliance on *SEC v. Espuelas*, 579 F. Supp. 2d 461 (S.D.N.Y. 2008) in support of

their argument that reckless disregard of red flags cannot establish knowledge for purposes of

aiding and abetting (Mem. at 34-35) is misplaced.  In *Espuelas*, the dismissal of the aiding and

abetting claims cited by movants had nothing to do with any red flags.  The complaint alleged

that a defendant had negotiated the relevant transactions (a purchase agreement and separate side

agreements that made the purchase agreement contingent and affected its accounting treatment),

had been aware of an internal company policy requiring the sales department to provide such

agreements to the finance department, and had failed to report the side agreements to the sales

department (or to notify the finance department that the purchase agreement alone was

incomplete).  *Id.* at 465-66, 484.  Because the Complaint "contained no allegations that someone

with accounting knowledge communicated to her that the transactions were being accounted for

incorrectly, and … lack[ed] any allegations that [the defendant] possessed any accounting

expertise herself," the Court could not draw "an inference that [she] actually knew the statements

contained errors" and dismissed the aiding and abetting claim against her.  *Id.* at 484.  The court

said nothing about any red flags—it did not even use the term with respect to her knowledge.

The two cases movants cite in a footnote are likewise inapposite.  In both, aiding and

abetting claims were dismissed because the defendants did not or could not understand the

accounting consequences of the transactions in question.  *See SEC v. Lucent Technologies Inc.*,

No. CIV. 04-2315 (WHW), 2005 WL 1206841, at *7 (D.N.J. May 20, 2005) (Complaint lacked

"allegations that show [defendant] had knowledge of accounting principles or Lucent's policy

regarding how and when revenue should be recognized in transactions such as the ones [he] is

alleged to have executed"); *SEC v. Sandifur*, NO. C05-1631C, 2006 WL 538210, at \*12 (W.D. Wash. Mar. 2, 2006) (complaint lacked allegations that defendants knew the restructured deal was improper or fraudulent). The instant Complaint does not allege complicated accounting transactions; it alleges simple and straightforward securities fraud.

Thus, the Complaint adequately pleads that Cohmad and the Cohns had actual knowledge of Madoff's securities fraud.

>    2.    The Complaint Adequately Alleges that Cohmad
>          and the Cohns Substantially Assisted Madoff's Fraud.

A defendant provides substantial assistance if it "affirmatively assists, helps conceal, or by virtue of failing to act when required to do so enables [the fraud] to proceed." *JP Morgan Chase Bank v. Winnick*, 406 F.Supp.2d 247, 256 (S.D.N.Y. 2005) (quoting *Nigerian Nat'l Petroleum Corp. v. Citibank, N.A.*, No. 98 Civ. 4960(MBM), 1999 WL 558141 (S.D.N.Y. July 30, 1999)). At least one court in this District has required only that the aider and abettor's conduct be a "substantial causal factor in the perpetration of the underlying fraud" in order to meet the substantial assistance requirement, while other courts in this District have required that the aider and abettor's conduct be a proximate cause of the primary violation. *Compare SEC v. Zwick*, No 03 Civ. 2742 (JGK), 2007 WL 831812, at \*16 (S.D.N.Y. Mar. 16, 2007), with *Pentagon Capital*, 612 F. Supp. 2d at 266; *Espuelas*, 579 F. Supp. 2d at 471; *SEC v. Treadway*, 430 F. Supp. 2d 293, 339 (S.D.N.Y. 2006).[9]

---

[9]    The Second Circuit has not yet decided the correct standard for "substantial assistance" in Commission enforcement actions. In 1994, the Supreme Court held that no cause of action existed for aiding and abetting violations of Section 10(b), *see Central Bank of Denver, N.A. v. First Interstate Bank of Denver*, 511 U.S. 164 (1994), and Congress thereafter authorized the Commission to bring aiding and abetting claims under Section 20(e) of the Exchange Act. Prior to 1994, the Second Circuit had held, in the context of private securities litigation, that substantial assistance was required for claims of aiding and abetting Section 10(b) and that "aider and abettor liability would not attach where the injury was not a direct or reasonably foreseeable

As the Complaint alleges, Cohmad and the Cohns raised billions of dollars for Madoff.

This alone qualifies as substantial assistance. Moreover, they affirmatively assisted and helped

conceal Madoff's securities fraud, and their actions proximately caused that fraud—the fraud

was "a direct or reasonably foreseeable result of" their assistance. *Bloor v. Carro, Spanbock,*

*Londin, Rodman & Fass*, 754 F.2d 57, 63 (2d Cir. 1985). As the Second Circuit has described,

the attraction of further investment—or new capital to fund the fraud—is an essential part of any

Ponzi scheme:

> A Ponzi scheme is one in which investor profits are manufactured from
> newly-attracted investment principal rather than through the success of the
> underlying business venture, creating a self-perpetuating cycle of fraud.
> Essentially, investors are drawn by the promise of high returns, but the
> scheming entity can pay those returns only for so long as it continues to
> attract further investment.

*SEC v. Credit Bancorp, Ltd.*, 386 F.3d 438, 441 n.1 (2d Cir. 2004). Attracting new capital for

Madoff's Ponzi scheme, as the Complaint alleges, is exactly what the Cohmad Defendants

specialized in—and it was an essential part of the scheme. Moreover, Madoff's decades-long

scheme was a "direct" and "reasonably foreseeable" result of the Cohmad Defendants' decades-

long solicitation and referral of new investment principal. *Bloor*, 754 F.2d at 63.

---

result of the conduct." *Bloor v. Carro, Spanbock, Londin, Rodman & Fass*, 754 F.2d 57, 63 (2d
Cir. 1985); *Armstrong v. McAlpin*, 699 F.2d 79, 92 (2d Cir. 1983) (no aiding and abetting
liability unless defendant's conduct "was a proximate cause of the [fraud] and the [plaintiff's]
resultant losses"). These cases required a causal link between the defendant's conduct and
plaintiff's injury or loss. Unlike private plaintiffs, however, the Commission need not
demonstrate any investor injury or loss to prove violations of Exchange Act Section 10(b) or
Advisers Act Section 206. *See Berko v. SEC*, 316 F.2d 137, 143 (2d Cir. 1963); *SEC v. Capital
Gains Research Bureau, Inc.*, 375 U.S. 180, 195 (1963). Therefore, it is not clear that the
Second Circuit would require the Commission to demonstrate proximate causation in order to
satisfy this prong of Section 20(e). *Cf. JP Morgan Chase Bank*, 406 F. Supp. 2d at 256 n.6
(expressing "some doubt about whether 'substantial assistance' can be equated with proximate
cause" because "[a] person can make a meaningful contribution to a fraudulent scheme without
being understood to have legally 'caused' the scheme or its results").

Bringing in money to fuel the Ponzi scheme is but one way the Cohmad Defendants substantially and directly assisted the scheme. As the Complaint also alleges, in order to help to conceal the fraud from view, Cohmad, through the Cohns, lied and misled in the Forms BD and financial statements that Cohmad filed with the Commission and in its internal books and records. (¶¶ 39-43.) Allegations of concealment—such as these lies and misrepresentations— likewise meet the substantial assistance test. *See JP Morgan Chase Bank*, 406 F.Supp.2d at 256; *Accousti v. Wolas*, No. 95-CV-5267 (JG), 1996 WL 1088218, at *2 (E.D.N.Y. Oct. 10, 1996) (allegations of "efforts to conceal the Ponzi scheme" sufficed in pleading substantial assistance because "deceptions that stall or prohibit the discovery of the truth are material to the continuing vitality of the fraud"). In addition, the Cohns and others at Cohmad provided existing investors with ongoing customer service, fielding and answering questions that enabled Madoff to perpetuate his scheme. (¶ 35.) This, too, had the effect of "keeping the people who are being defrauded at bay, so the scheme can continue." *Id.*

Movants rely on *Cromer Finance Ltd. v. Berger*, 137 F. Supp. 2d 452 (S.D.N.Y. 2001), but that case does not support dismissal. The *Cromer Finance* court rejected aiding and abetting allegations against a clearing broker (Bear Stearns) that over-extended margin credit, in violation of margin regulations, to an off-shore investment fund. *Id.* at 471-72. The court held that "no private right of action for a violation of margin regulations" existed and distinguished the role of a clearing broker from a retail broker, and the alleged conduct from instances, as in the instant case, "with more direct involvement in the underlying fraud." *Id.* Also cited by movants is a Third Circuit decision in a *Bivens* action, *Egervary v. Young*, 366 F.3d 238 (3rd Cir. 2004). Movants simply quote language from the opinion regarding intervening acts of third parties without arguing the principle applies in any way. (Mem. at 37.) It does not: the Complaint here

alleges that the Cohmad Defendants knew of Madoff's securities fraud and therefore that they could reasonably foresee that their conduct would cause Madoff's scheme to continue.

The Complaint therefore sufficiently alleges that Cohmad and the Cohns substantially assisted Madoff's securities fraud.

### B. The Complaint Adequately Alleges That the Cohmad Defendants Aided and Abetted Madoff's Violations of Exchange Act Section 15(b)(7) and Rule 15b7-1, and Advisers Act Section 206(4) and Rule 206(4)-3.

With respect to the Complaint's aiding and abetting allegations involving Exchange Act Section 15(b)(7) and Rule 15b7-1 and Advisers Act section 206(4) and Rule 206(4)-3, the story is simple and straightforward: the Cohmad Defendants were aware that Madoff had not complied with mandatory registration and disclosure provisions of the securities laws, and they aided and abetted Madoff's violations by continuing to associate with BMIS and by continuing to solicit investors. They could have—and should have—stopped doing both or told Madoff that they would not undertake such activity unless BMIS registered them and gave them disclosure documents for investors.

#### 1. Exchange Act Section 15(b)(7) and Rule 15b7-1

Section 15(b)(7) and Rule 15b7-1 prohibit a registered broker-dealer from "effect[ing] any transaction in, or induc[ing] the purchase or sale of, any security unless any natural person associated with such broker or dealer who effects or is involved in effecting such transaction is registered … in accordance with the rules of any … national securities association" of which the broker-dealer is a member, here, the Financial Industry Regulatory Authority ("FINRA") and its predecessor, the National Association of Securities Dealers ("NASD"). 15 U.S.C. § 78o(b)(7) and 17 C.F.R. § 240.15b7-1 (quoting the rule). Section 15(b)(7) and Rule 15b7-1 exist in part to ensure that FINRA and the Commission know which individuals are performing essential functions on behalf of, and receiving commissions from, which firms.

The Complaint alleges that Maurice and Marcia Cohn were associated persons of BMIS and that BMIS failed to register the Cohns with the NASD and FINRA. (¶¶ 100, 102).  Thus, as the Complaint alleges, BMIS violated Section 15(b)(7) and Rule 15b7-1.

The Complaint further alleges that Maurice and Marcia Cohn, as well as other Cohmad representatives, knew that BMIS had not registered them as associated persons and nonetheless continued to associate with BMIS.  (¶¶ 45-47, 102.)  As experienced securities industry professionals, the Cohns knew better, and regardless of whether they could have influenced BMIS's decision to register them, they should have stopped associating with BMIS when they knew BMIS had not registered them.  *See In re Ward*, SEC Release No. 226, 2003 WL 21026952, at *2, 5 (May 8, 2003) (Commission administrative proceeding decision) (registered broker aided and abetted brokerage firm's violations of Section 15(b)(7) and Rule 15b7-1 where he signed documents falsely representing that he was selling securities, when he caused an unregistered individual to sell the securities and paid him a commission).  The Cohns' ongoing association – while knowingly not registered – affirmatively assisted Madoff's violations (indeed, it was fundamental to them) and qualifies as substantial assistance.  *JP Morgan Chase Bank*, 406 F.Supp.2d at 256.  The Complaint therefore sufficiently pleads that the Cohns aided and abetted BMIS's Section 15(b)(7) and Rule 15b7-1 violations.

The Cohmad Defendants also argue that the Commission seeks to hold them liable for BMIS's primary violation of the registration provisions, but this is not true; the Complaint alleges secondary liability, and does so sufficiently.  Moreover, the Complaint does not allege knowledge and inaction on the part of the Cohmad Defendants; the Complaint alleges knowledge and action, which also moots their argument about whether any duty was owed.

2.    <u>Advisers Act Section 206(4) and Rule 206(4)-3</u>

The Complaint properly alleges that the Cohmad Defendants aided and abetted BMIS's

violations of Advisers Act Section 206(4), 15 U.S.C. § 80b-6, and Rule 206(4)-3, 17 C.F.R.

§ 275.206(4)-3.

Rule 206(4)-3 under the Advisers Act restricts an investment adviser's ability to pay

referral fees to solicitors or finders, and if certain thresholds are met, the solicitor is required "at

the time of any solicitation activities for which compensation is paid or to be paid by the

investment adviser, provide the client with a current copy of the investment adviser's [brochure]

and a separate written disclosure document described in paragraph (b) of [Rule 206(4)-3]."

Paragraph (b) of Rule 206(4)-3 requires the additional document to include:

> (1)  The name of the solicitor;
>
> (2)  The name of the investment adviser;
>
> (3)  The nature of the relationship, including any affiliation, between the solicitor and the investment adviser;
>
> (4)  A statement that the solicitor will be compensated for his solicitation services by the investment adviser;
>
> (5)  The terms of such compensation arrangement, including a description of the compensation paid or to be paid to the solicitor; and
>
> (6)  The amount, if any, for the cost of obtaining his account the client will be charged in addition to the advisory fee, and the differential, if any, among clients with respect to the amount or level of advisory fees charged by the investment adviser if such differential is attributable to the existence of any arrangement pursuant to which the investment adviser has agreed to compensate the solicitor for soliciting clients for, or referring clients to, the investment adviser.

17 C.F.R. § 275.206(4)-3(b),  A solicitor is not required to provide the separate disclosure

document if (a) the solicitor is controlled by the adviser, and (b) that fact is disclosed to the

prospective advisory client at the time of the solicitation or referral.

Because Section 206(4) applies to advisers that are registered or required to be registered, that section and Rule 206(4)-3 applied to BMIS both before and after it registered as an adviser with the Commission in September 2006. For more than a decade before it registered, BMIS provided advisory services to thousands of clients, and paid compensation to various solicitors, such as Cohmad, the Cohns, and Jaffe. And after it registered with the Commission in 2006, BMIS continued to provide advisory services to thousands of clients and continued to pay compensation to solicitors such as Cohmad, the Cohns and Jaffe. However, at no time before or after 2006 did BMIS disclose to clients that solicitors such as Cohmad, the Cohns and Jaffe were acting on BMIS's behalf, and at no time did the Cohmad Defendants provide written disclosures to the prospective clients they solicited on behalf of BMIS. Thus, BMIS violated Rule 206(4)-3.

The Complaint alleges that the Cohmad Defendants aided and abetted BMIS's violations of Rule 206(4)-3 because, as solicitors, they were required to do one of two things: either (i) provide BMIS's prospective advisory clients with a current copy of the BMIS's brochure and a separate written disclosure document describing, among other things, the nature of the Cohmad Defendants' relationship with BMIS and the terms of their compensation arrangement; or (ii) disclose the fact that Cohmad was controlled by BMIS to those prospective clients at the time of the solicitation or referral. (¶¶ 84-85.) The Cohmad Defendants did neither. (¶ 86.) As a result, the Cohmad Defendants aided and abetted BMIS's violations of Section 206(4) and Rule 206(4)-3 by knowingly providing substantial assistance to BMIS's violations.

Almost in passing, the Cohmad Defendants state that they had no duty to ensure BMIS made appropriate disclosures; that BMIS dominated and controlled them, somehow making it impossible for them to aid and abet Madoff's violations; and that there are no allegations that the Cohmad Defendants knew that Madoff had failed to make required disclosures. These cursory

31

objections have no merit.  The Commission is not alleging that the Cohmad Defendants should

or could have forced BMIS to do anything.  The Complaint alleges that the Cohmad Defendants

solicited hundreds of clients and referred them to Madoff, and in so doing never provided

prospective clients with either of the disclosures required of solicitors—that is, *of the Cohmad

Defendants*—by Rule 206(4)-3.  The Complaint therefore adequately pleads that the Cohmad

Defendants aided and abetted BMIS's primary violations of Section 206(4) and Rule 206(4)-3.

## IV.    THE COMPLAINT ADEQUATELY ALLEGES THAT MAURICE COHN VIOLATED EXCHANGE ACT SECTION 15(B)(1) AND AIDED AND ABETTED MADOFF'S VIOLATIONS OF EXCHANGE ACT SECTION 15(B)(1).

The Complaint alleges that Cohmad and the Cohns both violated as well as aided and

abetted violations of Section 15(b)(1) of the Exchange Act, 15 U.S.C. § 78o(b)(1), and Rule

15b3-1 thereunder, 17 C.F.R. § 240.15b3-1.  (¶¶ 91-97.)  Maurice Cohn moves to dismiss these

allegations; Cohmad and Marcia Cohn do not.  (Mem. at 42-43.)

Section 15(b)(1) of the Exchange Act and Rule 15b3-1 thereunder require all brokers or

dealers registered with the Commission to file an accurate Form BD with the Commission and to

correct any information in the Form BD if it is or becomes inaccurate for any reason.  Failing to

maintain an accurate Form BD constitutes a violation by the broker-dealer *and its control

persons* of Section 15(b) and Rule 15b3-1.  *SEC v. Moran*, 922 F. Supp. 867, 901 (S.D.N.Y.

1996) (noting that supplying complete and accurate information in Forms ADV and BD "furthers

the interest of public disclosure, informed decision making, and allows the SEC to monitor

securities transactions in order to fulfill the legislative mandate behind the establishment of the

securities acts.").

Ignoring the fact that Maurice Cohn is a principal of Cohmad, is both its Chairman and

Chief Executive Officer, and has substantial experience in the securities industry (¶ 15), the

Cohmad Defendants argue that the Complaint does not allege what was filed and when (for

primary liability), or how he substantially assisted Cohmad's violation of Section 15(b) and Rule 15b3-1. (Mem. at 42-43) However, as the Complaint alleges, rather than disclose the nature and extent of the relationship between Cohmad and BMIS in Cohmad's Form BD filings, Cohmad— through Maurice Cohn (and through Marcia Cohn, who is also a senior officer and principal of Cohmad) —knowingly and intentionally submitted inaccurate Form BD responses year after year so as to conceal that relationship. (¶¶ 15-16, 37-41.) Specifically, the Complaint alleges that from at least 2003, Cohmad violated Section 15(b)(1) and Rule 15b3-1 by failing to disclose in Forms BD filed with the Commission that (i) Cohmad was referring and introducing customers to BMIS (question 7); (ii) BMIS, another registered broker-dealer, was under the common control with Cohmad (question 10.A.) and (iii) Cohmad was in the business of finding investors for BMIS's advisory business and earning fees on such referrals (question 12.z.). (¶ 39.) And since at least 1999, Cohmad has filed 31 amendments to its Form BD, and none of these filings disclosed the true nature and extent of the relationship between Cohmad and BMIS, including the enormous number of accounts that Defendants have referred to BMIS. (¶ 40.)

The Complaint sufficiently alleges that Maurice Cohn knowingly violated Section 15(b)(1) and Rule 15b3-1 and, at the same time, that he affirmatively assisted Cohmad's violations of those provisions. *JP Morgan Chase Bank,* 406 F. Supp. 2d at 256. Even assuming Rule 9(b) applies, the Complaint contains more than enough of the "what, when, where and how" (Mem. at 42) to afford Maurice Cohn fair notice of plaintiff's claims and the factual grounds upon which they are based. *See Novak*, 216 F.3d at 314.

V.    THIS COURT HAS AUTHORITY TO IMPOSE CIVIL PENALTIES UNDER
      SECTION 209(E) OF THE ADVISERS ACT FOR AIDING AND ABETTING.

In an attempt to limit their exposure, the Cohmad Defendants claim that this Court cannot

impose civil monetary penalties under Section 209(e) of the Advisers Act for aiding and abetting

violations of that Act. They rely on a lone district court decision from the District of Columbia,

*see SEC v. Bolla*, 550 F. Supp. 2d 54 (D.D.C. 2008), which concludes that penalties for aiding

and abetting are unavailable under Section 209(e). The Commission respectfully submits that

the *Bolla* court reached the wrong result. The Advisers Act authorizes the Commission to seek,

and this Court to impose, penalties under Section 209(e) for aiding and abetting.[10]

There is no question that the Advisers Act expressly authorizes the Commission to bring

a civil injunctive action in federal court against aiders and abettors to seek monetary relief

against them. Section 209(d) explicitly so provides. 15 U.S.C. § 80b-9(d). There is also no

question that the Commission may seek civil penalties against 'violators' of the Advisers Act in

federal court. This power is explicitly granted in Section 209(e)(1). 15 U.S.C. § 80b-9(e)

(penalties are available against "any person" who "has violated" the Act, or who has "committed

[a] violation"). The question is whether federal courts lack authority to impose penalties against

aiders and abettors, even though the provision authorizing an injunctive action expressly refers to

aiders and abettors, because the provision authorizing civil penalties does not specifically refer to

aiding and abetting, but broadly authorizes penalties for 'violations' of the statute.

Section 214 of the Advisers Act grants federal courts jurisdiction "to enjoin any violation

of" the Act" and, like Section 209(e), it uses the term "violation." 15 U.S.C. § 80b-14. If

"violation" does not encompass aiding and abetting, then it creates an absurd result when Section

---

[10]    The question is currently one of several issues on appeal to the Second Circuit in *SEC v. DiBella*, Nos. 08-1673-cv(L) & 3-8797-cv(CON) (2d Cir. argued May 14, 2009).

214 is read with Section 209(d):  it would authorize the Commission to seek injunctions against both primary violators and aiders and abettors, but grant courts jurisdiction to enjoin only primary violators.  Reading Section 209(e) with Section 209(d) likewise creates an absurd result if "violation" does not encompass aiding and abetting:  it would force the Commission to commence two cases whenever the underlying conduct merited injunctive relief—one action in federal court pursuant to Section 209(d) to obtain injunctive relief and, separately, an administrative proceeding (where injunctive relief is unavailable) pursuant to Section 203(k) to impose civil penalties.  It is well-settled that "[a] statute should be interpreted in a way that avoids absurd results."  *United States v. Dauray*, 215 F.3d 257, 264 (2d Cir. 2000).  *See also See City of New York v. Beretta U.S.A. Corp.*, 524 F.3d 385, 401 (2d Cir. 2008) (citing *EEOC v. Commercial Office Prods. Co.*, 486 U.S. 107, 120 (1988)).  Courts also have long recognized a strong public policy against multiple lawsuits based on common facts proceeding simultaneously in different forums.  *See Wyndham Assocs. v. Bintliff*, 398 F.2d 614, 619 (2d Cir. 1968) (recognizing strong policy in favor of litigating related claims in the same tribunal to avoid waste and inconsistent results); *Morgan Guaranty Trust Co. of New York v. Tisdale*, No. 95 Civ. 8023 (BSJ), 1996 WL 544240, at * 9 (S.D.N.Y. Sept. 25, 1996) (same).  There is no reason to read Section 209(e) in a way that would lead to such nonsensical results.

In addition, at the time Section 209(e) was enacted, a "violation" was understood to include aiding and abetting.  Section 209(e) was enacted contemporaneously with, and tracked the language of, Exchange Act Section 21(d)(3), 15 U.S.C. 78u(d)(1).  These parallel provisions were placed into the securities laws by the Securities Enforcement Remedies and Penny Stock Reform Act of 1990 (the "Remedies Act").  Unlike Section 209(d), the Exchange Act did not expressly refer to aiding and abetting.  Rather, the Exchange Act afforded judicial remedies for a

"violation" of its provisions, and courts of appeal had uniformly and for years read those provisions, such as Section 21(d)(1), 15 U.S.C. 78u(d)(1), to cover aiders and abettors. *See Central Bank*, 511 U.S. at 192-94 & n.1 (dissent).[11]  The distinction between primary and secondary violations did not come to a head until *Central Bank*, five years after the Remedies Act added Section 209(e) to the Advisers Act (and *Central Bank* involved aiding and abetting liability, not remedies).  In any event, Section 209(e), was drafted in light of how the securities laws were being interpreted at the time that it was drafted—and in 1990 a "violation" included aiding and abetting.  There is no reason to accord it a different meaning now.

The court in *Bolla* reached the contrary result by comparing Section 209(e) with Section 209(d) (distinguished above) and Section 203(i) of the Advisers Act, and with Exchange Act Section 20(e), all of which explicitly apply to primary violators and aiders and abettors.  Section 203(i) was added to other statutory provisions concerning administrative proceedings and remedies (Sections 203(e) & (f)), also with their own history.  Those provisions track Exchange Act Sections 15(b)(4)-(b)(6), applicable to brokerage firms and their personnel.  They need have no bearing on provisions governing judicial remedies under either Act.  *See Clay v. United States*, 537 U.S. 522, 528-531 (2003) (two statutory sections with varied language did not have different meanings); *Barnhart v. Peabody Coal Co.*, 537 U.S. 149, 168 (2003) ("We do not read

---

[11]    *Central Bank*, although it was a private action, was seen by some as casting doubt on the scope of authority for Commission actions. In 1995, Congress overruled *Central Bank* as it might apply to Commission actions under the statute involved by adding Section 20(e) to the Exchange Act to make this clear.  *SEC v. Fehn*, 97 F.3d 1276, 1282-88 (9th Cir. 1996); *see Stoneridge Inv. Partners, LLC v. Scientific-Atlanta, Inc.*, 552 US 148, 128 S. Ct. 761, 771-72 (2008) (Section 20(e) is a provision "restoring" authority for "[a]iding and abetting liability" in "actions brought by the SEC but not by private parties"); *SEC v. Lybrand*, 200 F. Supp. 2d 384, 398-99 (S.D.N.Y. 2002) ("Congress passed [Section 20(e)] to clarify that the SEC retained the authority to bring [aiding and abetting] actions after" Central Bank), *aff'd on other grounds sub nom.*, *SEC v. Kern*, 425 F.3d 143 (2d Cir. 2005).

the enumeration of one case to exclude another unless it is fair to suppose that Congress considered the unnamed possibility and meant to say no to it."); *United States v. Bryser*, 954 F.2d 79, 83-84 (2d Cir. 1992) ("Congress' failure to fix" a later-added paragraph "to conform to" an earlier-enacted statutory section did not "represent[] a deliberate policy choice"); *United States v. Councilman*, 418 F.3d 67, 73-75 (1st Cir. 2005) (presumption of different meanings "rebutted" by consideration of "the statute's language, structure, [and] circumstances," including whether "the history of the two provisions is complex").  As for Exchange Act Section 20(e), that provision was added after Advisers Act Section 209(e) to clarify aiding and abetting liability after *Central Bank*.

     For the foregoing reasons, this Court should reject the Cohmad Defendants' argument concerning Section 209(e).  The Advisers Act authorizes the Commission to seek, and this Court to impose, civil monetary penalties for aiding and abetting.

## CONCLUSION

For the reasons set forth above, the Commission respectfully requests that the Court deny

the Cohmad Defendants motion to dismiss in its entirety.[12]


Dated: New York, New York
      October 2, 2009

                             By:    s/ Vincent P. Sherman
                                      Vincent P. Sherman
                                      Alexander M. Vasilescu
                                        Israel Friedman
                                        Preethi Krishnamurthy
                                        Attorneys for Plaintiff
                                        Securities and Exchange Commission
                                        New York Regional Office
                                        3 World Financial Center
                                        New York, NY  10281-1022
                                        (212) 336-1100

---

[12]      If the Court nevertheless dismisses any of the Commission's claims against the Cohmad Defendants, the Commission respectfully requests that the Court grant the Commission leave to replead such claims.  "It is the usual practice upon granting a motion to dismiss to allow leave to replead."  *Cortec Indus., Inc. v. Sum Holding L.P.*, 949 F.2d 42, 48 (2d Cir. 1991); *see also* Fed. R. Civ. P. 15(a) ("The court should freely give leave [to amend] when justice so requires."); *Acito*, 47 F.3d at 55 ("Leave to amend should be freely granted, especially where dismissal of the complaint was based on Rule 9(b).").