UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - -X
SECURITIES AND EXCHANGE COMMISSION,

Plaintiff,

- against -

COHMAD SECURITIES CORPORATION,
MAURICE J. COHN, MARCIA B. COHN,
and ROBERT M. JAFFE,

Defendants.
- - - - - - - - - - - - - - - - - - - - - - -X

09 Civ. 5680 (LLS)

Opinion and Order

The Securities and Exchange Commission sues defendants for participating in the Ponzi scheme perpetrated by Bernard L. Madoff through the investment advisory segment of Bernard L. Madoff Investment Securities LLC ("BMIS"). It alleges that Madoff used defendant Cohmad Securities Corporation ("Cohmad"), a registered broker-dealer, to market his investment advisory business. BMIS allegedly paid Cohmad and its representatives fees for recruiting prospective clients to BMIS, from which Cohmad derived the majority of its revenue. The individual defendants are Maurice J. Cohn, Cohmad's Chairman and Chief Executive Officer; Marcia B. Cohn, its President, Chief Operating Officer, and Chief Compliance Officer; and Robert M. Jaffe, its Vice President. They are also each partial owners of Cohmad.

Invoking Rules 12(b)(6) and 9(b) of the Federal Rules of Civil Procedure, defendants move to dismiss parts of the SEC's complaint. Specifically, they move to dismiss the securities fraud claims, which assert violations, and aiding and abetting violations, of

Section 10(b) of the Securities Exchange Act of 1934 ("Exchange Act"), 15 U.S.C. § 78j(b), and Rule 10b-5 thereunder, 17 C.F.R. § 240.10b-5; violations of Section 17(a) of the Securities Act of 1933 ("Securities Act"), 15 U.S.C. § 77q(a); and aiding and abetting violations of Sections 206(1) and (2) of the Investment Advisers Act of 1940 ("Advisers Act"), 15 U.S.C. §§ 80b-6(1) and (2). Cohmad and the Cohns also move to dismiss the claims for aiding and abetting violations of technical registration, compensation, and filing regulations under Section 15(b)(7) of the Exchange Act, 15 U.S.C. § 78o(b)(7), and Rule 15b7-1 thereunder, 17 C.F.R. § 240.15b7-1; Section 206(4) of the Advisers Act, 15 U.S.C. § 80b-6(4), and Rule 206(4)-3 thereunder, 17 C.F.R. § 275.206(4)-3; and, as against Maurice Cohn only, Section 15(b)(1) of the Exchange Act, 15 U.S.C. § 78o(b)(1), and Rule 15b3-1 thereunder, 17 C.F.R. § 240.15b3-1.[1] They also move to strike the SEC's request for civil penalties for aiding and abetting violations of the Advisers Act.

There is nothing inherently fraudulent about referring customers to an investment adviser for fees, and the complaint does not allege statements or omissions by defendants that are fraudulent absent awareness or notice that Madoff's investment advisory business was a sham. Thus, to state its securities fraud claims, the SEC must show that defendants knew of, or recklessly disregarded, Madoff's fraud. In other words, one who conducts

1 The SEC also asserts claims for violations, and aiding and abetting violations, of Section 17(a) of the Exchange Act, 15 U.S.C. § 78q(a), and Rule 17a-3 thereunder, 17 C.F.R. § 240.17a-3, which defendants do not move to dismiss.

normal business activities while ignorant that those activities are furthering a fraud is not liable for securities fraud.

In contrast, there is no need for the SEC to show defendants' knowledge of Madoff's fraud to state valid claims for technical rule violations.

**RULES 12(b)(6) AND 9(b)**

On a motion to dismiss under Rules 12(b)(6) and 9(b) of the Federal Rules of Civil Procedure, the Court must accept as true the factual allegations in the complaint, and draw all reasonable inferences in the plaintiff's favor. Mills v. Polar Molecular Corp., 12 F.3d 1170, 1174 (2d Cir. 1993).

To survive a motion to dismiss under Rule 12(b)(6),

> a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face. A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged. The plausibility standard is not akin to a probability requirement, but it asks for more than a sheer possibility that a defendant has acted unlawfully. Where a complaint pleads facts that are merely consistent with a defendant's liability, it stops short of the line between possibility and plausibility of entitlement to relief.

Ashcroft v. Iqbal, __ U.S. __, 129 S. Ct. 1937, 1949 (2009) (internal citations and quotation marks omitted).

Allegations of fraud must also comply with Rule 9(b), which requires that the plaintiff "state with particularity the circumstances constituting fraud." This rule "permits scienter [guilty knowledge] to be demonstrated by inference, [but] this must

not be mistaken for license to base claims of fraud on speculation and conclusory allegations. An ample factual basis must be supplied to support the charges." Wood ex rel. U.S. v. Applied Research Assocs., Inc., 328 F. App'x 744, 747 (2d Cir. 2009) (internal quotation marks omitted).

**SECURITIES FRAUD**

Madoff's fraud was the use of elaborate machinery, including falsifying account statements and trade confirmations, to promote the illusion that he was making securities transactions with investors' money, when the reality was that "when earlier investors sought to collect their 'profits,' Madoff simply paid them out of the capital received from newer investors." Anwar v. Fairfield Greenwich Ltd., __ F. Supp. 2d __, No. 09 Civ. 0118, 2009 WL 5103234, at *4 (S.D.N.Y. Dec. 23, 2009). However, nowhere does the complaint allege any fact that would have put defendants on notice of Madoff's fraud.

Rather, the complaint supports the reasonable inference that Madoff fooled the defendants as he did individual investors, financial institutions, and regulators. As it alleges, Madoff is a former Chairman of the NASDAQ stock market. BMIS has existed since 1960. Maurice Cohn is Madoff's former neighbor. They formed Cohmad in 1985, and Marcia Cohn joined in 1988, before Madoff allegedly began operating BMIS's investment advisory business as a fraud in 1991. The Cohns worked in Cohmad's New York office on the 18th and 19th floors of BMIS's New York premises, from which BMIS

operated legitimate market-making and proprietary trading businesses. BMIS's fraudulent investment advisory business was on the 17th floor. Jaffe was farther removed from the site of the fraud, operating Cohmad's Boston office. Defendants' are claimed to have referred prospective clients to BMIS. They are not alleged to have had a role in managing clients' funds. When clients called Cohmad with questions about their BMIS accounts, the Cohns checked "with Madoff or employees on BMIS' 17th floor to find out the answers." Compl. ¶ 35. The individual defendants maintained their own BMIS accounts. Outside of its referral business, "Cohmad had some 600 retail brokerage accounts which, for many years, Cohmad cleared through the broker-dealer Bear Sterns Securities Corp.," id. ¶ 14, and it executed trades on the New York Stock Exchange for BMIS's legitimate market-making business. Cohmad is not alleged to have engaged in wrongdoing in those activities.

The allegations of defendants' scienter can be grouped into four categories, but whether considered individually or collectively, they do not show that defendants knew of, or recklessly disregarded, Madoff's fraud:

**1. Cohmad's Compensation Arrangement with BMIS**

The SEC argues that the Cohns' fraudulent intent can be inferred from Cohmad's compensation arrangement with BMIS, id. ¶ 27:

> The incentive for Cohmad representatives was a rich compensation structure. Madoff compensated Cohmad each year (in monthly installments) with a percentage (declining from 1% to .25% over the years) of the original capital investment brought into BMIS' advisory business by Cohmad representatives for as long as the

> account was open. However, to the extent that any withdrawals were made from the investor's account, the amount of capital subject to the fee calculation was reduced. The vast majority of these payments was passed on to the representatives in quarterly installments.

In 2002, the arrangement changed for Maurice Cohn, and he received a flat fee of $2 million a year.

Cohmad's compensation arrangement with BMIS provided incentives to induce customers to invest with BMIS and "discourage investors from withdrawing any funds that might exceed the amount of the individual investments." Id. ¶ 57. That does not indicate fraud. The compensation structure was consistent with Cohmad's business, which existed before Madoff's fraud began. Cohmad referred customers to a purported investment adviser and provided customer service, but it had no role in investment decisions, so it is logical that Cohmad did not earn fees on "profits" from investment. The decrease in the fees over time from 1% to .25% is inconsistent with any inference that Madoff was inducing defendants to participate in a fraud and thereby "put the Defendants['] licenses, and the individual defendants' livelihoods, at risk," id. ¶ 6. See Shields v. Citytrust Bancorp, Inc., 25 F.3d 1124, 1130 (2d Cir. 1994) ("In looking for a sufficient allegation of motive, we assume that the defendant is acting in his or her informed economic self-interest."). No inference of fraudulent motive can be drawn from the change in compensation for Maurice Cohn in 2002, because there are no allegations that it resulted in higher pay than he was earning before, and the change is not tied to any

suspicious event. Compare Kalnit v. Eichler, 264 F.3d 131, 139 (2d Cir. 2001) (providing example of fraudulent motive "where plaintiff alleged that defendants misrepresented corporate performance to inflate stock prices while they sold their own shares").

Since defendants' fraudulent motive is not apparent, "the strength of the circumstantial allegations must be correspondingly greater." Id. at 142.

**2. Madoff's Requests for Secrecy**

The SEC argues that defendants' fraudulent intent can be inferred from allegations that Madoff requested secrecy in marketing BMIS, and that defendants complied. According to the complaint, "Madoff directed Cohmad and the Cohns to maintain a cloud of secrecy about how BMIS was marketed, banning all written marketing materials, cold calls, and emails." Compl. ¶ 53. Madoff also "communicated to the Defendants that he would not accept investments from anyone who worked in the finance or banking industry" because "sophisticated investors would ask 'too many questions.'" Id. ¶ 48. Thus, to recruit customers, id. ¶ 26,

> Cohmad's representatives strategically circulated among wealthy individuals in exclusive milieus - New Jersey golf clubs, Palm Beach Country Club, and the like - and offhandedly mentioned that they were affiliated with Madoff. The representatives projected themselves as individuals who became wealthy through BMIS, had no need to work, and merely frequented country clubs. When prospective investors asked if the representatives could make an introduction to Madoff so they could invest with BMIS, the Cohmad representatives would agree to try to put in a good word with Madoff and see if they could get the investors in. Cohmad and its representatives would then assist and arrange the opening of accounts with BMIS.

That Madoff's secrecy warned defendants of fraud amounts to an argument of "fraud by hindsight," which the Second Circuit "has rejected as a basis for a securities fraud complaint." Stevelman v. Alias Research, Inc., 174 F.3d 79, 85 (2d Cir. 1999). The complaint itself offers what defendants may reasonably have perceived was a neutral explanation for Madoff's secrecy: that "Madoff had a clever marketing strategy" by which "He cultivated an aura of success and secrecy surrounding BMIS, projecting to a social network of wealthy friends and investors that he was highly successful and did not need to market or solicit to obtain investments." Compl. ¶ 23. That strategy was successful in that, "By creating an air of prestige and exclusivity, many of BMIS' victims felt privileged to be allowed to invest with Madoff and BMIS and many prospective investors angled for ways to get in." Id. ¶ 24. It did not give notice of fraud because, as Cohmad and the Cohns explain, "anyone who watches TV commercials or reads magazine ads can attest" that "the projection of an 'aura of exclusivity' is a common marketing tactic." Cohmad & Cohn Mem. 25.

**3. Regulatory Violations**

The SEC argues that defendants' fraudulent intent can be inferred from allegations that Cohmad failed to disclose the full extent of its relationship with BMIS in its regulatory filings and books and records, and that defendants were aware that BMIS failed to register them as associated with BMIS.

The SEC points to Cohmad's Form BD and amendments filed with

the SEC the past six years, Compl. ¶ 39:

- Question 7 on the Form BD asks: "Does applicant refer or introduce customers to any broker or dealer?" Cohmad answered "Yes," but only disclosed Bear Sterns, its clearing firm for the retail brokerage business and failed to disclose any reference to BMIS, to which it referred over 800 customers. [emphasis in complaint]

. . . .

- Question 12 asks the filer to identify "Types of Business" engaged in and Cohmad did not identify its primary business of obtaining investors for BMIS. Although the catchall box for "Other" was checked, Cohmad did not disclose its predominant business referring customers to BMIS in response to the question, but instead identified its business as "Development of Trading, Hedging and Investment Strategies."

In its 2007 Annual Audit Report filed with the SEC, Cohmad disclosed the amount of its fees from BMIS, but it classified them as "brokerage service fees," id. ¶ 42, and in its quarterly FOCUS reports filed with the Financial Industry Regulatory Authority, it classified them as "Fees for account supervision, investment advisory and administrative services," id. ¶ 43. Cohmad also maintained "no meaningful records" of its referral business "Other than an ongoing tally of amounts invested (less withdrawals of principal)." Id. ¶ 44.

Absent facts showing that defendants were on notice of Madoff's fraud, the chain of inferences that Cohmad's recent regulatory disclosures' failure "to accurately identify the nature and scope of the business arrangement between Cohmad and BMIS," id. ¶ 41, showed an intention to conceal that relationship, and further

that the concealment was because any defendant knew that Madoff was committing fraud, is speculative and flimsy.

**4. Irregularities in Jaffe's Personal BMIS Accounts**

As to Jaffe, the SEC also relies on paragraphs 60 and 62 of the complaint regarding his personal BMIS accounts:

> 60. BMIS directly compensated Jaffe for the numerous investors he brought to BMIS. Unlike the other Cohmad representatives, Jaffe's compensation did not come via Cohmad. Instead, Jaffe received compensation directly from BMIS, through his personal BMIS accounts. Through these accounts, BMIS provided Jaffe with outsized returns: Jaffe received annual returns of up to 46% while the investors that Jaffe brought into BMIS received annual returns of only 12-18%. Based on these outsized returns, Jaffe made large withdrawals from his BMIS accounts, totaling at least $150 million between 1996 and 2008.
>
> . . . .
>
> 62. Jaffe frequently made specific requests to BMIS seeking a specific dollar amount of gains for a given period. Some of these were requests for specific dollar amounts of "long term gains" on specific days. A BMIS employee would then insert a backdated trade going back days, weeks or even months that afforded Jaffe's account that particular gain and then mailed confirmations and account statements to Jaffe reflecting those trades. This was a highly unusual arrangement, particularly given that the instructions requested specific dollar amounts and were not for the sale of any particular securities, but were followed by confirmations reflecting trades that antedated the requests.

The basis for the assertion that he was part of the fraud is that "Jaffe received annual returns of up to 46% while the investors that Jaffe brought into BMIS received annual returns of only 12-18%," id. ¶ 60, but the complaint does not allege when or how often Jaffe received "outsized returns" to support the

inference that they were unusual or suspicious. In light of Madoff's established reputation as a successful and respected investment adviser, the high returns he produced were not generally perceived (even by professionals) as a badge of fraud.

Similarly, the complaint does not allege how often Jaffe's account reflected a backdated trade. An irregular trade date over the twelve years that Jaffe maintained an account with BMIS does not show reckless disregard of Madoff's fraud. Jaffe reasonably might believe that his account reflected an innocent bookkeeping or typographical error.

Thus, the SEC has failed to allege facts giving rise to a plausible inference of the Cohns' or Jaffe's fraudulent intent, and the securities fraud claims against them are dismissed.[2] Since the SEC has failed to plead the Cohns' or Jaffe's fraudulent intent (and it does not argue that Madoff's intent can be imputed to Cohmad), the securities fraud claims against Cohmad are dismissed as well.

**REGISTRATION, COMPENSATION, AND FILING VIOLATIONS**

Cohmad and the Cohns also move to dismiss claims for aiding and abetting technical registration, compensation, and filing violations of the federal securities laws. These claims do not

---

2 The SEC argues that Jaffe's assertion of his Fifth Amendment privilege during his SEC investigative testimony "provides a sufficient and independent reason for denying his motion to dismiss in its entirety." Pl.'s Opp. to Jaffe Mot. 23. The adverse inference that may be drawn from Jaffe's invocation of his Fifth Amendment privilege is weak. Given the numerous criminal investigations arising from Madoff's fraud, there is a justifiable concern for anyone who did business with BMIS's investment advisory unit, as did Jaffe, that he or she will be hauled into the criminal probe.

require awareness or notice of Madoff's fraud. Nor are they subject to Rule 9(b)'s standards for alleging fraud. The SEC has pleaded those claims apart from its fraud allegations.

Because the SEC asserts aiding and abetting liability, however, it must plead (i) the existence of the technical violation by the primary party; (ii) knowledge of this violation on the part of defendants; and (iii) substantial assistance by defendants in the achievement of the violation. See SEC v. DiBella, 587 F.3d 553, 566 (2d Cir. 2009).

**1. Aiding and Abetting Violations of Section 15(b)(7) of the Exchange Act, and Rule 15b7-1 Thereunder, and Section 206(4) of the Advisers Act, and Rule 206(4)-3 Thereunder**

Rule 15b7-1, pursuant to Section 15(b)(7) of the Exchange Act, makes it unlawful for a registered broker-dealer to "effect any transaction in, or induce the purchase or sale of, any security unless any natural person associated with such broker or dealer who effects or is involved in effecting such transaction is registered." Rule 206(4)-3, pursuant to Section 206(4) of the Advisers Act, prohibits an investment adviser from paying a referral fee unless certain pre-requisites have been met. The SEC alleges that Cohmad and the Cohns aided and abetted BMIS's violations. In essence, it argues that they knew BMIS was in violation of the rules but nevertheless continued to conduct their referral business with BMIS.

That fails to allege that Cohmad or the Cohns aided and

abetted BMIS's violations. The sole authority cited by the SEC in which aiding and abetting liability was imposed under either rule is instructive. In Dennis Ward, Initial Decision Release No. 226, 80 SEC Docket 453 (May 8, 2003), an SEC Administrative Proceeding, a registered broker aided and abetted his brokerage firm's violation of Rule 15b7-1, as well as Rule 17a-3 which requires accurate records, where he "signed subscription documents, new account forms, order tickets, and other documents falsely representing that he was the registered representative" for securities sales made by his business associate whom he knew was not registered. In contrast, here the SEC does not allege misconduct by Cohmad or the Cohns aimed at enabling BMIS's rule violations, but only that they continued their routine business with BMIS. Cf. IIT v. Cornfeld, 619 F.2d 909, 922 (2d Cir. 1980) ("in order to be held as an aider and abettor, a person must 'in some sort associate himself with the venture, that he participate in it as something that he wishes to bring about, that he seek by his action to make it succeed'"), quoting United States v. Peoni, 100 F.2d 401, 402 (2d Cir. 1938). The complaint does not allege that the Cohns held themselves out as BMIS registered representatives or hid their involvement from clients they solicited, in order to enable BMIS's Rule 15b7-1 violations. Indeed, their participation was transparent because they allegedly assisted with opening BMIS accounts and fielded customer inquiries.

Accordingly, the SEC's claims against Cohmad and the Cohns for aiding and abetting violations of Section 15(b)(7) of the Exchange Act, and Rule 15b7-1 thereunder; and Section 206(4) of the Advisers Act, and Rule 206(4)-3 thereunder, are dismissed.

**2. Aiding and Abetting Violations of Section 15(b)(1) of the Exchange Act, and Rule 15b3-1 Thereunder, as Against Maurice Cohn**

Rule 15b3-1, pursuant to Section 15(b)(1) of the Exchange Act, requires a broker-dealer to correct its Form BD and amendments if they are inaccurate. The SEC alleges that Cohmad was the primary violator, and that the Cohns aided and abetted its violation. Maurice Cohn disputes whether the SEC has pleaded his substantial assistance because the complaint alleges that Marcia Cohn signed each of the filings at issue.

Maurice Cohn cannot escape aiding and abetting liability under Rule 15b3-1 even though only Marcia Cohn may have signed Cohmad's filings. He is allegedly Cohmad's largest owner (48%), and its founder, Chairman, and Chief Executive Officer. A reasonable juror could conclude that Maurice Cohn had the duty and authority to see that the filings were corrected, and that his failure to do so over the six years that Cohmad's filings were allegedly inaccurate substantially assisted Cohmad's violation.

**<u>CIVIL PENALTIES UNDER THE ADVISERS ACT</u>**

Cohmad and the Cohns move to dismiss the SEC's claim for civil penalties for aiding and abetting violations of the Advisers Act.

They argue that the Advisers Act does not grant authority to impose penalties for aiding and abetting violations. After briefing on their motion closed, the Second Circuit in DiBella, 587 F.3d at 571-72, held that "the civil penalty provision encompasses both primary and secondary violators of the Advisers Act." This Court is bound by that decision. Thus, this aspect of Cohmad and the Cohns' motion is denied.

**LEAVE TO REPLEAD**

The SEC requests leave to replead if any of its claims are dismissed. It has not previously amended its complaint, and defendants offer no persuasive reason why amendment would be futile. Accordingly, the SEC is granted leave to replead its defective claims by filing an amended complaint within 30 days from the date of this opinion and order.

**CONCLUSION**

Jaffe's motion (Docket No. 12) is granted, and Cohmad and the Cohns' motion (Docket No. 17) is granted in part and denied in part. In particular, the claims for securities fraud (Claims One through Four) are dismissed as against all defendants. The claims for aiding and abetting violations of Section 206(4) of the Advisers Act, and Rule 206(4)-3 thereunder, (Claim Five) and Section 15(b)(7) of the Exchange Act, and Rule 15b7-1 thereunder, (Claim Seven) are dismissed as against Cohmad and the Cohns. Cohmad and the Cohns' motion is otherwise denied.

The SEC is granted leave to replead its defective claims by filing an amended complaint within 30 days from the date of this opinion and order.

So ordered.

Dated: New York, New York
February 1, 2010

Louis L. Stanton
LOUIS L. STANTON
U.S.D.J.